UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X

NOBLE RESOURCES S.A.,

               Plaintiff,

    - against -

YUGTRANZITSERVIS LTD.,

              Defendant.

-------------------------------------------------X

08 CV _____
ECF CASE

## VERIFIED COMPLAINT

    Plaintiff, NOBLE RESOURCES S.A. (hereinafter referred to as "Plaintiff" or "Noble"),

by and through its attorneys, Tisdale Law Offices LLC, as and for its Verified Complaint against

the Defendant, YUGTRANZITSERVIS LTD. (hereinafter referred to as "Defendant") alleges,

upon information and belief, as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.

    2.    At all times material to this action, Plaintiff was, and still is, a foreign company

duly organized and operating under foreign law with a principal place of business in Switzerland.

    3.    Upon information and belief, Defendant was, and still is, a foreign corporation or

other business entity organized under and existing by virtue of foreign law with a place of

business in Nicosia, Cyprus.

    4.    By a contract dated April 13, 2007, Plaintiff agreed to buy 25,000 mt of Russian

Milling Wheat (the "cargo") from the defendant. *See April 13, 2007 Contract annexed hereto as

Exhibit "1."*

5.      The contract provided that the cargo be delivered "within July 15 – August 15, 2007" for loading in Novorossiysk port.

6.      The contract further provided that the Plaintiff was to nominate a suitable vessel and tender her Notice of Readiness at Novorossiysk loading port and to be ready to load the cargo without extension.

7.      On or about July 14, 2007, the Plaintiff nominated the M/V SOUTHGATE (hereinafter the "Vessel") and on or about July 24, 2007, the defendant accepted the Plaintiff's nomination.

8.      In accordance with the contract, the Vessel arrived at the port of Novorossiysk and tendered her Notice of Readiness on August 2, 2007.  On August 3, 2007, the Vessel passed its hold inspection and was ready to load cargo.

9.      Despite due demand, the Defendant failed to make arrangements to berth and load the Vessel or to cooperate with the Plaintiff within the delivery period agreed to in the contract.

10.      After waiting for an additional six days after the end of the delivery period, the Plaintiff had no option but to declare the Defendant in default and to re-fix the Vessel.

11.      As a result of Defendant's breaches of the contract, Plaintiff has suffered damages in the principal amounts of $3,125,000 for the Defendant's default and $788,623.87 for wasted vessel costs. *See Plaintiff's Arbitration Claim Submission annexed hereto as Exhibit "2" at 7.*

12.      Pursuant to the contract, any disputes arising thereunder shall be referred to arbitration in London, England in accordance with GAFTA rules.

13.      Plaintiff has commenced arbitration in accordance with the contract and appointed its arbitrator.

14.   Despite due demand, Defendant has failed to pay the sums due and owing as a result of its breaches of the contract.

15.   Interest, costs and attorneys' fees are routinely awarded to the prevailing party in London Arbitration proceedings.  As best as can now be estimated, Plaintiff expects to recover the following amounts:

| | | | | |
|---|---|---|---|---|
| A. | Principal claim: | | | $3,913,623.87 |
| | a. | Default Damages | $3,125,000.00 | |
| | b. | Wasted Vessel Costs | $788,623.87 | |
| B. | Estimated interest on claims:<br>3 years at 7.5% | | | $978,291.75 |
| C. | Estimated attorneys' fees: | | | $250,000.00 |
| **Total** | | | | **$5,150,915.50** |

16.   The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

17.   The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any property of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant, to compel arbitration and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint, failing which default judgment be entered against it in the sum of **$5,150,915.50.**

B.     That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$5,150,915.50** belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishee(s) to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.     That pursuant to 9 U.S.C. §§201 et seq. this Court recognize and confirm any London arbitration award in Plaintiff's favor against the Defendant as a judgment of this Court;

D.     That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

E.    That the Plaintiff have such other, further and different relief as the Court

may deem just and proper.

Dated: April 24, 2008
      New York, NY

                                The Plaintiff,
                                NOBLE RESOURCES SA,

By: _____
                                Lauren C. Davies (LD 1980)
                                Thomas L. Tisdale (TT 5263)
                                TISDALE LAW OFFICES LLC
                                11 West 42nd Street, Suite 900
                                New York, NY 10036
                                (212) 354-0025 – phone
                                (212) 869-0067 – fax
                                ldavies@tisdale-law.com
                                ttisdale@tisdale-law.com

## ATTORNEY'S VERIFICATION

State of Connecticut )
                  )    ss.:    City of Southport
County of Fairfield   )

1. My name is Lauren C. Davies.

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am an Attorney in the firm of Tisdale Law Offices, LLC, attorneys for the Plaintiff.

4. I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7. I am authorized to make this Verification on behalf of the Plaintiff.

Dated:       April 24, 2008
               Southport, CT

                                Lauren C. Davies

# EXHIBIT 1

Yugtranzitservis Ltd.
Poumpoulinas 15 Office 301/302 P.C.
1060 Nicosia
Cyprus

Contract nr : 200704147
Date          : 13-04-2007
Page 1

| | | |
|---|---|---|
| Sellers | : | Yugtranzitservis Ltd., Poumpoulinas 15 Office 301/302 P.C., 1060 Nicosia - Cyprus |
| Buyers | : | Noble Resources S.A., Avenue des Mousquines 4, 1005 Lausanne – Switzerland |
| Commodity | : | Russian Milling Wheat. Sound, loyal, merchantable, new crop. Free from alive insects and foreign smell. |

Quality:

| | | |
|---|---|---|
| — Moisture | max. | 14.0% |
| — Foreign matter | max. | 2.0% |
| — Protein | min. | 11.5% (Nx 5.7) on dry matter basis |
| — Falling no. (Hagberg) | min. | 230 sec. |
| — Wet gluten | min. | 23.0% as per ISO |
| — Test weight | min. | 77 kgs/hl |
| — Alveograph W | min. | 160 |
| — Bug damaged | max. | 1.5% |

