UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
NOBLE RESOURCES S.A.,          :
                               :
            Plaintiff,         :
                               :     08 CV 3876 (LAP)
      - against -              :     ECF CASE
                               :
YUGTRANZITSERVIS LTD. a.k.a.   :
YUGTRANZIT SERVIS LIMITED,     :
AND SILVERSTONE S.A.,          :
                               :
            Defendants.        :
------------------------------------------------------X



RECEIVED JUN 17 2008 U.S.D.C. S.D.N.Y. CASHIERS

## VERIFIED AMENDED COMPLAINT

Plaintiff, NOBLE RESOURCES S.A. (hereinafter referred to as "Plaintiff" or "Noble"), by and through its attorneys, Tisdale Law Offices LLC, as and for its Verified Amended Complaint against the Defendants, YUGTRANZITSERVIS LTD. a.k.a. YUGTRANZIT SERVIS LIMITED (hereinafter referred to as "YTS") and SILVERSTONE S.A. (hereinafter referred to as "Silverstone")(collectively referred to as "Defendants") alleges, upon information and belief, as follows:

1.  This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333.

2.  At all times material to this action, Plaintiff was, and still is, a foreign company duly organized and operating under foreign law with a principal place of business in Switzerland.

3.  Upon information and belief, Defendant YTS was, and still is, a foreign corporation or other business entity organized under and existing by virtue of foreign law with a place of business in Nicosia, Cyprus.

4. Upon information and belief, Defendant Silverstone was, and still is, a foreign corporation or other business entity organized under and existing by virtue of foreign law with a place of business in Lausanne, Switzerland.

5. By a contract dated April 13, 2007, Plaintiff agreed to buy 25,000 mt of Russian Milling Wheat (the "cargo") from the defendant YTS. *See April 13, 2007 Contract annexed hereto as Exhibit "1."*

6. The contract provided that the cargo be delivered "within July 15 – August 15, 2007" for loading in Novorossiysk port.

7. The contract further provided that the Plaintiff was to nominate a suitable vessel and tender her Notice of Readiness at Novorossiysk loading port and to be ready to load the cargo without extension.

8. Silverstone agreed to guarantee YTS's performance of the contract without limitation. *See Silverstone Guarantee annexed hereto as "Exhibit "2."*

9. On or about July 14, 2007, the Plaintiff nominated the M/V SOUTHGATE (hereinafter the "Vessel") and on or about July 24, 2007, the defendant YTS accepted the Plaintiff's nomination.

10. In accordance with the contract, the Vessel arrived at the port of Novorossiysk and tendered her Notice of Readiness on August 2, 2007. On August 3, 2007, the Vessel passed its hold inspection and was ready to load cargo.

11. Despite due demand, the Defendants failed to make arrangements to berth and load the Vessel or to cooperate with the Plaintiff within the delivery period agreed to in the contract.

12. After waiting for an additional six days after the end of the delivery period, the Plaintiff had no option but to declare the Defendants in default and to re-fix the Vessel.

13. As a result of Defendants' breaches of the contract, Plaintiff has suffered damages in the principal amounts of $3,125,000 for the Defendants' default and $788,623.87 for wasted vessel costs. *See Plaintiff's Arbitration Claim Submission annexed hereto as Exhibit "3" at 7.*

14. Pursuant to the contract, any disputes arising thereunder shall be referred to arbitration in London, England in accordance with GAFTA rules.

15. Plaintiff has commenced arbitration in accordance with the contract and appointed its arbitrator.

16. Despite due demand, Defendants have failed to pay the sums due and owing as a result of its breaches of the contract.

17. Interest, costs and attorneys' fees are routinely awarded to the prevailing party in London Arbitration proceedings. As best as can now be estimated, Plaintiff expects to recover the following amounts:

| | | | |
|---|---|---|---|
| A. | Principal claim: | | $3,913,623.87 |
| | a. Default Damages | $3,125,000.00 | |
| | b. Wasted Vessel Costs | $788,623.87 | |
| B. | Estimated interest on claims: 3 years at 7.5% | | $978,291.75 |
| C. | Estimated attorneys' fees: | | $250,000.00 |
| **Total** | | | **$5,150,915.50** |

18. The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during

3

the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendants.