Tests as per EU method (ISO).
Quality and condition final at loading as per certificates issued by GAFTA approved surveyor at Sellers' option and costs.
Weight final at loading as per weight certificate issued by GAFTA approved surveyor at Sellers' option and costs.
Fumigation at Sellers' expense. If fumigation with the active (forced) recirculation is required, additional expenses related to it to be compensated by Buyers.

| | | |
|---|---|---|
| Quantity | : | 25,000 metric tons, plus or minus 10% at Buyers' option and at contract price. |
| Delivery | : | within July 15th – August 15th, 2007, both dates included, to be narrowed in Sellers' option as a "window" for loading in Novorossiysk port. |

Vessel nominated by Buyers to tender her Notice of Readiness at Novorossiysk loading port and to be in all respects ready to load the cargo in Novorossiysk port "window" dates, without extension.
First and last day of the "window" to be included and to be advised by Sellers at the beginning of July, 2007, before shipping period commences. If the vessel will not arrive within the stipulated "window" days, Buyers to bear all expenses incurred in this connection, including but not limited to carrying charges, storage, expenses for loading, demurrage, detention, demurrage and/or detention of other arriving vessels in the port queue, interest, insurance and other normal carrying expenses.
Clauses 6 and 8 of GAFTA 49 not to apply.
Loading to be executed by direct method (wagon – board of the vessel).
Buyers to present self-trimming bulk carrier single decker vessel suitable for direct loading (wagon – board of the vessel). The vessel being nominated by Buyers should be confirmed or rejected by Sellers in writing (by means of E-mail or telefax) with indication of the vessel's parameters unacceptable to the loadport within 4 Novorossiysk port working hours after Buyers having presented vessel's description.

1

Contract nr : 200764147
Date        : 13-04-2007
Page 2

| | | |
|---|---|---|
| Price | : | USD 172.00 (say one hundred and seventy two US Dollars and nil cents) per metric ton, FOB Stowed/Trimmed Novorossiysk port, one/two berth (s). In case second berth at loading shifting expenses to be for Owners/Buyers account. |
| Payment | : | Payment shall be made 100 pct net CAD within 48 hours upon presentation of documents at Buyer's First Class European bank and shall be effected by telegraphic transfer. Costs for TT for Buyers' account. Costs/commissions in Buyer's bank for Buyers' account. Costs/commissions in Sellers' bank to be for Sellers' account. |

Sellers will supply the following documents:
— Commercial invoice stamped and signed;
— Full set of 3/3 Congen B/L, clean on board, freight prepaid
— Official Certificate of origin
— Official Phytosanitary certificate
— Non radiation certificate.
— Fumigation certificate.
— Quality and condition certificate of first class superintendent company proving the goods quality at time and place of loading
— Weight certificate of first class superintendent company proving the quantity loaded
— Holds cleanliness certificate

| | | |
|---|---|---|
| Pre-advice | | Buyers to give to Sellers 7 days provisional and 5/3 days, 24 hrs definite pre-advice with the following information:<br>— ETA<br>— Vessel's name<br>— Flag<br>— Dimensions of the vessel (LOA/BEAM/DM)<br>— Vessels' hatches, holds dimensions<br>— DWT<br>— AIRDRAFT |
| C/P | | Buyers to despatch copy of C/P / fixture recap to Sellers upon their request. |
| Loading Instructions | | Buyers to provide Sellers with final and precise documentary and fumigation instructions latest three working days before vessels' arrival at port of loading. All the shipping documents shall be made in English and/or with English translation. |
| Loading rate | | 5.000 metric tons per WWD of 24 consecutive hrs or pro rata, SSHEX EIU. |
| Notice | : | Notice of Readiness shall be tendered at the office of the agent at the load port between 08.00 AM and 05.00 PM local time on all days except Saturdays, Sundays and holidays. WIPON / WIFPON / WICCON / WIBON. |
| Laytime | : | Laytime shall commence at 08:00 hrs next working day after tender of valid Notice of Readiness (NOR). Time from Friday 5 p.m. (or from 5 p.m. on day preceding holidays) until 8 a.m. on Monday (or 8 a.m. on next business day) shall not to count even if used. |

Contract nr : 200704147
Date        : 13-04-2007
Page 3

| | | |
|---|---|---|
| Demurrage | : | Demurrage as per relevant C/P / fixture recap or if timecharter daily hire.  But max demurrage USD 18'000.—.  Despatch half demurrage. Calculation as per N.O.R. and S.O.F both signed by masters/shippers and ships agents and sent by fax to Seller and Buyer. Payment of agreed demurrage/despatch if any, to be settled within 60 days from vessels completion. |
| Vessel's agent | : | Vessel agents at loadport to be nominated by Owners and for the Owners' account and in Sellers' option. |
| Insurance | : | To be covered by Buyers at their own risk and costs, from the moment the goods pass the ship's rail at loading until completion of discharge. Buyers undertake to confirm insurance coverage upon first request from Sellers. |
| General conditions | : | All other terms, conditions and rules, not in contradiction with the above contained in Form 49 of GAFTA of which the parties admit that they have knowledge and notice, apply to this transaction and the details above given shall be taken as having been written into such form in the appropriate places. |
| Arbitration clause | : | Any dispute arising out or under this contract shall be settled by arbitration in accordance with the Arbitration Rules no.125 of the Grain and Feed Trade Association, in the edition current at the date of this contract, such rules forming part of this contract and of which both parties hereto shall be deemed to be cognizant. Arbitration to take place in London/England. |
| Commission | : | US$ 0.50 per mton payable by sellers |

On behalf of Buyers:                    Allgrain Brokers :                    On behalf of Sellers:

Effective 1ˢᵗ January 2006

# *Gafta No.49*

Copyright
### THE GRAIN AND FEED TRADE ASSOCIATION

## CONTRACT FOR THE DELIVERY OF GOODS
## FROM CENTRAL AND EASTERN EUROPE
## IN BULK OR BAGS
### FOB TERMS

*delete/specify as applicable

Date ..................................................................