19. The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any property of the Defendants held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendants, to compel arbitration and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A. That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Verified Amended Complaint, failing which default judgment be entered against it in the sum of **$5,150,915.50.**

B. That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$5,150,915.50** belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial

institutions and/or other institutions or such other garnishee(s) to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Verified Amended Complaint;

C. That pursuant to 9 U.S.C. §§201 et seq. this Court recognize and confirm any London arbitration award in Plaintiff's favor against the Defendants as a judgment of this Court;

D. That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

E. That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: June 17, 2008
New York, NY

By: _____
The Plaintiff,
NOBLE RESOURCES SA,

Lauren C. Davies (LD 1980)
Thomas L. Tisdale (TT 5263)
TISDALE LAW OFFICES LLC
11 West 42nd Street, Suite 900
New York, NY 10036
(212) 354-0025 – phone
(212) 869-0067 – fax
ldavies@tisdale-law.com
ttisdale@tisdale-law.com

## ATTORNEY'S VERIFICATION

State of Connecticut   )
                       )   ss.:   City of Southport
County of Fairfield    )

1. My name is Lauren C. Davies.

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am an Attorney in the firm of Tisdale Law Offices, LLC, attorneys for the Plaintiff.

4. I have read the foregoing Verified Amended Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7. I am authorized to make this Verification on behalf of the Plaintiff.

Dated:   June 17, 2008
         Southport, CT

_____
Lauren C. Davies

6

# EXHIBIT 1

Yugtranzitservis Ltd.
Pournpoulinas 15 Office 301/302 P.C.
1060 Nicosia
Cyprus

Contract nr : 200704147
Date        : 13-04-2007
Page 1

| | | |
|---|---|---|
| Sellers | : | Yugtranzitservis Ltd., Pournpoulinas 15 Office 301/302 P.C., 1060 Nicosia - Cyprus |
| Buyers | : | Noble Resources S.A., Avenue des Mousquines 4, 1005 Lausanne – Switzerland |
| Commodity | : | Russian Milling Wheat. Sound, loyal, merchantable, new crop. Free from alive insects and foreign smell. |

Quality:
— Moisture            max. 14.0%
— Foreign matter      max. 2.0%
— Protein             min. 11.5% (N x 5.7) on dry matter basis
— Falling no. (Hagberg) min. 230 sec.
— Wet gluten          min. 23.0% as per ISO'
— Test weight         min. 77 kgs/hl
— Alveograph W        min. 160
— Bug damaged         max. 1.5%

Tests as per EU method (ISO).
Quality and condition final at loading as per certificates issued by GAFTA approved surveyor at Sellers' option and costs.
Weight final at loading as per weight certificate issued by GAFTA approved surveyor at Sellers' option and costs.
Fumigation at Sellers' expense. If fumigation with the active (forced) recirculation is required, additional expenses related to it to be compensated by Buyers.

Quantity    : 25,000 metric tons, plus or minus 10% at Buyers' option and at contract price.

Delivery    : within July 15th – August 15th, 2007, both dates included, to be narrowed in Sellers' option as a "window" for loading in Novorossiysk port.
Vessel nominated by Buyers to tender her Notice of Readiness at Novorossiysk loading port and to be in all respects ready to load the cargo in Novorossiysk port "window" dates, without extension.
First and last day of the "window" to be included and to be advised by Sellers at the beginning of July, 2007, before shipping period commences. If the vessel will not arrive within the stipulated "window" days, Buyers to bear all expenses incurred in this connection, including but not limited to carrying charges, storage, expenses for loading, demurrage, detention, demurrage and/or detention of other arriving vessels in the port queue, interest, insurance and other normal carrying expenses.
Clauses 6 and 8 of GAFTA 49 not to apply.
Loading to be executed by direct method (wagon – board of the vessel).
Buyers to present self-trimming bulk carrier single decker vessel suitable for direct loading (wagon – board of the vessel). The vessel being nominated by Buyers should be confirmed or rejected by Sellers in writing (by means of E-mail or telefax) with indication of the vessel's parameters unacceptable to the loadport within 4 Novorossiysk port working hours after Buyers having presented vessel's description.