1 SELLERS ........................................................................................................................................................
2
3 INTERVENING AS BROKERS..................................................................................................................
4
5 BUYERS.............................................................................................................................................................
6 have this day entered into a contract on the following terms and conditions.

8 1.  GOODS- (in bulk or in bags)....................................................................................................................
9     Packing - if in bags, to be uniform weight bags suitable to withstand ordinary wear and tear to destination, such bags to be taken and
10    paid for as goods. If in bulk, shipper has the option of shipping up to 10% in bags for stowage purposes, such bags to be taken and paid
11    for as goods.
12
13 2.  QUANTITY-...............................................................................................................tonnes of 1000 kilograms, plus or minus 5%
14    at Buyers' call.  In the event of more than one delivery being made, each delivery shall be considered a separate contract, but the margin
15    on the mean quantity sold shall not be affected thereby. Each mark/parcel shall stand as a separate parcel.
16
17 3.  PRICE-.................................................................................................................................per tonne of 1000 kilograms gross weight,
18
19    delivered Free On Board Buyers' Vessel(s) in ..............................................................................................................................
20
21 4.  BROKERAGE.................................................per tonne, to be paid by Sellers on the mean contract quantity, goods lost or not lost,
22    contract fulfilled or not fulfilled unless such non-fulfilment is due to the cancellation of the contract under the terms of the
23    Prohibition or Force Majeure Clause. Brokerage shall be due on the day shipping documents are exchanged or, if the goods are not
24    appropriated then brokerage shall be due on the 30th consecutive day after the last day for delivery.
25
26 5.  QUALITY-.....................................................................................................................................................................................
27    Condition – delivery shall be made in good condition.
28
30 6.  PERIOD OF DELIVERY .................................................................................................................. at Buyers' call.
31    Delivery during-
32    Nomination of Vessel- Buyers shall serve not less than ...........................................consecutive day's notice of the name and
33    probable readiness date of the vessel and the estimated tonnage required. The Sellers shall have the goods ready to be delivered to
34    the Buyers at any time within the contract period of delivery.
35    Buyers have the right to substitute the nominated vessel, but in any event the original delivery period and any extension shall not be
36    affected thereby. Provided the vessel is presented at the loading port in readiness to load within the delivery period, Sellers shall if
37    necessary complete loading after the delivery period, and carrying charges shall not apply.  In case of re-sales a provisional notice
38    shall be passed on without delay, where possible, by telephone and confirmed on the same day in accordance with the Notices
39    Clause.
40
41 7.  LOADING -Loading port ...........................................................................................................................................................
42    If a range is given, Sellers to declare port/berth(s)..............................days prior to commencement of the delivery period. Vessel(s)
43    to load in accordance with the custom of the port of loading unless otherwise stipulated.  Bill of lading shall be considered proof of
44    delivery in the absence of evidence to the contrary.
45
46
47 8.  EXTENSION OF DELIVERY- The contract period of delivery shall be extended by an additional period of not more than 21
48    consecutive days, provided that Buyers serve notice claiming extension not later than the next business day following the last day of the
49    delivery period. In this event Sellers shall carry the goods for Buyers' account and all charges for storage, interest, insurance and other
50    such normal carrying expenses shall be for Buyers' account, unless the vessel presents in readiness to load within the contractual
51    delivery period.

4

Any differences in export duties, taxes, levies etc, between those applying during the original delivery period and those applying during the period of extension, shall be for the account of Buyers. If required by Buyers, Sellers shall produce evidence of the amounts paid. In such cases the Duties, Taxes and Levies Clause shall not apply.

Should Buyers fail to present a vessel in readiness to load under the extension period, Sellers shall have the option of declaring Buyers to be in default, or shall be entitled to demand payment at the contract price plus such charges as stated above, less current FOB charges, against warehouse warrants and the tender of such warehouse warrants shall be considered complete delivery of the contract on the part of Sellers.

9.  INSURANCE- Marine and war risk insurance including strikes, riots, civil commotions and mine risks to be effected by Buyers with first class underwriters and/or approved companies. Buyers shall supply Sellers with confirmation thereof at least 5 consecutive days prior to expected readiness of vessel(s). If Buyers fail to provide such confirmation, Sellers shall have the right to place such insurance at Buyers' risk and expense.

10. PAYMENT-
    (a)  By cash in .............................................................................................................................

    against the following documents .......................................................................................................
    (b) No obvious clerical error in the documents shall entitle Buyers to reject them or delay payment, but Sellers shall be responsible for all loss or expense caused to Buyers by reason of such error, and Sellers shall on request of Buyers furnish an approved guarantee in respect thereto.
    (c) Amounts payable under this contract shall be settled without delay. If not so settled, either party may notify the other that a dispute has arisen and serve a notice stating his intention to refer the dispute to arbitration in accordance with the Arbitration Rules.
    (d) Interest – If there has been unreasonable delay in any payment, interest appropriate to the currency involved shall be charged. If such charge is not mutually agreed, a dispute shall be deemed to exist which shall be settled by arbitration. Otherwise interest shall be payable only where specifically provided in the terms of the contract or by an award of arbitration. The terms of this clause do not override the parties' contractual obligation under sub-clause (a).

11. EXPORT LICENCE - EC Export Licence if required, to be obtained by Buyers. For other countries export licence if required, to be obtained by Sellers.

12. DUTIES, TAXES AND LEVIES ON GOODS- Any EC export duties, taxes, levies, and refunds etc present or future in the country of origin, shall be for Buyers' account, otherwise national duties and taxes, present or future shall be for Sellers' account. For other countries any duties, taxes, levies, and refunds etc, present or future in the country of origin, shall be for Sellers' account.