Contract nr : 200704147
Date       : 13-04-2007
Page 2

| | | |
|---|---|---|
| Price | : | USD 172.00 (say one hundred and seventy two US Dollars and nil cents) per metric ton, FOB Stowed/Trimmed Novorossiysk port, one/two berth (s). In case second berth at loading shifting expenses to be for Owners/Buyers account. |
| Payment | : | Payment shall be made 100 pct net CAD within 48 hours upon presentation of documents at Buyer's First Class European bank and shall be effected by telegraphic transfer. Costs for TT for Buyers' account. <br> Costs/commissions in Buyer's bank for Buyers' account. <br> Costs/commissions in Sellers' bank to be for Sellers' account. <br><br> Sellers will supply the following documents: <br> — Commercial invoice stamped and signed; <br> — Full set of 3/3 Congen B/L, clean on board, freight prepaid <br> — Official Certificate of origin <br> — Official Phytosanitary certificate <br> — Non radiation certificate. <br> — Fumigation certificate. <br> — Quality and condition certificate of first class superintendent company proving the goods quality at time and place of loading <br> — Weight certificate of first class superintendent company proving the quantity loaded <br> — Holds cleanliness certificate |
| Pre-advice | : | Buyers to give to Sellers 7 days provisional and 5/3 days, 24 hrs definite pre-advice with the following information: <br> — ETA <br> — Vessel's name <br> — Flag <br> — Dimensions of the vessel (LOA/BEAM/DM) <br> — Vessels' hatches, holds dimensions <br> — DWT <br> — AIRDRAFT |
| C/P | : | Buyers to despatch copy of C/P / fixture recap to Sellers upon their request. |
| Loading Instructions | : | Buyers to provide Sellers with final and precise documentary and fumigation instructions latest three working days before vessels' arrival at port of loading. <br> All the shipping documents shall be made in English and/or with English translation. |
| Loading rate | : | 5.000 metric tons per WWD of 24 consecutive hrs or pro rata, SSHEX EIU. |
| Notice | : | Notice of Readiness shall be tendered at the office of the agent at the load port between 08.00 AM and 05.00 PM local time on all days except Saturdays, Sundays and holidays. WIPON / WIFPON / WICCON / WIBON. |
| Laytime | : | Laytime shall commence at 08:00 hrs next working day after tender of valid Notice of Readiness (NOR). Time from Friday 5 p.m. (or from 5 p.m. on day preceding holidays) until 8 a.m. on Monday (or 8 a.m. on next business day) shall not to count even if used. |

Contract nr : 200704147
Date : 13-04-2007
Page 3

| | | |
|---|---|---|
| Demurrage | : | Demurrage as per relevant C/P 7 fixture recap or if timecharter daily hire. But max demurrage USD 16'000,--. Despatch half demurrage. Calculation as per N.O.R. and S.O.F both signed by masters/shippers and ships agents and sent by fax to Seller and Buyer. Payment of agreed demurrage/despatch if any, to be settled within 60 days from vessels completion. |
| Vessel's agent | : | Vessel agents at loadport to be nominated by Owners and for the Owners' account and in Sellers' option. |
| Insurance | : | To be covered by Buyers at their own risk and costs, from the moment the goods pass the ship's rail at loading until completion of discharge. Buyers undertake to confirm insurance coverage upon first request from Sellers. |
| General conditions | : | All other terms, conditions and rules, not in contradiction with the above contained in Form 49 of GAFTA of which the parties admit that they have knowledge and notice, apply to this transaction and the details above given shall be taken as having been written into such form in the appropriate places. |
| Arbitration clause | : | Any dispute arising out of under this contract shall be settled by arbitration in accordance with the Arbitration Rules no. 125 of the Grain and Feed Trade Association, in the edition current at the date of this contract, such rules forming part of this contract and of which both parties hereto shall be deemed to be cognizant. Arbitration to take place in London/England. |
| Commission | : | US$ 0,50 per mton payable by sellers |

On behalf of Buyers:            Allgrain Brokers :            On behalf of Sellers:

# EXHIBIT 2



From: Silverstone S.A. ("the Guarantor")

To: Noble Resources S.A. ("the Buyers")

Dear Sirs,

Yugtranzit Servis Limited sale/purchase Contract 200704147 dated 13.04.07 (the "Contract").