13. PROHIBITION- In case of prohibition of export, blockade or hostilities or in case of any executive or legislative act done by or on behalf of the government of the country of origin of the goods, or of the country from which the goods are to be shipped, restricting export, whether partially or otherwise, any such restriction shall be deemed by both parties to apply to this contract and to the extent of such total or partial restriction to prevent fulfilment whether by shipment or by any other means whatsoever and to that extent this contract or any unfulfilled portion thereof shall be cancelled. Sellers shall advise Buyers without delay with the reasons therefor and, if required, Sellers must produce proof to justify the cancellation.

14. FORCE MAJEURE, STRIKES, ETC.- Should the execution of this contract or any unfulfilled portion thereof be prevented by a strike, lockout, riot or civil commotion, combination of workmen, breakdown of machinery, or fire, or any cause comprehended in the term "Force Majeure", provided that notice has been served by Sellers or Buyers, as appropriate, within 7 consecutive days from the occurrence, or not later than 21 days before the commencement of the delivery period, whichever is later, the time for delivery shall be extended for a period of 30 consecutive days. If delivery be delayed for more than 30 consecutive days, Buyers shall have the option of cancelling the delayed portion of the contract, such option to be exercised by Buyers serving notice to be received by Sellers not later than the first business day after the additional 30 consecutive days. If Buyers do not exercise this option, such delayed portion shall be automatically extended for a further period of 30 consecutive days. If delivery under this clause be prevented during the further 30 consecutive days extension, the contract shall be considered void. Buyers shall have no claim against Sellers for delay or non-delivery under this clause, provided that Sellers shall have supplied to Buyers, if required, satisfactory evidence justifying the delay or non-fulfilment.

15. ICE-
    (a) If FOB at an ocean-going port, should delivery or loading of the goods or any part thereof be prevented at any time during the last 30 days of the guaranteed delivery period or at any time during the guaranteed delivery period if such be less than 30 days, by reason of ice at port(s) of loading or elsewhere preventing the forwarding of the goods to such port or ports, then the Sellers shall be entitled, at the termination of such ice, to as much time, not exceeding 21 days, for delivery at such port(s) as was left for delivery under the contract prior to the outbreak of ice, and in the event of the time left for delivery under the contract being 14 days or less, a minimum extension of 14 days shall be allowed. In the event of further ice preventing delivery or loading of the goods during the time by which the guaranteed time of delivery has been extended by reason of the operation of the provisions of the foregoing paragraph, the additional extension shall be limited to the actual duration of such ice.
    (b) If FOB at an up-river port, should delivery or loading of the goods or any part thereof be prevented at any time during the last 30 days of the guaranteed delivery period or at any time during the guaranteed delivery period if such be less than 30 days, by reason of ice at port(s) of loading or elsewhere preventing the arrival of the vessel at the load port, then the Buyers shall be entitled at the termination of such ice to as much time, not exceeding 21 days, for delivery at such port(s) as was left for delivery under the contract prior to the outbreak of ice, and in the event of the time left for delivery under the contract being 14 days or less, a minimum extension of 14 days shall be allowed. In the event of further ice preventing delivery or loading of the goods during the time by which the guaranteed time of delivery has been extended by reason of the operation of the provisions of the foregoing paragraph, the additional extension shall be limited to the actual duration of such ice.
    (c) Buyers shall serve notice not later than 5 business days after the commencement of ice or 5 business days after the commencement of

49/2

the delivery period whichever is later if they intend to claim an extension of time for delivery under this clause.

(d) If required by either party, the other party must provide documentary evidence to establish any claim for extension under this clause.

(e) In the case of non-delivery made under the above circumstances the date of default shall be similarly deferred.

16. **NOTICES-** All notices required to be served on the parties pursuant to this contract shall be communicated rapidly in legible form. Methods of rapid communication for the purposes of this clause are defined and mutually recognised as: - either telex, or letter if delivered by hand on the date of writing, or telefax, or E-mail, or other electronic means, always subject to the proviso that if receipt of any notice is contested, the burden of proof of transmission shall be on the sender who claims, in the case of a dispute, establish, to the satisfaction of the arbitrator(s) or board of appeal appointed pursuant to the Arbitration Clause, that the notice was actually transmitted to the addressee. In case of resales/repurchases all notices shall be served without delay by sellers on their respective buyers or vice versa, any notice received after 1600 hours on a business day shall be deemed to have been received on the business day following. A notice to the Brokers or Agent shall be deemed a notice under this contract.

17. **NON-BUSINESS DAYS-** Saturdays, Sundays and the officially recognised and/or legal holidays of the respective countries and any days, which GAFTA may declare as non-business days for specific purposes, shall be non-business days. Should the time limit for doing any act or serving any notice expire on a non-business day, the time so limited shall be extended until the first business day thereafter. The period of delivery shall not be affected by this Clause.

18. **WEIGHING-** the terms and conditions of GAFTA Weighing Rules No.123 are deemed to be incorporated into this contract. Final at time and place of loading, as per GAFTA registered superintendent certificate at Sellers' choice and expense. Buyers have the right to attend at loading.

19. **SAMPLING, ANALYSIS AND CERTIFICATES OF ANALYSIS-** the terms and conditions of GAFTA Sampling Rules No. 124, are deemed to be incorporated into this contract. Samples shall be taken at time and place of loading. The parties shall appoint superintendents, for the purposes of supervision and sampling of the goods, from the GAFTA Register of Superintendents. Unless otherwise agreed, analysts shall be appointed from the GAFTA Register of Analysts

20. **DEFAULT-** In default of fulfilment of contract by either party, the following provisions shall apply: -

(a) The party other than the defaulter shall, at their discretion have the right, after serving notice on the defaulter, to sell or purchase, as the case may be, against the defaulter, and such sale or purchase shall establish the default price.

(b) If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be mutually agreed, then the assessment of damages shall be settled by arbitration.

(c) The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price established under (a) above or upon the actual or estimated value of the goods on the date of default established under (b) above.

(d) In all cases the damages shall, in addition, include any proven additional expenses which would directly and naturally result in the ordinary course of events from the defaulter's breach of contract, but shall in no case include loss of profit on any sub-contracts made by the party defaulted against or others unless the arbitrator(s) or board of appeal, having regard to special circumstances, in his/their sole and absolute discretion think fit.