GUARANTEE

The Guarantor irrevocably and unconditionally:

(a) as principal obligor guarantees to the Buyers the prompt performance by the Yugtranzit Servis Limited of all its obligations under the Contract ;
(b) undertakes with the Buyers that whenever the Yugtranzit Servis Limited does not pay the agreed and confirmed amount when due under or in connection with the Contract the Guarantor shall forthwith on demand by the Buyers pay that amount (in the currency in which it is due) as if the Guarantor instead of the Yugtranzit Servis Limited were expressed to be the principal obligor; and
(c) indemnifies the Buyers on demand against any loss or liability suffered by it if any obligation guaranteed by the Guarantor is or becomes unenforceable, invalid or illegal.

Yours faithfully,
Silverstone S.A.



Rue du Grand-Chene 6 1003 Lausanne Switzerland
Tel.: 0041 21 317 52 30  fax: 0041 21 317 52 31
e-mail: info@silverstone-europe.com

# EXHIBIT 3

IN THE MATTER OF AN ARBITRATION AT GAFTA

BETWEEN:

NOBLE RESOURCES S.A

Buyers/Claimants

-and-

YUGTRANZITSERVIS LTD

Sellers/Respondents

## CLAIM SUBMISSIONS

1. These submissions are made on behalf of Noble Resources S.A. ("Buyers"), in their dispute with Yugtranzitservis Ltd ("Sellers") arising out of a contract dated 13 April 2007 (contract no. 200704147) for the sale of 25,000 metric tonnes (plus or minus 10% at Buyers' option) of Russian Milling Wheat ("the Contract").

2. The claim arises out of Sellers' failure to perform the Contract.

3. A paginated bundle of documents and correspondence relevant to the claim is enclosed with these submissions. References to page numbers in these submissions are references to the pages in that bundle.

### THE CONTRACT

4. By the Contract, Sellers agreed to sell and Buyers agreed to buy 25,000 mt of Russian Milling Wheat, plus or minus 10% at Buyers' option (pages 1 to 3).

5. The contract price was US$172.00 per metric ton, basis *"FOB stowed/trimmed Novorossiysk port, one/two berth(s)"*. The Contract incorporated the terms of GAFTA 49 (pages 4 to 7), in so far as these were not in conflict with the Contract terms. The Contract provided for arbitration in London and in accordance with GAFTA 125.

6. In relation to delivery, the Contract provided as follows:

   *Delivery: within July 15th -August 15th, 2007, both dates included, to be narrowed in Sellers' option as a "window" for loading in Novorossiysk port.*
   *Vessel nominated by Buyers to tender her Notice of Readiness at Novorossiysk loading port and to be in all respects ready to load the cargo in Novorossiysk port "window" dates, without extension.*
   *First and last day of the "window" to be included and to be advised by Sellers at the beginning of July, 2007, before shipping period commences. If the vessel will not arrive within the stipulated "window" days, Buyers to bear all expenses incurred in this connection, including but not limited to carrying charges, storage, expenses for loading, demurrage, detention, demurrage and/or detention of other arriving vessels in the port queue, interest, insurance and other normal carrying expenses.*

*Clauses 6 and 8 of GAFTA 49 not to apply.*
*Loading to be executed by direct method (wagon-board of the vessel).*
*Buyers to present self-trimming bulk carrier single decker vessel suitable for direct loading (wagon - board of the vessel). The vessel being nominated by Buyers should be confirmed or rejected by Sellers in writing (by means of E-mail or telefax) with indication of the vessel's parameters unacceptable to the loadport within 4 Novorossiysk port working hours after Buyers having presented vessel's description.*

7. The Contract also provided for a loading rate of "*5,000 metric tons per WWD of 24 consecutive hrs or pro rata, SSHEX EIU*".

### THE FACTS

8. In accordance with the terms of the Contract, Sellers were required to provide a "window" for loading in Novorossiysk port at the beginning of July 2007 and before 15 July 2007. Sellers did not do so.

9. It was only after requests from Buyers (see messages from Buyers to Sellers of 2 and 5 July 2007 (pages 8-11) that on 11 July 2007 the Sellers declared a "window" for loading between 1 and 15 August 2007 (pages 12-13). However, Sellers indicated that they were unable to provide a more precise window.