(e) Damages, if any, shall be computed on the quantity called for, but if no such quantity has been declared then on the mean contract quantity and any option available to either party shall be deemed to have been exercised accordingly in favour of the mean contract quantity.

21. **CIRCLE-** Where Sellers re-purchase from their Buyers or from any subsequent Buyer the same goods or part thereof, a circle shall be considered to exist as regards the particular goods so re-purchased, and the provisions of the Default Clause shall not apply. (For the purpose of this clause the same goods shall mean goods of the same description, from the same country of origin, of the same quality, and, where applicable, of the same analysis warranty, for delivery from the same port(s) of loading during the same period of delivery). Different currencies shall not invalidate the circle.

Subject to the terms of the Prohibition Clause in the contract, if the circle is established before the goods are delivered, or if the goods are not delivered, invoices based on the mean contract quantity, or if the goods have been delivered invoices based on the delivered quantity, shall be settled by all Buyers and their Sellers in the circle by payment by all Buyers to their Sellers of the excess of the Sellers' invoice amount over the lowest invoice amount in the circle. Payment shall be due not later than 15 consecutive days after the last date for delivery, or, should the circle not be ascertained before the expiry of this time, then payment shall be due not later than 15 consecutive days after the circle is ascertained.

Where the circle includes contracts expressed in different currencies the lowest invoice amount shall be replaced by the market price on the first day for contractual delivery and invoices shall be settled between each Buyer and his Seller in the circle by payment of the differences between the market price and the relative contract price in the currency of the contract.

All Sellers and Buyers shall give every assistance to ascertain the circle and when a circle shall have been ascertained in accordance with this clause it shall be binding on all parties to the circle. As between Buyers and Sellers in the circle, the non-presentation of documents by Sellers to their Buyers shall not be considered a breach of contract. Should any party in the circle prior to the due date of payment commit any act comprehended in the Insolvency Clause of this contract, settlement by all parties in the circle shall be calculated at the closing out price as provided for in the Insolvency Clause, which shall be taken as a basis for settlement, instead of the lowest invoice amount in the circle. In this event respective Buyers shall make payment to their Sellers or respective Sellers shall make payment to their Buyers of the difference between the closing out price and the contract price.

22. **INSOLVENCY-** If before the fulfilment of this contract, either party shall suspend payments, notify any of the creditors that he is unable to meet debts or that he has suspended or that he is about to suspend payment of his debts, convene, call or hold a meeting of creditors, propose a voluntary arrangement, have an administration order made, have a winding up order made, have a receiver or manager appointed, convene, call or hold a meeting to go into liquidation (other than for re-construction or amalgamation), or have a Bankruptcy Petition presented against him (any of which acts being hereinafter called an "Act of Insolvency") then the party committing such Act of Insolvency shall forthwith serve a notice of the occurrence of such Act of Insolvency on the other party to the contract and upon proof (by either the other party to the contract or the Receiver, Administrator, Liquidator or other person representing the party

49/3

194 committing the Act of Insolvency) that such notice was thus served within 2 business days of the occurrence of the Act of Insolvency,
195 the contract shall be closed out at the market price ruling on the business day following the serving of the notice. If such notice has not
196 been served, then the other party, on learning of the occurrence of the Act of Insolvency, shall have the option of declaring the contract
197 closed out at either the market price on the first business day after the date when such party first learnt of the occurrence of the Act of
198 Insolvency or at the market price ruling on the first business day after the date when the Act of Insolvency occurred.
199 In all cases the other party to the contract shall have the option of ascertaining the settlement price on the closing out of the contract by
200 repurchase or re-sale, and the difference between the contract price and the re-purchase or re-sale price shall be the amount payable or
201 receivable under this contract.
202
203 **23.** DOMICILE- This contract shall be deemed to have been made in England, notwithstanding any
204 contrary provision, and this contract shall be construed and take effect in accordance with the laws of England. Except for the
205 purpose of enforcing any award made in pursuance of the Arbitration Clause of this contract, the Courts of England shall have
206 exclusive jurisdiction to determine any application for ancillary relief, (save for obtaining security only for the claim or counter-
207 claim),the exercise of the powers of the Court in relation to the arbitration proceedings and any dispute other than a dispute which
208 shall fall within the jurisdiction of arbitrators or board of appeal of the Association pursuant to the Arbitration Clause of this
209 contract. For the purpose of any legal proceedings each party shall be deemed to be ordinarily resident or carrying on business at the
210 offices of The Grain and Feed Trade Association, (GAFTA), England, and any party residing or carrying on business in Scotland
211 shall be held to have prorogated jurisdiction against himself to the English Courts or if in Northern Ireland to have submitted to the
212 jurisdiction and to be bound by the decision of the English Courts. The service of proceedings upon any such party by leaving the
213 same at the offices of The Grain and Feed Trade Association, together with the posting of a copy of such proceedings to his address
214 outside England, shall be deemed good service, any rule of law or equity to the contrary notwithstanding.
215
216 **24.** ARBITRATION-
217 (a) Any and all disputes arising out of or under this contract or any claim regarding the interpretation or execution of this contract
shall be determined by arbitration in accordance with the GAFTA Arbitration Rules, No 125, in the edition current at the date of this
contract, such Rules are incorporated into and form part of this Contract and both parties hereto shall be deemed to be fully cognizant
220 of and to have expressly agreed to the application of such Rules.
221
222 (b) Neither party hereto, nor any persons claiming under either of them shall bring any action or other legal proceedings against the
223 other in respect of any such dispute, or claim until such dispute or claim shall first have been heard and determined by the
224 arbitrator(s) or a board of appeal, as the case may be, in accordance with the Arbitration Rules and it is expressly agreed and
225 declared that the obtaining of an award from the arbitrator(s) or board of appeal, as the case may be, shall be a condition precedent to
226 the right of either party hereto or of any persons claiming under either of them to bring any action or other legal proceedings against
227 the other of them in respect of any such dispute or claim.
228
229 (c) Nothing contained under this Arbitration Clause shall prevent the parties from seeking to obtain security in respect of their claim
230 or counterclaim via legal proceedings in any jurisdiction, provided such legal proceedings shall be limited to applying for and/or
231 obtaining security for a claim or counterclaim, it being understood and agreed that the substantive merits of any dispute or claim
232 shall be determined solely by arbitration in accordance with the GAFTA Arbitration Rules, No 125.
233
234 **25.** INTERNATIONAL CONVENTIONS-
235 The following shall not apply to this contract : -
236 (a) The Uniform Law on Sales and the Uniform Law on Formation to which effect is given by the Uniform Laws on International Sales
237 Act 1967;
238 (b) The United Nations Convention on Contracts for the International Sale of Goods of 1980; and
239 (c) The United Nations Convention on Prescription (Limitation) in the International Sale of Goods of 1974 and amending Protocol of
240 1980.
241 (d) Incoterms.
242 (e) Unless the contract contains any statement expressly to the contrary, a person who is not a party to this contract has no right
243 under the Contract (Rights of Third Parties) Act 1999 to enforce any term of it.