10. Buyers responded on 13 July 2007 acknowledging Sellers' declaration of a shipment period. Buyers also insisted that Sellers notify their "*intention of loading latest by next Monday 16th of July*", referring to Sellers' failure to give a more precise window (pages 14-15).

11. On 18 July 2007, Buyers nominated the MV ISLAND SKIPPER as the performing vessel for 1 August 2007 (pages 16-17). By e-mail of the same date, Sellers rejected Buyers nominated vessel because "*the dimensions of hatch No. 1 are not suitable for loading by direct variant "wagon-board of the vessel"*" (page 18).

12. On 19 July 2007, Buyers nominated the MV GALINA III as the performing vessel (pages 19-20). This vessel was also rejected by Sellers on 20 July 2007 because "*she is a tweendecker and as per terms of our cntr the vessel should be single decker suitable for direct loading "wagon-board the vessel"*" (pages 21-23).

13. Buyers then nominated the MV PANAGIA I on 20 July 2007 (pages 24-26). This vessel was also rejected by Sellers on 23 July 2007 (pages 27-28).

14. On 20 July 2007, Sellers also gave a two day window for the port of 10-11 August 2007 (page 29). This message was simply too late to have any contractual effect given that Sellers had already declared the window as 1 to 15 August 2007 and the date by which such a window needed to be given had already passed.

15. At around this time, Buyers became aware that Sellers had defaulted on delivery of a shipment of Russian Milling wheat to Nidera from Novorossiysk. During discussions with Sellers at the relevant time, Buyers had raised with Sellers their concern as to whether Sellers would perform. At the time, Sellers confirmed that they would perform under the Contract subject to Buyers providing a suitable vessel.

16. On 24 July 2007 Buyers nominated the MV SOUTHGATE ETA 10 August 2007 (pages 29-30). This vessel was accepted by Sellers on 24 July 2007. In confirming Buyers nominated vessel, Sellers stated as follows:

   *"We draw your attention that the vessel to be ready in all respects to load her cargo at nominated window 10-11 August 2007 without extension. In case if you will delay that window will be missed."* (page 29).

17. Buyers responded on 26 July 2007 rejecting Sellers' comments in relation to the purported narrowed window nomination (page 31).

18. On 1 August 2007, the MV SOUTHGATE arrived at the port of Novorossiysk and the vessel's master tendered notice of readiness on 2 August 2007 (page 32). On 3 August 2007, the vessel passed its hold inspection performed by SGS (pages 58-64).

19. Following tender of NOR, Buyers had the vessel waiting ready for loading to commence. It initially appeared that no berth was available. However, on 9 August 2007, Buyers received a message from their agents stating as follows: *"ETB: not earlier than on 10-11/08 - due to unavailability of cargo"* (page 33-34).

20. On 10 August 2007, Buyers sent a message to Sellers stating:

   *"As you well know, the vessel has tendered NOR at the port and is ready to load the wheat since beginning of August.*

   *We are very concerned, however, that we are yet to see any berthing instructions from sellers nor any confirmation that sellers have the cargo ready to commence loading.*

   *We want to hear from sellers urgently on this.*

   *In the meantime, Buyers have no option but to reserve all of their rights and hold sellers fully responsible for all losses, expenses and costs arising out of the delay in commencement of loading."* (page 35).

21. Later that day, Buyers received a message from Sellers attaching a translation of a letter received from Sellers' forwarder at Novorossiysk stating that the vessel was not ready for handling due to a technical reason (pages 36 -38).

22. Buyers immediately investigated the position and learned that the Ministry of Transport of the Russian Federation Federal Agency of Sea and River Transport Federal State Institution ("Novorossiysk Maritime Port Administration"), had ordered a Port State Control inspection of the MV Southgate on 8 August 2007. Buyers only learnt of the inspection on 10 August 2007.

23. The Report of the Novorossiysk Maritime Port Administration was issued the same day and noted a number of deficiencies. A copy of the Report is attached at pages 39-41. This did not, however, affect the vessel's readiness to load the cargo. As set out above, the vessel had passed its hold inspection on 3 August.

24. Immediately, work was undertaken to remedy the deficiencies and on 11 August 2007, the Russian Maritime Register of Shipping undertook a survey of the vessel and concluded as follows: *"The all deficiencies (with the exception of item 0915 - IMO symbols) have been rectified. Deficiency concerning IMO symbols (item 0915) should be rectified at next port (code of action - 15/40)."* (page 44).