Sellers ........................................................ ........................Buyers........................................................

Printed in England and issued by

**GAFTA**
(THE GRAIN AND FEED TRADE ASSOCIATION)
GAFTA HOUSE, 6 CHAPEL PLACE, RIVINGTON ST, LONDON EC2A 3SH

49/4

7

# EXHIBIT 2

IN THE MATTER OF AN ARBITRATION AT GAFTA

BETWEEN:

## NOBLE RESOURCES S.A

**Buyers/Claimants**

### -and-

## YUGTRANZITSERVIS LTD

**Sellers/Respondents**

---

## CLAIM SUBMISSIONS

---

1.  These submissions are made on behalf of Noble Resources S.A. ("Buyers"), in their dispute with Yugtranzitservis Ltd ("Sellers") arising out of a contract dated 13 April 2007 (contract no. 200704147) for the sale of 25,000 metric tonnes (plus or minus 10% at Buyers' option) of Russian Milling Wheat ("the Contract").

2.  The claim arises out of Sellers' failure to perform the Contract.

3.  A paginated bundle of documents and correspondence relevant to the claim is enclosed with these submissions. References to page numbers in these submissions are references to the pages in that bundle.

### THE CONTRACT

4.  By the Contract, Sellers agreed to sell and Buyers agreed to buy 25,000 mt of Russian Milling Wheat, plus or minus 10% at Buyers' option (pages 1 to 3).

5.  The contract price was US$172.00 per metric ton, basis *"FOB stowed/trimmed Novorossiysk port, one/two berth(s)"*. The Contract incorporated the terms of GAFTA 49 (pages 4 to 7), in so far as these were not in conflict with the Contract terms. The Contract provided for arbitration in London and in accordance with GAFTA 125.

6.  In relation to delivery, the Contract provided as follows:

    **Delivery**: *within July 15th -August 15th, 2007, both dates included, to be narrowed in Sellers' option as a "window" for loading in Novorossiysk port.*
    *Vessel nominated by Buyers to tender her Notice of Readiness at Novorossiysk loading port and to be in all respects ready to load the cargo in Novorossiysk port "window" dates, without extension.*
    *First and last day of the "window" to be included and to be advised by Sellers at the beginning of July, 2007, before shipping period commences. If the vessel will not arrive within the stipulated "window" days, Buyers to bear all expenses incurred in this connection, including but not limited to carrying charges, storage, expenses for loading, demurrage, detention, demurrage and/or detention of other arriving vessels in the port queue, interest, insurance and other normal carrying expenses.*

> *Clauses 6 and 8 of GAFTA 49 not to apply.*
> *Loading to be executed by direct method (wagon-board of the vessel).*
> *Buyers to present self-trimming bulk carrier single decker vessel suitable for direct loading (wagon - board of the vessel). The vessel being nominated by Buyers should be confirmed or rejected by Sellers in writing (by means of E-mail or telefax) with indication of the vessel's parameters unacceptable to the loadport within 4 Novorossiysk port working hours after Buyers having presented vessel's description.*

7.   The Contract also provided for a loading rate of "*5,000 metric tons per WWD of 24 consecutive hrs or pro rata, SSHEX EIU*".

**THE FACTS**

8.   In accordance with the terms of the Contract, Sellers were required to provide a "window" for loading in Novorossiysk port at the beginning of July 2007 and before 15 July 2007. Sellers did not do so.

9.   It was only after requests from Buyers (see messages from Buyers to Sellers of 2 and 5 July 2007 (pages 8-11) that on 11 July 2007 the Sellers declared a "window" for loading between 1 and 15 August 2007 (pages 12-13). However, Sellers indicated that they were unable to provide a more precise window.

10.  Buyers responded on 13 July 2007 acknowledging Sellers' declaration of a shipment period. Buyers also insisted that Sellers notify their "*intention of loading latest by next Monday 16ᵗʰ of July*", referring to Sellers' failure to give a more precise window (pages 14-15).

11.  On 18 July 2007, Buyers nominated the MV ISLAND SKIPPER as the performing vessel for 1 August 2007 (pages 16-17). By e-mail of the same date, Sellers rejected Buyers nominated vessel because "*the dimensions of hatch No. 1 are not suitable for loading by direct variant "wagon-board of the vessel"*" (page 18).

12.  On 19 July 2007, Buyers nominated the MV GALINA III as the performing vessel (pages 19-20). This vessel was also rejected by Sellers on 20 July 2007 because "*she is a tweendecker and as per terms of our cntr the vessel should be single decker suitable for direct loading "wagon-board the vessel"*" (pages 21-23).

13.  Buyers then nominated the MV PANAGIA I on 20 July 2007 (pages 24-26). This vessel was also rejected by Sellers on 23 July 2007 (pages 27-28).