25. On 11 August 2007, Buyers reiterated to Sellers that vessel was ready to load, having arrived and tendered NOR a number of days previously. Buyers said that they expected Sellers to stand-by for loading (page 45).

26. Buyers sent a further message to Sellers on 12 August 2007 raising concerns that despite the Vessel being ready to berth it appeared that Sellers had failed to include it in the berthing plan. Buyers requested immediate confirmation from Sellers that they were urgently taking steps to allow the vessel to berth (page 46).

27. On 12 August 2007 Silverstone SA (Sellers' guarantor) confirmed to Sellers' forwarder (page 47 and 48) that the loading of the MV Southgate was being cancelled.

28. The information was confirmed the next day when Buyers were informed by their agents at Novorossysk port that Sellers had cancelled the MV SOUTHGATE for loading of the cargo (page 49).

29. On 14 August 2007, Buyers sent a message to Sellers mentioning that they had still not received a response from Sellers. Buyers referred to the Port State Control report which showed that the vessel was ready in all respects for loading. Buyers requested that Sellers declare their intentions in respect of the cargo urgently and requested a response by 4 pm that day (page 50).

30. Sellers responded on 14 August 2007 alleging that the Contract had been "frustrated" allegedly by reason of Buyers' vessel having missed the "window" (page 51).

31. On 15 August 2007, Buyers wrote again to Sellers reiterating that vessel had been at the port since the beginning of August and asking for clarification whether Sellers intended to load the M.V. SOUTHGATE (page 52).

32. Buyers then sent a further message to Sellers on 16 August 2007 stating: *"We have already told you many times that we are ready and waiting to load the wheat but you are refusing to respond at all. Please urgently confirm that the cargo is ready to be loaded and that you will indeed be loading our cargo."* (pages 53-54).

33. No response was received from Sellers. Buyers gave Sellers a further opportunity to respond and on 17 August 2007, Buyers wrote to Sellers referring to its previous messages of 15 and 16 August 2007 (pages 55-56).

34. By this time, the price of Russian Milling Wheat had increased significantly to approximately US$300 per metric ton.

35. Buyers requested that Sellers immediately confirm their intentions as regards loading of the vessel. Buyers gave Sellers until 11 am local time on 21 August 2007 to confirm (a) that Sellers intend to load the vessel and provide a reasonable quick and short loading

4

date; or (b) to commence loading. Buyers indicated that if Sellers failed to give the requisite confirmation then Buyers would hold Sellers in default (page 55).

36. Sellers failed to respond within the requested deadline and no steps whatsoever were taken by Sellers to berth or load the vessel. Accordingly, by their message dated 21 August 2007, Buyers declared Sellers in default (page 57).

### BUYERS' NOTICE OF ARBITRATION

37. On 20 September 2007, Buyers wrote to Sellers claiming arbitration in respect of the substantial damages, additional expenses and costs incurred by reason of Sellers failure to berth and load the M.V. SOUTHGATE in accordance with the Contract.

38. Buyers appointed Mr Martin Sage as arbitrator in respect of its claims. On 28 September 2007, Sellers appointed Mr Peter Brown as arbitrator in response to Buyers' claims.

### SUBMISSIONS

39. Buyers' case is that Sellers - in breach of their obligations as FOB seller under the Contract - failed to make arrangements to berth the vessel at the port of Novorossiysk and failed to load the cargo on board the M.V. SOUTHGATE. Buyers have suffered losses as a result of that breach.

40. Buyers' vessel arrived at Novorossiysk port on 1 August 2008. The M.V. SOUTHGATE was fit and ready for loading as from 3 August 2008 as evidenced by the Holds Inspection by SGS dated 3 August 2007 (pages 58-64).

41. Buyers repeatedly asked Sellers to confirm their intentions in respect of loading of the vessel, as detailed at paragraphs 8 to 36 above. However, Sellers failed to make arrangements to berth and load the vessel or to co-operate with Buyers within the delivery period. This was against the background of the confirmation from Sellers' forwarder and Buyers' agents that Sellers had "cancelled" the vessel for loading within the contractual delivery period.