14.  On 20 July 2007, Sellers also gave a two day window for the port of 10-11 August 2007 (page 29). This message was simply too late to have any contractual effect given that Sellers had already declared the window as 1 to 15 August 2007 and the date by which such a window needed to be given had already passed.

15.  At around this time, Buyers became aware that Sellers had defaulted on delivery of a shipment of Russian Milling wheat to Nidera from Novorossiysk. During discussions with Sellers at the relevant time, Buyers had raised with Sellers their concern as to whether Sellers would perform. At the time, Sellers confirmed that they would perform under the Contract subject to Buyers providing a suitable vessel.

LONDON-4507721.1-LMASON

16.    On 24 July 2007 Buyers nominated the MV SOUTHGATE ETA 10 August 2007 (pages 29-30). This vessel was accepted by Sellers on 24 July 2007. In confirming Buyers nominated vessel, Sellers stated as follows:

*"We draw your attention that the vessel to be ready in all respects to load her cargo at nominated window 10-11 August 2007 without extension. In case if you will delay that window will be missed."* (page 29).

17.    Buyers responded on 26 July 2007 rejecting Sellers' comments in relation to the purported narrowed window nomination (page 31).

18.    On 1 August 2007, the MV SOUTHGATE arrived at the port of Novorossiysk and the vessel's master tendered notice of readiness on 2 August 2007 (page 32).    On 3 August 2007, the vessel passed its hold inspection performed by SGS (pages 58-64).

19.    Following tender of NOR, Buyers had the vessel waiting ready for loading to commence. It initially appeared that no berth was available. However, on 9 August 2007, Buyers received a message from their agents stating as follows: *"ETB: not earlier than on 10-11/08 - due to unavailability of cargo"* (page 33-34).

20.    On 10 August 2007, Buyers sent a message to Sellers stating:

*"As you well know, the vessel has tendered NOR at the port and is ready to load the wheat since beginning of August.*

*We are very concerned, however, that we are yet to see any berthing instructions from sellers nor any confirmation that sellers have the cargo ready to commence loading.*

*We want to hear from sellers urgently on this.*

*In the meantime, Buyers have no option but to reserve all of their rights and hold sellers fully responsible for all losses, expenses and costs arising out of the delay in commencement of loading."*(page 35).

21.    Later that day, Buyers received a message from Sellers attaching a translation of a letter received from Sellers' forwarder at Novorossiysk stating that the vessel was not ready for handling due to a technical reason (pages 36 -38).

22.    Buyers immediately investigated the position and learned that the Ministry of Transport of the Russian Federation Federal Agency of Sea and River Transport Federal State Institution ("Novorossiysk Maritime Port Administration"), had ordered a Port State Control inspection of the MV Southgate on 8 August 2007. Buyers only learnt of the inspection on 10 August 2007.

23.    The Report of the Novorossiysk Maritime Port Administration was issued the same day and noted a number of deficiencies. A copy of the Report is attached at pages 39-41. This did not, however, affect the vessel's readiness to load the cargo. As set out above, the vessel had passed its hold inspection on 3 August.

LONDON-4507721.1-LMASON

24.    Immediately, work was undertaken to remedy the deficiencies and on 11 August 2007, the Russian Maritime Register of Shipping undertook a survey of the vessel and concluded as follows: "*The all deficiencies (with the exception of item 0915 - IMO symbols) have been rectified. Deficiency concerning IMO symbols (item 0915) should be rectified at next port (code of action - 15/40)*." (page 44).

25.    On 11 August 2007, Buyers reiterated to Sellers that vessel was ready to load, having arrived and tendered NOR a number of days previously. Buyers said that they expected Sellers to stand-by for loading (page 45).

26.    Buyers sent a further message to Sellers on 12 August 2007 raising concerns that despite the Vessel being ready to berth it appeared that Sellers had failed to include it in the berthing plan. Buyers requested immediate confirmation from Sellers that they were urgently taking steps to allow the vessel to berth (page 46).

27.    On 12 August 2007 Silverstone SA (Sellers' guarantor) confirmed to Sellers' forwarder (page 47 and 48) that the loading of the MV Southgate was being cancelled.

28.    The information was confirmed the next day when Buyers were informed by their agents at Novorossysk port that Sellers had cancelled the MV SOUTHGATE for loading of the cargo (page 49).

29.    On 14 August 2007, Buyers sent a message to Sellers mentioning that they had still not received a response from Sellers. Buyers referred to the Port State Control report which showed that the vessel was ready in all respects for loading. Buyers requested that Sellers declare their intentions in respect of the cargo urgently and requested a response by 4 pm that day (page 50).

30.    Sellers responded on 14 August 2007 alleging that the Contract had been "frustrated" allegedly by reason of Buyers' vessel having missed the "window" (page 51).

31.    On 15 August 2007, Buyers wrote again to Sellers reiterating that vessel had been at the port since the beginning of August and asking for clarification whether Sellers intended to load the M.V. SOUTHGATE (page 52).

32.    Buyers then sent a further message to Sellers on 16 August 2007 stating: "*We have already told you many times that we are ready and waiting to load the wheat but you are refusing to respond at all. Please urgently confirm that the cargo is ready to be loaded and that you will indeed be loading our cargo.*" (pages 53-54).

33.    No response was received from Sellers. Buyers gave Sellers a further opportunity to respond and on 17 August 2007, Buyers wrote to Sellers referring to its previous messages of 15 and 16 August 2007 (pages 55-56).

34.    By this time, the price of Russian Milling Wheat had increased significantly to approximately US$300 per metric ton.

35.    Buyers requested that Sellers immediately confirm their intentions as regards loading of the vessel. Buyers gave Sellers until 11 am local time on 21 August 2007 to confirm (a) that Sellers intend to load the vessel and provide a reasonable quick and short loading

4

date; or (b) to commence loading. Buyers indicated that if Sellers failed to give the requisite confirmation then Buyers would hold Sellers in default (page 55).