42. Buyers waited for an additional 6 days after the end of the delivery period before declaring Sellers in default. This was more than reasonable in the circumstances. Faced with Sellers' intransigence, and with no prospect of the M.V. SOUTHGATE being allowed to berth at Novorossiysk, Buyers had no option but to declare Sellers in default and re-fix the vessel.

43. The "window" given by Sellers on 20 July 2007 of 10-11 August was of no contractual effect since it was given too late under the Contract and, in any event, a window of 1-15 August had already been declared. Any further narrowing was not in accordance with the Contract, nor Buyers' message of 13 July 2007 (page 14).

44. Even if (which is denied), the window of 10-11 August was contractual:

- The vessel arrived and was ready to load within the delivery period.

- The Port State Control inspection of the vessel did not affect its readiness to receive the cargo and in any event, the inspection was completed on 11 August and the vessel passed.

- The consequences of not meeting the window are set out in the Contract and Sellers were still obliged to load as the Delivery Period was still open until 15 August 2007

45. In short, Buyers gave effective shipping instructions, Sellers accepted the vessel and the vessel was ready to load within the delivery period. Buyers fulfilled all of their obligations under the Contract. Sellers failed to ship the cargo and were in default.

## DAMAGES

46. As a result of Sellers' breach of contract, Buyers' have incurred considerable losses. We set out below details of the sums Buyers now claim from Sellers.

### Default Damages

47. The damages recoverable for default are set out in the GAFTA default clause (clause 20 of GAFTA 49). Clause 20 provides:

    *"(a) The party other than the defaulter shall, at their discretion have the right, after serving notice on the defaulter, to sell or purchase, as the case may be, against the defaulter, and such sale or purchase shall establish the default price.*

    *(b) If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be mutually agreed, then the assessment of damages shall be settled by arbitration.*

    *(c) The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price established under (a) above or upon the actual or estimated value of the goods on the date of default established under (b) above."*

48. Buyers claim damages under GAFTA 24(c). Buyers declared Sellers in default on 21 August 2007. Accordingly, the date of default for the purpose of establishing the default price is 21 August 2007.

49. Buyers refer the Tribunal to the market price evidence summarised in the attached table (page 65). The statements of independent brokers, Allgrain Brokers (page 66) and Vicorus Commodity Brokers (page 67) are the best evidence of the market price for Russian Milling Wheat on the date of default. Taking an average of the two statements, the market price at the time of default was US$297.00 per metric tonne. Accordingly, Buyers claim damages of US$3,125,000 being the difference between the contract price of US$172.00 and the market price of US$297.00 in respect of the mean contractual quantity of 25,000 mts.

Wasted Vessel Costs

50. GAFTA 20 (d) provides as follows:

*"In all cases the damages shall, in addition, include any proven additional expenses which would directly and naturally result in the ordinary course of events from the defaulter's breach of contract..."*

51. Buyers paid hire on the vessel chartered to perform the Contract in the total sum of US$1,364,515.59. They also paid bunker costs of US$131,520 and port costs of US$26,000. The vessel was delivered and gave NOR on 2 August 2007, within the delivery period and original "window". Accordingly, pursuant to GAFTA 20(d) Buyers are entitled to those wasted vessel costs incurred as a result of Sellers' default less any sums obtained from Buyers re-letting the vessel. Buyers were able to re-let the vessel as from the date of default (21 August 2007) for the amount of US$733,411.72. Buyers therefore claim total wasted vessel costs in the sum of US$788,623.87.

## CONCLUSION

52. Sellers were plainly in default of the Contract. Accordingly, Buyers are entitled to default damages in the sum of US$3,125,000.00 based on the difference between Contract and market price.

53. Buyers are also entitled to wasted costs of US$788,623.87.

54. Buyers ask the Tribunal for an Award in the following terms:

 (a) Sellers were in default of Contract by virtue of their failure to load the cargo.

 (b) Sellers pay Buyers' damages (including proven additional expenses) in the sum of US$3,913,623.87 (paragraphs 49 to 51 above).

 (c) Sellers to pay the costs of the arbitration.

 (d) Sellers to pay compounded interest on all principal sums awarded from the date of default to the date of payment and Sellers to pay interest on arbitration costs from the date of the Award until payment.

26 November 2007