36.    Sellers failed to respond within the requested deadline and no steps whatsoever were taken by Sellers to berth or load the vessel. Accordingly, by their message dated 21 August 2007, Buyers declared Sellers in default (page 57).

## BUYERS' NOTICE OF ARBITRATION

37.    On 20 September 2007, Buyers wrote to Sellers claiming arbitration in respect of the substantial damages, additional expenses and costs incurred by reason of Sellers failure to berth and load the M.V. SOUTHGATE in accordance with the Contract.

38.    Buyers appointed Mr Martin Sage as arbitrator in respect of its claims. On 28 September 2007, Sellers appointed Mr Peter Brown as arbitrator in response to Buyers' claims.

## SUBMISSIONS

39.    Buyers' case is that Sellers - in breach of their obligations as FOB seller under the Contract - failed to make arrangements to berth the vessel at the port of Novorossiysk and failed to load the cargo on board the M.V. SOUTHGATE. Buyers have suffered losses as a result of that breach.

40.    Buyers' vessel arrived at Novorossiysk port on 1 August 2008. The M.V. SOUTHGATE was fit and ready for loading as from 3 August 2008 as evidenced by the Holds Inspection by SGS dated 3 August 2007 (pages 58-64).

41.    Buyers repeatedly asked Sellers to confirm their intentions in respect of loading of the vessel, as detailed at paragraphs 8 to 36 above. However, Sellers failed to make arrangements to berth and load the vessel or to co-operate with Buyers within the delivery period. This was against the background of the confirmation from Sellers' forwarder and Buyers' agents that Sellers had "cancelled" the vessel for loading within the contractual delivery period.

42.    Buyers waited for an additional 6 days after the end of the delivery period before declaring Sellers in default. This was more than reasonable in the circumstances. Faced with Sellers' intransigence, and with no prospect of the M.V. SOUTHGATE being allowed to berth at Novorossiysk, Buyers had no option but to declare Sellers in default and re-fix the vessel.

43.    The "window" given by Sellers on 20 July 2007 of 10-11 August was of no contractual effect since it was given too late under the Contract and, in any event, a window of 1-15 August had already been declared. Any further narrowing was not in accordance with the Contract, nor Buyers' message of 13 July 2007 (page 14).

44.    Even if (which is denied), the window of 10-11 August was contractual:

- The vessel arrived and was ready to load within the delivery period.

5

- The Port State Control inspection of the vessel did not affect its readiness to receive the cargo and in any event, the inspection was completed on 11 August and the vessel passed.

- The consequences of not meeting the window are set out in the Contract and Sellers were still obliged to load as the Delivery Period was still open until 15 August 2007

45.   In short, Buyers gave effective shipping instructions, Sellers accepted the vessel and the vessel was ready to load within the delivery period.   Buyers fulfilled all of their obligations under the Contract. Sellers failed to ship the cargo and were in default.

## DAMAGES

46.   As a result of Sellers' breach of contract, Buyers' have incurred considerable losses. We set out below details of the sums Buyers now claim from Sellers.

### Default Damages

47.   The damages recoverable for default are set out in the GAFTA default clause (clause 20 of GAFTA 49). Clause 20 provides:

> "*(a) The party other than the defaulter shall, at their discretion have the right, after serving notice on the defaulter, to sell or purchase, as the case may be, against the defaulter, and such sale or purchase shall establish the default price.*

> *(b)   If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be mutually agreed, then the assessment of damages shall be settled by arbitration.*

> *(c )   The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price established under (a) above or upon the actual or estimated value of the goods on the date of default established under (b) above."*

48.   Buyers claim damages under GAFTA 24(c). Buyers declared Sellers in default on 21 August 2007. Accordingly, the date of default for the purpose of establishing the default price is 21 August 2007.

49.   Buyers refer the Tribunal to the market price evidence summarised in the attached table (page 65).   The statements of independent brokers, Allgrain Brokers (page 66) and Vicorus Commodity Brokers (page 67) are the best evidence of the market price for Russian Milling Wheat on the date of default. Taking an average of the two statements, the market price at the time of default was US$297.00 per metric tonne.   Accordingly, Buyers claim damages of US$3,125,000 being the difference between the contract price of US$172.00 and the market price of US$297.00 in respect of the mean contractual quantity of 25,000 mts.

6

**Wasted Vessel Costs**

50. GAFTA 20 (d) provides as follows:

> "*In all cases the damages shall, in addition, include any proven additional expenses which would directly and naturally result in the ordinary course of events from the defaulter's breach of contract...*"

51. Buyers paid hire on the vessel chartered to perform the Contract in the total sum of US$1,364,515.59. They also paid bunker costs of US$131,520 and port costs of US$26,000. The vessel was delivered and gave NOR on 2 August 2007, within the delivery period and original "window". Accordingly, pursuant to GAFTA 20(d) Buyers are entitled to those wasted vessel costs incurred as a result of Sellers' default less any sums obtained from Buyers re-letting the vessel. Buyers were able to re-let the vessel as from the date of default (21 August 2007) for the amount of US$733,411.72. Buyers therefore claim total wasted vessel costs in the sum of US$788,623.87.

## CONCLUSION

52. Sellers were plainly in default of the Contract. Accordingly, Buyers are entitled to default damages in the sum of US$3,125,000.00 based on the difference between Contract and market price.

53. Buyers are also entitled to wasted costs of US$788,623.87.

54. Buyers ask the Tribunal for an Award in the following terms:

    (a) Sellers were in default of Contract by virtue of their failure to load the cargo.

    (b) Sellers pay Buyers' damages (including proven additional expenses) in the sum of US$3,913,623.87 (paragraphs 49 to 51 above).

    (c) Sellers to pay the costs of the arbitration.

    (d) Sellers to pay compounded interest on all principal sums awarded from the date of default to the date of payment and Sellers to pay interest on arbitration costs from the date of the Award until payment.

26 November 2007

LONDON-4607721.1-LMASON