UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

NOBLE RESOURCES, S.A.

               *Plaintiff,*           **08 Civ. 3876 (LAP)**

  - against -

YUGTRANZITSERVIS LTD.,
a.k.a.YUGTRANZIT SERVIS LIMITED, and
SILVERSTONE S.A.,

              *Defendants.*
-------------------------------------------------------------X

## DECLARATION OF OLEG BOLDYIREV

    I, **OLEG BOLDYIREV,** pursuant to Section 1746 of Title 18 of the United States Code, hereby declare and say the following under penalty of perjury:

1. I am an individual of sound mind and body, and have never been convicted of a crime of moral turpitude.

2. This declaration is respectfully submitted in support of defendant, Yugtranzitservis Ltd.'s. (hereinafter "Yugtranzitservis"), motion to vacate a pending Rule B attachment and to dismiss the U.S. legal proceedings.

3. I am a citizen of Russia and a resident of Moscow. I have been granted Power of Attorney to represent Yugtranzitservis, including but not limited to, the power to defend the company in litigation and to commence litigation on its behalf. Annexed hereto as Exhibit "A" is a true and complete copy of the Power of Attorney duly executed by Mrs. Zavrou Antri, Director, on behalf of Yugtranzitservis on April 3rd, 2008.

1

4.  As Attorney-in Fact for Yugranzitservis, I am fully familiar with the proceedings before this Court, the prior GAFTA arbitration, and the facts of the underlying dispute between Yugtranzitservis, as "Sellers" and Noble Resources S.A., as "Buyers" in connection with a wheat sale & purchase contract. I make this declaration based upon my personal knowledge, official company records, my own investigation and discussions with our legal advisors.

5.  Yugtranzitservis is a corporation existing by virtue of the laws of Cyprus with its principal place of business at Christodoulou Chatzipavlou, 205 Louloupis Court , 2nd Floor, Flat/Office 201 P.C., Limassol, Cyprus.

6.  On or about April 13, 2007, Yugtranzitservis, as "Sellers," entered into a sale & purchase contract with Noble Resources S.A., as "Buyers," for the sale & purchase of 25,000 metric tons (+/- 10% in Buyers option) of Russian milling wheat.

7.  A true and complete copy of this sale & purchase contract is attached hereto as Exhibit "B."

8.  This standard sale & purchase contract incorporated GAFTA 49 terms and conditions, except for Clauses 6 and 8 and to the extent the remaining terms were not expressly amended by the parties.

9.  All disputes arising in connection with the Contract are properly to be referred to GAFTA arbitration in London.

10. The contract expressly provided for period of time (July 15th through August 15th) for Noble Resources S.A., as "Buyers" to take delivery of the subject wheat from Yugtranzitservis, as "Sellers."

11. Noble Resources S.A., as "Buyers" were to conclude a third-party contract to charter a vessel in order to take delivery of the wheat from Yugtranzitservis, as "Sellers." The wheat was to be delivered on board the vessel to be presented by Noble Resources S.A., as "Buyers."

12. Yugtranzitservis was <u>not</u> a party to any charter-party or other maritime contract the Buyers, Noble Resources S.A., had concluded in order to take delivery of the subject wheat pursuant to our <u>sale & purchase</u> contract.

13. During the agreed delivery window, Noble Resources S.A., as "Buyers," provided descriptions of four (4) different vessels to be accepted and confirmed by the local port authorities in order to take delivery of the subject wheat that Noble Resources S.A., as buyer, had committed to purchase from us.

14. Three (3) of the four (4) vessels were not suitable to take delivery of the subject wheat during the agreed delivery window. The fourth vessel was initially accepted, but was later found to be unfit and unable to receive the wheat Noble Resources S.A. had purchased from us within the agreed delivery window.

15. Again, Yugtranzitservis was not a party to any agreement relating to the vessels nominated by the buyer in order to take delivery of the wheat pursuant to our <u>sale & purchase</u> contract.

16. Thereafter, a dispute arose between Yugtranzitservis, as "Seller" and Noble Resources S.A., as "Buyers" with respect to the parties obligations under the <u>sale & purchase</u> contract.

17. The matter was referred to GAFTA Arbitration on or about August 29, 2007, in accordance with the prior agreement of the parties.

18. Noble Resources S.A., as "Buyers" served their claim submission on or about November 27, 2007.

19. A true and complete copy of buyer's (Noble Resources, S.A.) claim submission is attached hereto as Exhibit "C." It is my understanding that a copy of same was also presented to this Honorable Court as Exhibit "3" to Buyer's Amended Verified Complaint (Docket Entry # 7).

20. As Your Honor will note, Solicitors acting on behalf of Noble Resources S.A. clearly understood that the true nature of the agreement entered into by Yugtranzitservis, as "seller" and Noble Resources S.A., as "buyer" was a <u>sale & purchase</u> contract. In this regard, Buyer's counsel wrote, *inter alia,* the following: "*<u>Sellers</u> were plainly in default of the Contract. Accordingly, <u>Buyers</u> are entitled to default damages in the sum of US$ 3,125,000.00 based upon the difference between Contract and market price.*" (emphasis added).

21. On or about July 4, 2008, an Award was issued by the Arbitration Tribunal. A true and complete copy of the Arbitrator's decision is attached hereto as Exhibit "D."

22. The Award is subject to appeal within thirty (30) days from its issue. At present, we are working with our Solicitors to prepare and submit a timely notice of appeal of the Award on or before August 3rd, 2008 (i.e.- the current deadline to do so). We are advised that there are several substantive and meritorious appellate issues, which should be accepted on appeal.

23. Yugtranzitservis is not qualified, registered, licensed or authorized to do business in the State of New York.

24. Yugtranzitservis does not have an agent in New York who is authorized to accept service of process on its' behalf.

25. Yugtranzitservis has not consented to jurisdiction in the State of New York nor has the company agreed to arbitration in the State of New York for any matters related to this lawsuit.

26. Yugtranzitservis does not maintain an office or employees in the State of New York.

27. Yugtranzitservis does not own property in the State of New York.

28. Yugtranzitservis does not maintain bank accounts in the State of New York.

29. Yugtranzitservis does not "do business" or conduct business within the State of New York.

I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and accurate to the best of my knowledge.

Dated: July _21st_, 2008
     Limassol, Cyprus

**OLEG BOLDYIREV**

EXHIBIT "A"

# POWER OF ATTORNEY

GRANTED BY

## YUGTRANZITSERVIS LIMITED

By this Power of Attorney given on the 3rd day of April, 2008 we

## YUGTRANZITSERVIS LIMITED

a limited liability company incorporated and registered in Cyprus under registration No. 164645, and whose registered office is situated at 205, Christodoulou Chatzipavlou, Louloupis Court, Floor 2, Office/Flat 201, P.C. 3036, P.O.Box 56034.3304, Limassol, Cyprus (hereinafter referred to as ''The Company'') hereby appoint

### Mr. BOLDYIREV OLEG

date of birth 31.03.1968, holder of passport 20 01 580722, issued on 21.09.2001 by Kominternovskiy RUVD of Voronezh city, code of section: 362-002, registered with address: 19 "G", Konenkova , Flat 21, Moscow, Russia, acting alone, having power by himself alone to represent and bind the Company to be our Attorney for us and in our name to do and execute all or any of the following acts, deeds and things according to the Articles of Association of the Company, Cyprus Law and law of any other part of the world where the company will accomplish its business that is to say:

1. Sign in the name of the Company any agreements, contracts, additional agreements and any other documents of title.
2. Represent the Company before any competent authorities and institutions, both public and nonpublic, inclusive of tax, registration, controlling, antimonopoly, judicial and any other competent authorities including security agencies, public prosecutor's offices and police, off-budget funds bodies and statistical agencies in reference to the obtaining and filing of the necessary documents, certificates, applications, notices, petitions, complaints, orders, evidences and any other documents whatsoever.
3. Make decisions on and participate in the foundation and incorporation of any legal entity both within and outside the territory of Russian Federation, either individually or together with any Russian or foreign partners, acquire shares of Russian and foreign corporate issuers (interests in the authorized capital of any legal entities) either at charge or free of charge, sign sale, donation and barter contracts and other contracts and deeds for acquiring or alienating shares (interests) in the authorized capital of corporate issuers, participate in the management and supervision of their commercial activities, be a member of the executive, supervisory and internal auditing bodies of said legal entities, request and obtain any information, materials and documents concerning the legal entities' activities, attend and speak at all annual and extraordinary general meetings of shareholders (members) held either in the presence or in the absence of their participants, vote with all the shares belonging to the Company at general meetings of shareholders (members) of the legal entities whose shares (interests) are held by the Company with respect to any items on the agenda of each of such meetings, obtain ballot-papers for voting at all annual and extraordinary general meetings of shareholders and sign the same both affixing and without affixing the seal, demand that proposals be put on the agenda of annual and extraordinary general meetings of shareholders and put proposals on

the agenda himself, be registered as a participant in general meetings of shareholders, initiate general meetings of shareholders (members), demand that the Board of Directors (or Supervisory Board) or any other governing body of the Company call general meeting of shareholders, nominate candidates for members of the Board of Directors (or Supervisory Board), internal auditing commission, collective executive body of the Company, for General Director, internal auditors, external auditors, members of other governing and controlling bodies of the Company, exercise any other rights of shareholder provided for by the laws of Russian Federation and the Company's constituent documents.

4. Acquire, alienate, enter into lease, barter, pledge, assignment, loan and compensation for release from obligation agreements, draw promissory notes and bills of exchange in the name of the Company and buy promissory notes and bills of exchange of third parties, serve on claims for performance of obligations, perform the Company's obligations, present promissory notes and bills of exchange for retirement, sign any other contracts and agreements which are not specified herein and make other transactions involving any property of the Company, transfer and receive any property due to the Company, make any securities transactions, including governmental securities.

5. Raise or borrow money on behalf of the Company offering the Company's property as security.

6. Give the Company's property on lease and receive refusals, if any, take any property on lease (or on hire) on behalf of the Company.

7. Purchase or take on lease any property for the Company.

8. Conclude insurance contracts, represent the Company before insurance companies with regard to any matter, particularly in case of insured accident, pay insurance premiums, receive insurance payments, carry out other acts to insure the property and liability of the Company and receive insurance indemnity.

9. Be representative in the court, file petitions, sue and be sued, lodge declarations and applications, including those for securing claims, speak in the court of law and court of arbitration using the remedies and exercising any rights which the parties have in the court - the rights of a party, an applicant, a third party, a debtor, a creditor and other subjects of proceedings, including the right to:

sign and file a petition and appeals;

sign comments for the petition and appeals;

sign an application for securing the claim;

sign and file any other applications and complaints;

refer the case for arbitration;

waive the claims in whole or in part;

waive the demands stated in complaints, applications or petitions in whole or in part;

admit a claim or an appeal;

admit the demands set out in complaints;

change the cause or subject matter of a claim;

enter into an amicable agreement and an agreement as to actual circumstances;

sign an application for revising judicial acts based on newly found circumstances;

appeal against a judicial act of the court of arbitration or court of law;

receive the adjudged funds or other property;

sign an application for filing a protest;

to sign a demand for enforcement of a judicial act;

receive the adjudged property or money;

produce and revoke an execution document;

appeal against the acts (or omissions) of an usher-executor;

retain lawyers and advocates and pay for their services in his own discretion.

10. Represent the Company's interests before antimonopoly authorities in filing applications and serving notices with the right to make oral and written declarations in the name of the Company, submit and obtain the necessary information and documents, sign declarations, applications and notices.

11. Carry on negotiations, take decisions, compromise or act in any other manner in his own discretion, sign financial documents, contracts, agreements and reports on behalf of the Company, lodge and obtain any documents, applications and intimations with and from tax and any public authorities, including income declarations, as well as sign for the receipt thereof.

12. Open bank accounts of any kind with any banks in the name of the Company, sign bank account agreements and applications, fill in and sign forms, operate and close any bank and other accounts, conduct account transactions, request and obtain statements of account, sign payment orders on behalf of the Company.

13. Issue and accept receipts.

14. Receive any money payable to the Company.

15. Invest any money of the Company in the projects chosen in his own discretion.

16. Effect payments needed to fulfill his duties.

17. Perform all the contracts and other documents signed in the name of the Company.

18. Retain lawyers, accountants or any other professionals for rendering assistance in the performance of the aforementioned acts and pay for their work.

19. Represent the Principal's interests before the companies acting as depositaries and holders of registers of joint stock companies and of registered securities holders, hereinafter referred to as the "Companies", and carry out the following acts:

- sign and give the Companies the documents required to establish personal accounts with specialized registrars (register holders) and Depo accounts with depositaries as well as to amend or supplement the information on the Company;

- give the register holders (or depositaries) instructions in relation to the securities movement on the Company's accounts;

- request and receive notices, statements, references and other documents associated with the securities movement on the Company's account, including the certificates of shares issued in a documentary form;

- receive any financial documents relative to the payment for the services provided to the Company;

- to open personal accounts in the Registers of shareholders and to block and unblock the shares;

- to carry out all necessary actions on disposing and rewriting of the ordinary and preferred shares, debentures and other securities in the name and on behalf of the Company;

- pay for the services rendered by the companies acting as depositaries and holders of registers of joint stock companies and of registered securities holders.

20. Enter into any transactions involving movable and immovable property which belongs to the Company by right of ownership or lease, including residential and nonresidential premises, buildings and constructions, for which purpose the right is afforded to sign sale contracts, lease and sublease agreements and transfer deeds, file such contracts, agreements and ownership transfer deeds with the Committee for State Registration of the Rights to Immovable Property and Transactions Involving It, technical inventory offices and other competent agencies, obtain certificates of state registration of the rights to immovable property.

21. Take part in any auctions, acquire property and rights, make a deposit and pay for the acquired property (or rights).

22. Set up, cause to be registered and wind up representative offices of the Company both in and outside of Russian Federation, engage and



discharge employees of such representative offices, be director of the representative office having all the powers and responsibilities contemplated by the law of the country where the representative office is opened.
Sign any documents in the name of the Company affixing or without affixing the Company's seal, as he may deem expedient, and perform any other acts on behalf and in the interests of the Company.

The authorities under this Power of Attorney cannot be delegated to other persons.

This Power of Attorney is granted for a period of one year.

IN WITNESS whereof the Common Seal of "YUGTRANZITSERVIS LIMITED" has hereunto been affixed this 3rd day of April, 2008.

The Common Seal of "YUGTRANZITSERVIS LIMITED" was hereunto affixed in my presence:

Mrs. Zavrou Antri
Director

Signed ( or sealed) this day in my presence by ........ Zavrou ........
........ Antri ........
who is personally known to me.
In testimony whereof I have hereto set my hand and official seal this 3rd ........ day of April ........ 20 08

Fees

Kyriaki Fasouliotou
Certifying Officer

KYRIAKI FASOULIOTOU



This is to certify that the signature appearing above is the signature of Mr/Mrs. ............................ a Certifying Officer of Limassol, appointed by the Minister of the Interior of the Republic of Cyprus, under the Certifying Officers Law, Cap 39, to certify signatures and seals and that the seal opposite the said signature is that of the Certifying Officer of Limassol

LIMASSOL - CYPRUS

The ...5.5.5........

District Officer

E. ATHANASIOU-GEORGIADOU

APOSTILLE

(Convention de La Haye du 5 octobre 1961)

1. Country CYPRUS.
   E. ATHANASIOU-GEORGIADOU
   This public document

2. has been signed by .....................................

3. acting in the capacity of District Officer

4. bears the seal/stamp of the District Officer.

Certified

5. at Nicosia                         6. the   - 3 APR 2008

7. by ....Maria Iasonos....       ou 853/08

8. No. ..........................        10. Signature:

9. Seal/stamp

Permanent Secretary
Ministry of Justice and Public Order

EXHIBIT "B"

Yugtranzitservis Ltd.
Fotimpoufinas 15 Office 301/302 P.C.
1060 Nicosia
Cyprus

Contract nr : 200704147
Date : 13-04-2007
Page 1

Sellers : Yugtranzitservis Ltd., Foumpoulinas 15 Office 301/302 P.C., 1060 Nicosia - Cyprus

Buyers : Noble Resources S.A., Avenue des Mousquines 4, 1005 Lausanne - Switzerland

Commodity : Russian Milling Wheat. Sound, loyal, merchantable, new crop.
Free from alive insects and foreign smell.
Quality:

| | |
|---|---|
| — Moisture | |
| — Foreign matter | max. 14.0% |
| — Protein | max. 2.0% |
| — Falling no. (Hagberg) | min. 11.5% (Nt 5.7) on dry matter basis |
| — Wet gluten | min. 230 sec. |
| — Test weight | min. 23.0% as per ISO |
| — Alveograph W | min. 77 kgs/hl |
| — Bug damaged | min. 160 |
| | max. 1.5% |

Tests as per EU method (ISO).
Quality and condition final at loading as per certificates issued by GAFTA approved surveyor at
Sellers' option and costs.
Weight final at loading as per weight certificate issued by GAFTA approved surveyor at Sellers'
option and costs.
Fumigation at Sellers' expense, if fumigation with the active (forced) recirculation is required,
additional expenses related to it to be compensated by Buyers.

Quantity : 25,000 metric tons, plus or minus 10% at Buyers' option and at contract price.

Delivery : within July 15th – August 15th, 2007, both dates included, to be narrowed in Sellers' option
as a "window" for loading in Novorossiysk port.
Vessel nominated by Buyers to tender her Notice of Readiness at Novorossiysk loading port and
to be in all respects ready to load the cargo in Novorossiysk port "window" dates, without
extension.
First and last day of the "window" to be included and to be advised by Sellers at the beginning of
July, 2007, before shipping period commences. If the vessel will not arrive within the stipulated
"window" days, Buyers to bear all expenses incurred in this connection, including but not limited
to carrying charges, storage, expenses for loading, demurrage, detention, demurrage and/or
detention of other arriving vessels in the port queue, interest, insurance and other normal
carrying expenses.
Clauses 6 and 8 of GAFTA 49 not to apply.
Loading to be executed by direct method (wagon – board of the vessel).
Buyers to present self-trimming bulk carrier single decker vessel suitable for direct loading
(wagon – board of the vessel). The vessel being nominated by Buyers should be confirmed or
rejected by Sellers in writing (by means of E-mail or telefax) with indication of the vessel's
parameters unacceptable to the loadport within 4 Novorossiysk port working hours after Buyers
having presented vessel's description.

1

Contract nr : 200764147
Date      : 13-04-2007
Page 2

| | | |
|---|---|---|
| Price | : | USD 172.00 (say one hundred and seventy two US Dollars and nil cents) per metric ton, FOB Stowed/Trimmed Novorossiysk port, one/two berth (s). In case second berth at loading shifting expenses to be for Owners/Buyers account. |
| Payment | : | Payment shall be made 100 pct net CAD within 48 hours upon presentation of documents at Buyer's First Class European bank and shall be effected by telegraphic transfer. Costs for TT for Buyers' account. Costs/commissions in Buyer's bank for Buyers' account. Costs/commissions in Sellers' bank to be for Sellers' account. |

Sellers will supply the following documents:
 — Commercial invoice stamped and signed;
 — Full set of 3/3 Congen B/L, clean on board, freight prepaid
 — Official Certificate of origin
 — Official Phytosanitary certificate
 — Non radiation certificate.
 — Fumigation certificate
 — Quality and condition certificate of first class superintendent company proving the goods quality at time and place of loading
 — Weight certificate of first class superintendent company proving the quantity loaded
 — Holds cleanliness certificate

| | | |
|---|---|---|
| Pre-advice | : | Buyers to give to Sellers 7 days provisional and 5/3 days, 24 hrs definite pre-advice with the following information: |

 — ETA
 — Vessel's name
 — Flag
 — Dimensions of the vessel (LOA/BEAM/DM)
 — Vessels' hatches, holds dimensions
 — DWT
 — AIRDRAFT

| | | |
|---|---|---|
| C/P | : | Buyers to despatch copy of C/P / fixture recap to Sellers upon their request. |
| Loading Instructions | : | Buyers to provide Sellers with final and precise documentary and fumigation instructions latest three working days before vessels' arrival at port of loading. All the shipping documents shall be made in English and/or with English translation. |
| Loading rate | : | 5.000 metric tons per WWD of 24 consecutive hrs or pro rata, SSHEX EIU. |
| Notice | : | Notice of Readiness shall be tendered at the office of the agent at the load port between 08.00 AM and 05.00 PM local time on all days except Saturdays, Sundays and holidays. WIPON / WIFPON / WICCON / WIBON. |
| Laytime | : | Laytime shall commence at 08:00 hrs next working day after tender of valid Notice of Readiness (NOR). Time from Friday 5 p.m. (or from 5 p.m. on day preceding holidays) until 8 a.m. on Monday (or 8 a.m. on next business day) shall not to count even if used. |

2

Contract nr : 200704147
Date         : 13-04-2007
Page 3

| | | |
|---|---|---|
| Demurrage | : | Demurrage as per relevant C/P / fixture recap or if timecharter daily hire. But max demurrage USD 16'000.—. Despatch half demurrage. Calculation as per N.O.R. and S.O.F both signed by masters/shippers and ships agents and sent by fax to Seller and Buyer. Payment of agreed demurrage/despatch if any, to be settled within 60 days from vessels completion. |
| Vessel's agent | : | Vessel agents at loadport to be nominated by Owners and-for the Owners' account and in Sellers' option. |
| Insurance | : | To be covered by Buyers at their own risk and costs, from the moment the goods pass the ship's rail at loading until completion of discharge. Buyers undertake to confirm insurance coverage upon first request from Sellers. |
| General conditions | : | All other terms, conditions and rules, not in contradiction with the above contained in Form 49 of GAFTA of which the parties admit that they have knowledge and notice, apply to this transaction and the details above given shall be taken as having been written into such form in the appropriate places. |
| Arbitration clause | : | Any dispute arising out or under this contract shall be settled by arbitration in accordance with the Arbitration Rules no. 125 of the Grain and Feed Trade Association, in the edition current at the date of this contract, such rules forming part of this contract and of which both parties hereto shall be deemed to be cognizant. Arbitration to take place in London/England. |
| Commission | : | US$ 0,50 per mton payable by sellers |

On behalf of Buyers:              Allgrain Brokers :              On behalf of Sellers:

3

Effective 1st January 2006

# *Gafta No.49*

Copyright
THE GRAIN AND FEED TRADE ASSOCIATION

## CONTRACT FOR THE DELIVERY OF GOODS
## FROM CENTRAL AND EASTERN EUROPE
## IN BULK OR BAGS
### FOB TERMS

*delete/specify as applicable                                        Date ..................

1  SELLERS ............................................................................................
2
3  INTERVENING AS BROKERS............................................................
4
5  BUYERS...............................................................................................
6  have this day entered into a contract on the following terms and conditions.

7   **1.  GOODS-** (in bulk or in bags)..................................................................................
9        Packing - if in bags, to be uniform weight bags suitable to withstand ordinary wear and tear to destination, such bags to be taken and
10       paid for as goods. If in bulk, shipper has the option of shipping up to 10% in bags for stowage purposes, such bags to be taken and paid
11       for as goods.
12
13   **2.  QUANTITY-**...................................................................... tonnes of 1000 kilograms, plus or minus 5%
14       at Buyers' call.  In the event of more than one delivery being made, each delivery shall be considered a separate contract, but the margin
15       on the mean quantity sold shall not be affected thereby.  Each mark/parcel shall stand as a separate parcel.
16
17   **3.  PRICE-**............................................................................................. per tonne of 1000 kilograms gross weight,
18
19       delivered Free On Board Buyers' Vessel(s) in ...................................................................
20
21   **4.  BROKERAGE-**................................................... per tonne, to be paid by Sellers on the mean contract quantity, goods lost or not lost,
22       contract fulfilled or not fulfilled unless such non-fulfilment is due to the cancellation of the contract under the terms of the
23       Prohibition or Force Majeure Clause.  Brokerage shall be due on the day shipping documents are exchanged or, if the goods are not
24       appropriated then brokerage shall be due on the 30th consecutive day after the last day for delivery.
25
26   **5.  QUALITY-**....................................................................................................
27       Condition – delivery shall be made in good condition.
28
29   **6.  PERIOD OF DELIVERY**
30       Delivery during-....................................................................................... at Buyers' call.
31       Nomination of Vessel- Buyers shall serve not less than .......................................... consecutive day's notice of the name and
32       probable readiness date of the vessel and the estimated tonnage required.  The Sellers shall have the goods ready to be delivered to
33       the Buyers at any time within the contract period of delivery.
34       Buyers have the right to substitute the nominated vessel, but in any event the original delivery period and any extension shall not be
35       affected thereby.  Provided the vessel is presented at the loading port in readiness to load within the delivery period, Sellers shall if
36       necessary complete loading after the delivery period, and carrying charges shall not apply.  In case of re-sales a provisional notice
37       shall be passed on without delay, where possible, by telephone and confirmed on the same day in accordance with the Notices
38       Clause.
39
40
41   **7.  LOADING -**Loading port .............................................................................................
42       If a range is given, Sellers to declare port/berth(s)............................. days prior to commencement of the delivery period. Vessel(s)
43       to load in accordance with the custom of the port of loading unless otherwise stipulated.  Bill of lading shall be considered proof of
44       delivery in the absence of evidence to the contrary.
45
46
47   **8.  EXTENSION OF DELIVERY-** The contract period of delivery shall be extended by an additional period of not more than 21
48       consecutive days, provided that Buyers serve notice claiming extension not later than the next business day following the last day of the
49       delivery period.  In this event Sellers shall carry the goods for Buyers' account and all charges for storage, interest, insurance and other
50       such normal carrying expenses shall be for Buyers' account, unless the vessel presents in readiness to load within the contractual
51       delivery period.

49/1

4

52    Any differences in export duties, taxes, levies etc. between those applying during the original delivery period and those applying during
53    the period of extension, shall be for the account of Buyers. If required by Buyers, Sellers shall produce evidence of the amounts paid. In
54    such cases the Duties, Taxes and Levies Clause shall not apply.
55    Should Buyers fail to present a vessel in readiness to load under the extension period, Sellers shall have the option of declaring Buyers to
56    be in default, or shall be entitled to demand payment at the contract price plus such charges as stated above, less current FOB charges,
57    against warehouse warrants and the tender of such warehouse warrants shall be considered complete delivery of the contract on the part
58    of Sellers.
59

60   9.   INSURANCE- Marine and war risk insurance including strikes, riots, civil commotions and mine risks to be effected by Buyers with
61    first class underwriters and/or approved companies. Buyers shall supply Sellers with confirmation thereof at least 5 consecutive days
62    prior to expected readiness of vessel(s). If Buyers fail to provide such confirmation, Sellers shall have the right to place such insurance at
63    Buyers' risk and expense.
64

65   10.   PAYMENT-
66     (a)   By cash in .................................................................................................
67
68    against the following documents ...........................................................................
69     (b) No obvious clerical error in the documents shall entitle Buyers to reject them or delay payment, but Sellers shall be responsible for
70    all loss or expense caused to Buyers by reason of such error, and Sellers shall on request of Buyers furnish an approved guarantee in
71    respect thereto.
72     (c) Amounts payable under this contract shall be settled without delay. If not so settled, either party may notify the other that a
73    dispute has arisen, and serve a notice stating his intention to refer the dispute to arbitration in accordance with the Arbitration Rules.
74     (d) Interest – If there has been unreasonable delay in any payment, interest appropriate to the currency involved shall be charged. If
75    such charge is not mutually agreed, a dispute shall be deemed to exist which shall be settled by arbitration. Otherwise interest shall
76    be payable only where specifically provided in the terms of the contract or by an award of arbitration. The terms of this clause do not
77    override the parties' contractual obligation under sub-clause (a).
78

79   11.   EXPORT LICENCE - EC Export Licence if required, to be obtained by Buyers. For other countries export licence if required, to be
80    obtained by Sellers.
81

82   12.   DUTIES, TAXES AND LEVIES ON GOODS- Any EC export duties, taxes, levies, and refunds etc present or future in the country of
83    origin, shall be for Buyers' account, otherwise national duties and taxes, present or future shall be for Sellers' account. For other countries
84    any duties, taxes, levies, and refunds etc, present or future in the country of origin, shall be for Sellers' account.
85

86   13.   PROHIBITION- In case of prohibition of export, blockade or hostilities or in case of any executive or legislative act done by or on
87    behalf of the government of the country of origin of the goods, or of the country from which the goods are to be shipped, restricting
88    export, whether partially or otherwise, any such restriction shall be deemed by both parties to apply to this contract and to the extent of
89    such total or partial restriction to prevent fulfilment whether by shipment or by any other means whatsoever and to that extent this
90    contract or any unfulfilled portion thereof shall be cancelled. Sellers shall advise Buyers without delay with the reasons therefor and, if
91    required, Sellers must produce proof to justify the cancellation.
92

93   14.   FORCE MAJEURE, STRIKES, ETC.- Should the execution of this contract or any unfulfilled portion thereof be prevented by a strike,
94    lockout, riot or civil commotion, combination of workmen, breakdown of machinery, or fire, or any cause comprehended in the term
95    "Force Majeure", provided that notice has been served by Sellers or Buyers, as appropriate, within 7 consecutive days from the
96    occurrence, or not later than 21 days before the commencement of the delivery period, whichever is later, the time for delivery shall be
97    extended for a period of 30 consecutive days. If delivery be delayed for more than 30 consecutive days, Buyers shall have the option of
98    cancelling the delayed portion of the contract, such option to be exercised by Buyers serving notice to be received by Sellers not later than
99    the first business day after the additional 30 consecutive days. If Buyers do not exercise this option, such delayed portion shall be
100   automatically extended for a further period of 30 consecutive days. If delivery under this clause be prevented during the further 30
101   consecutive days extension, the contract shall be considered void. Buyers shall have no claim against Sellers for delay or non-delivery
102   under this clause, provided that Sellers shall have supplied to Buyers, if required, satisfactory evidence justifying the delay or non-
103   fulfilment.
104

105   15.   ICE-
106     (a) If FOB at an ocean-going port, should delivery or loading of the goods or any part thereof be prevented at any time during the last
107    30 days of the guaranteed delivery period or at any time during the guaranteed delivery period if such be less than 30 days, by reason
108    of ice at port(s) of loading or elsewhere preventing the forwarding of the goods to such port or ports, then the Sellers shall be
109    entitled, at the termination of such ice, to as much time, not exceeding 21 days, for delivery at such port(s) as was left for delivery
110    under the contract prior to the outbreak of ice, and in the event of the time left for delivery under the contract being 14 days or less, a
111    minimum extension of 14 days shall be allowed. In the event of further ice preventing delivery or loading of the goods during the
112    time by which the guaranteed time of delivery has been extended by reason of the operation of the provisions of the foregoing
113    paragraph, the additional extension shall be limited to the actual duration of such ice.
114     (b) If FOB at an up-river port, should delivery or loading of the goods or any part thereof be prevented at any time during the last 30
115    days of the guaranteed delivery period or at any time during the guaranteed delivery period if such be less than 30 days, by reason of ice
116    at port(s) of loading or elsewhere preventing the arrival of the vessel at the load port, then the Buyers shall be entitled at the termination
117    of such ice to as much time, not exceeding 21 days, for delivery at such port(s) as was left for delivery under the contract prior to the
118    outbreak of ice, and in the event of the time left for delivery under the contract being 14 days or less, a minimum extension of 14 days
119    shall be allowed. In the event of further ice preventing delivery or loading of the goods during the time by which the guaranteed time of
120    delivery has been extended by reason of the operation of the provisions of the foregoing paragraph, the additional extension shall be
121    limited to the actual duration of such ice.
122     (c) Buyers shall serve notice not later than 5 business days after the commencement of ice or 5 business days after the commencement of

the delivery period whichever is later if they intend to claim an extension of time for delivery under this clause.

(d) If required by either party, the other party must provide documentary evidence to establish any claim for extension under this clause.

(e) In the case of non-delivery made under the above circumstances the date of default shall be similarly deferred.

16. NOTICES-All notices required to be served on the parties pursuant to this contract shall be communicated rapidly in legible form. Methods of rapid communication for the purposes of this clause are defined and mutually recognised as: - either telex, or letter if delivered by hand on the date of writing, or telefax, or E-mail, or other electronic means, always subject to the proviso that if receipt of any notice is contested, the burden of proof of transmission shall be on the sender who shall, in the case of a dispute, establish, to the satisfaction of the arbitrator(s) or board of appeal appointed pursuant to the Arbitration Clause, that the notice was actually transmitted to the addressee. In case of resales/repurchases all notices shall be served without delay by sellers on their respective buyers or vice versa, any notice received after 1600 hours on a business day shall be deemed to have been received on the business day following. A notice to the Brokers or Agent shall be deemed a notice under this contract.

17. NON-BUSINESS DAYS- Saturdays, Sundays and the officially recognised and/or legal holidays of the respective countries and any days, which GAFTA may declare as non-business days for specific purposes, shall be non-business days. Should the time limit for doing any act or serving any notice expire on a non-business day, the time so limited shall be extended until the first business day thereafter. The period of delivery shall not be affected by this Clause.

18. WEIGHING- the terms and conditions of GAFTA Weighing Rules No.123 are deemed to be incorporated into this contract. Final at time and place of loading, as per GAFTA registered superintendent certificate at Sellers' choice and expense. Buyers have the right to attend at loading.

19. SAMPLING, ANALYSIS AND CERTIFICATES OF ANALYSIS- the terms and conditions of GAFTA Sampling Rules No. 124, are deemed to be incorporated into this contract. Samples shall be taken at time and place of loading. The parties shall appoint superintendents, for the purpose of supervision and sampling of the goods, from the GAFTA Register of Superintendents. Unless otherwise agreed, analysts shall be appointed from the GAFTA Register of Analysts

20. DEFAULT- In default of fulfilment of contract by either party, the following provisions shall apply: -
(a) The party other than the defaulter shall, at their discretion have the right, after serving notice on the defaulter, to sell or purchase, as the case may be, against the defaulter, and such sale or purchase shall establish the default price.
(b) If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be mutually agreed, then the assessment of damages shall be settled by arbitration.
(c) The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price established under (a) above or upon the actual or estimated value of the goods on the date of default established under (b) above.
(d) In all cases the damages shall, in addition, include any proven additional expenses which would directly and naturally result in the ordinary course of events from the defaulter's breach of contract, but shall in no case include loss of profit on any sub-contracts made by the party defaulting against or others unless the arbitrator(s) or board of appeal, having regard in special circumstances, shall in his/their sole and absolute discretion think fit.
(e) Damages, if any, shall be computed on the quantity called for, but if no such quantity has been declared then on the mean contract quantity and any option available to either party shall be deemed to have been exercised accordingly in favour of the mean contract quantity.

21. CIRCLE- Where Sellers re-purchase from their Buyers or from any subsequent Buyer the same goods or part thereof, a circle shall be considered to exist as regards the particular goods so re-purchased, and the provisions of the Default Clause shall not apply. (For the purpose of this clause the same goods shall mean goods of the same description, from the same country of origin, of the same quality, and, where applicable, of the same analysis warranty, for delivery from the same port(s) of loading during the same period of delivery). Different currencies shall not invalidate the circle.
Subject to the terms of the Prohibition Clause in the contract, if the circle is established before the goods are delivered, or if the goods are not delivered, invoices based on the mean contract quantity, or if the goods have been delivered invoices based on the delivered quantity, shall be settled by all Buyers and their Sellers in the circle by payment by all Buyers to their Sellers of the excess of the Sellers' invoice amount over the lowest invoice amount in the circle. Payment shall be due not later than 15 consecutive days after the last date for delivery, or, should the circle not be ascertained before the expiry of this time, then payment shall be due not later than 15 consecutive days after the circle is ascertained.
Where the circle includes contracts expressed in different currencies the lowest invoice amount shall be replaced by the market price on the first day for contractual delivery and invoices shall be settled between each Buyer and his Seller in the circle by payment of the differences between the market price and the relative contract price in the currency of the contract.
All Sellers and Buyers shall give every assistance to ascertain the circle and when a circle shall have been ascertained in accordance with this clause it shall be binding on all parties to the circle. As between Buyers and Sellers in the circle, the non-presentation of documents by Sellers to their Buyers shall not be considered a breach of contract. Should any party in the circle prior to the due date of payment commit any act comprehended in the Insolvency Clause of this contract, settlement by all parties in the circle shall be calculated at the closing out price as provided for in the Insolvency Clause, which shall be taken as a basis for settlement, instead of the lowest invoice amount in the circle. In this event respective Buyers shall make payment to their Sellers or respective Sellers shall make payment to their Buyers if the difference between the closing out price and the contract price.

22. INSOLVENCY- If before the fulfilment of this contract, either party shall suspend payments, notify any of the creditors that he is unable to meet debts or that he has suspended or that he is about to suspend payment of his debts, convene, call or hold a meeting of creditors, propose a voluntary arrangement, have an administration order made, have a winding up order made, have a receiver or manager appointed, convene, call or hold a meeting to go into liquidation (other than for re-construction or amalgamation), or have a Bankruptcy Petition presented against him (any of which acts being hereinafter called an "Act of Insolvency") then the party committing such Act of Insolvency shall forthwith serve a notice of the occurrence of such Act of Insolvency on the other party to the contract and upon proof (by either the other party to the contract or the Receiver, Administrator, Liquidator or other person representing the party

49/3

6

194   committing the Act of Insolvency) that such notice was thus served within 2 business days of the occurrence of the Act of Insolvency,
195   the contract shall be closed out at the market price ruling on the business day following the serving of the notice. If such notice has not
196   been served, then the other party, on learning of the occurrence of the Act of Insolvency, shall have the option of declaring the contract
197   closed out at either the market price on the first business day after the date when such party first learnt of the occurrence of the Act of
198   Insolvency or at the market price ruling on the first business day after the date when the Act of Insolvency occurred.
199   In all cases the other party to the contract shall have the option of ascertaining the settlement price on the closing out of the contract by
200   repurchase or re-sale, and the difference between the contract price and the re-purchase or re-sale price shall be the amount payable or
201   receivable under this contract.

202
203   23.   DOMICILE- This contract shall be deemed to have been made in England and to be performed in England, notwithstanding any
204   contrary provision, and this contract shall be construed and take effect in accordance with the laws of England. Except for the
205   purpose of enforcing any award made in pursuance of the Arbitration Clause of this contract, the Courts of England shall have
206   exclusive jurisdiction to determine any application for ancillary relief, (save for obtaining security only for the claim or counter-
207   claim),the exercise of the powers of the Court in relation to the arbitration proceedings and any dispute other than a dispute which
208   shall fall within the jurisdiction of arbitrators or board of appeal of the Association pursuant to the Arbitration Clause of this
209   contract. For the purpose of any legal proceedings each party shall be deemed to be ordinarily resident or carrying on business at the
210   offices of The Grain and Feed Trade Association, (GAFTA), England, and any party residing or carrying on business in Scotland
211   shall be held to have prorogated jurisdiction against himself to the English Courts or if in Northern Ireland to have submitted to the
212   jurisdiction and to be bound by the decision of the English Courts. The service of proceedings upon any such party by leaving the
213   same at the offices of The Grain and Feed Trade Association, together with the posting of a copy of such proceedings to his address
214   outside England, shall be deemed good service, any rule of law or equity to the contrary notwithstanding.

215
216   24.   ARBITRATION-
217   (a) Any and all disputes arising out of or under this contract or any claim regarding the interpretation or execution of this contract
  shall be determined by arbitration in accordance with the GAFTA Arbitration Rules, No 125, in the edition current at the date of this
  contract, such Rules are incorporated into and form part of this Contract and both parties hereto shall be deemed to be fully cognizant
220   of and to have expressly agreed to the application of such Rules.

221
222   (b) Neither party hereto, nor any persons claiming under either of them shall bring any action or other legal proceedings against the
223   other in respect of any such dispute, or claim until such dispute or claim shall first have been heard and determined by the
224   arbitrator(s) or a board of appeal, as the case may be, in accordance with the Arbitration Rules and it is expressly agreed and
225   declared that the obtaining of an award from the arbitrator(s) or board of appeal, as the case may be, shall be a condition precedent to
226   the right of either party hereto or of any persons claiming under either of them to bring any action or other legal proceedings against
227   the other of them in respect of any such dispute or claim.

228
229   (c) Nothing contained under this Arbitration Clause shall prevent the parties from seeking to obtain security in respect of their claim
230   or counterclaim via legal proceedings in any jurisdiction, provided such legal proceedings shall be limited to applying for and/or
231   obtaining security for a claim or counterclaim, it being understood and agreed that the substantive merits of any dispute or claim
232   shall be determined solely by arbitration in accordance with the GAFTA Arbitration Rules, No 125.

233
234   25.   INTERNATIONAL CONVENTIONS-
235   The following shall not apply to this contract -
236   (a) The Uniform Law on Sales and the Uniform Law on Formation to which effect is given by the Uniform Laws on International Sales
237   Act 1967;
238   (b) The United Nations Convention on Contracts for the International Sale of Goods of 1980; and
239   (c) The United Nations Convention on Prescription (Limitation) in the International Sale of Goods of 1974 and amending Protocol of
240   1980.
  (d) Incoterms.
243   (e) Unless the contract contains any statement expressly to the contrary, a person who is not a party to this contract has no right
  under the Contract (Rights of Third Parties) Act 1999 to enforce any term of it.

Sellers ............................................................................. Buyers.............................................

Printed in England and issued by

GAFTA
(THE GRAIN AND FEED TRADE ASSOCIATION)
GAFTA HOUSE, 6 CHAPEL PLACE, RIVINGTON ST, LONDON EC2A 3SH

49/4

EXHIBIT "C"

[??]

IN THE MATTER OF AN ARBITRATION AT GAFTA

BETWEEN:

NOBLE RESOURCES S.A

Buyers/Claimants

-and-

YUGTRANZITSERVIS LTD

Sellers/Respondents

---

CLAIM SUBMISSIONS

---

1.    These submissions are made on behalf of Noble Resources S.A. ("Buyers"), in their dispute with Yugtranzitservis Ltd ("Sellers") arising out of a contract dated 13 April 2007 (contract no. 200704147) for the sale of 25,000 metric tonnes (plus or minus 10% at Buyers' option) of Russian Milling Wheat ("the Contract").

2.    The claim arises out of Sellers' failure to perform the Contract.

3.    A paginated bundle of documents and correspondence relevant to the claim is enclosed with these submissions. References to page numbers in these submissions are references to the pages in that bundle.

THE CONTRACT

4.    By the Contract, Sellers agreed to sell and Buyers agreed to buy 25,000 mt of Russian Milling Wheat, plus or minus 10% at Buyers' option (pages 1 to 3).

5.    The contract price was US$172.00 per metric ton, basis "*FOB stowed/trimmed Novorossiysk port, one/two berth(s)*". The Contract incorporated the terms of GAFTA 49 (pages 4 to 7), in so far as these were not in conflict with the Contract terms. The Contract provided for arbitration in London and in accordance with GAFTA 125.

6.    In relation to delivery, the Contract provided as follows:

> **Delivery:** *within July 15th -August 15th, 2007, both dates included, to be narrowed in Sellers' option as a "window" for loading in Novorossiysk port.*
> *Vessel nominated by Buyers to tender her Notice of Readiness at Novorossiysk loading port and to be in all respects ready to load the cargo in Novorossiysk port "window" dates, without extension.*
> *First and last day of the "window" to be included and to be advised by Sellers at the beginning of July, 2007, before shipping period commences. If the vessel will not arrive within the stipulated "window" days, Buyers to bear all expenses incurred in this connection, including but not limited to carrying charges, storage, expenses for loading, demurrage, detention, demurrage and/or detention of other arriving vessels in the port queue, interest, insurance and other normal carrying expenses.*

*Clauses 6 and 8 of GAFTA 49 not to apply.*
*Loading to be executed by direct method (wagon-board of the vessel).*
*Buyers to present self-trimming bulk carrier single decker vessel suitable for direct loading (wagon - board of the vessel). The vessel being nominated by Buyers should be confirmed or rejected by Sellers in writing (by means of E-mail or telefax) with indication of the vessel's parameters unacceptable to the loadport within 4 Novorossiysk port working hours after Buyers having presented vessel's description.*

7.    The Contract also provided for a loading rate of *"5,000 metric tons per WWD of 24 consecutive hrs or pro rata, SSHEX EIU"*.

## THE FACTS

8.    In accordance with the terms of the Contract, Sellers were required to provide a "window" for loading in Novorossiysk port at the beginning of July 2007 and before 15 July 2007. Sellers did not do so.

9.    It was only after requests from Buyers (see messages from Buyers to Sellers of 2 and 5 July 2007 (pages 8-11) that on 11 July 2007 the Sellers declared a "window" for loading between 1 and 15 August 2007 (pages 12-13). However, Sellers indicated that they were unable to provide a more precise window.

10.   Buyers responded on 13 July 2007 acknowledging Sellers' declaration of a shipment period. Buyers also insisted that Sellers notify their *"intention of loading latest by next Monday 16th of July"*, referring to Sellers' failure to give a more precise window (pages 14-15).

11.   On 18 July 2007, Buyers nominated the MV ISLAND SKIPPER as the performing vessel for 1 August 2007 (pages 16-17). By e-mail of the same date, Sellers rejected Buyers nominated vessel because *"the dimensions of hatch No. 1 are not suitable for loading by direct variant "wagon-board of the vessel"* (page 18).

12.   On 19 July 2007, Buyers nominated the MV GALINA III as the performing vessel (pages 19-20). This vessel was also rejected by Sellers on 20 July 2007 because *"she is a tweendecker and as per terms of our cntr the vessel should be single decker suitable for direct loading "wagon-board the vessel"* (pages 21-23).

13.   Buyers then nominated the MV PANAGIA I on 20 July 2007 (pages 24-26). This vessel was also rejected by Sellers on 23 July 2007 (pages 27-28).

14.   On 20 July 2007, Sellers also gave a two day window for the port of 10-11 August 2007 (page 29). This message was simply too late to have any contractual effect given that Sellers had already declared the window as 1 to 15 August 2007 and the date by which such a window needed to be given had already passed.

15.   At around this time, Buyers became aware that Sellers had defaulted on delivery of a shipment of Russian Milling wheat to Nidera from Novorossiysk. During discussions with Sellers at the relevant time, Buyers had raised with Sellers their concern as to whether Sellers would perform. At the time, Sellers confirmed that they would perform under the Contract subject to Buyers providing a suitable vessel.

2

16. On 24 July 2007 Buyers nominated the MV SOUTHGATE ETA 10 August 2007 (pages 29-30). This vessel was accepted by Sellers on 24 July 2007. In confirming Buyers nominated vessel, Sellers stated as follows:

*"We draw your attention that the vessel to be ready in all respects to load her cargo at nominated window 10-11 August 2007 without extension. In case if you will delay that window will be missed."* (page 29).

17. Buyers responded on 26 July 2007 rejecting Sellers' comments in relation to the purported narrowed window nomination (page 31).

18. On 1 August 2007, the MV SOUTHGATE arrived at the port of Novorossiysk and the vessel's master tendered notice of readiness on 2 August 2007 (page 32).    On 3 August 2007, the vessel passed its hold inspection performed by SGS (pages 58-64).

19. Following tender of NOR, Buyers had the vessel waiting ready for loading to commence. It initially appeared that no berth was available. However, on 9 August 2007, Buyers received a message from their agents stating as follows: *"ETB: not earlier than on 10-11/08 - due to unavailability of cargo"* (page 33-34).

20. On 10 August 2007, Buyers sent a message to Sellers stating:

*"As you well know, the vessel has tendered NOR at the port and is ready to load the wheat since beginning of August.*

*We are very concerned, however, that we are yet to see any berthing instructions from sellers nor any confirmation that sellers have the cargo ready to commence loading.*

*We want to hear from sellers urgently on this.*

*In the meantime, Buyers have no option but to reserve all of their rights and hold sellers fully responsible for all losses, expenses and costs arising out of the delay in commencement of loading."*(page 35).

21. Later that day, Buyers received a message from Sellers attaching a translation of a letter received from Sellers' forwarder at Novorossiysk stating that the vessel was not ready for handling due to a technical reason (pages 36 -38).

22. Buyers immediately investigated the position and learned that the Ministry of Transport of the Russian Federation Federal Agency of Sea and River Transport Federal State Institution ("Novorossiysk Maritime Port Administration"), had ordered a Port State Control inspection of the MV Southgate on 8 August 2007. Buyers only learnt of the inspection on 10 August 2007.

23. The Report of the Novorossiysk Maritime Port Administration was issued the same day and noted a number of deficiencies. A copy of the Report is attached at pages 39-41. This did not, however, affect the vessel's readiness to load the cargo. As set out above, the vessel had passed its hold inspection on 3 August.

LONDON-4507721.1-LMASON

24.    Immediately, work was undertaken to remedy the deficiencies and on 11 August 2007, the Russian Maritime Register of Shipping undertook a survey of the vessel and concluded as follows: "*The all deficiencies (with the exception of item 0915 - IMO symbols) have been rectified. Deficiency concerning IMO symbols (item 0915) should be rectified at next port (code of action - 15/40).*" (page 44).

25.    On 11 August 2007, Buyers reiterated to Sellers that vessel was ready to load, having arrived and tendered NOR a number of days previously. Buyers said that they expected Sellers to stand-by for loading (page 45).

26.    Buyers sent a further message to Sellers on 12 August 2007 raising concerns that despite the Vessel being ready to berth it appeared that Sellers had failed to include it in the berthing plan. Buyers requested immediate confirmation from Sellers that they were urgently taking steps to allow the vessel to berth (page 46).

27.    On 12 August 2007 Silverstone SA (Sellers' guarantor) confirmed to Sellers' forwarder (page 47 and 48) that the loading of the MV Southgate was being cancelled.

28.    The information was confirmed the next day when Buyers were informed by their agents at Novorossysk port that Sellers had cancelled the MV SOUTHGATE for loading of the cargo (page 49).

29.    On 14 August 2007, Buyers sent a message to Sellers mentioning that they had still not received a response from Sellers. Buyers referred to the Port State Control report which showed that the vessel was ready in all respects for loading. Buyers requested that Sellers declare their intentions in respect of the cargo urgently and requested a response by 4 pm that day (page 50).

30.    Sellers responded on 14 August 2007 alleging that the Contract had been "frustrated" allegedly by reason of Buyers' vessel having missed the "window" (page 51).

31.    On 15 August 2007, Buyers wrote again to Sellers reiterating that vessel had been at the port since the beginning of August and asking for clarification whether Sellers intended to load the M.V. SOUTHGATE (page 52).

32.    Buyers then sent a further message to Sellers on 16 August 2007 stating: "*We have already told you many times that we are ready and waiting to load the wheat but you are refusing to respond at all. Please urgently confirm that the cargo is ready to be loaded and that you will indeed be loading our cargo.*" (pages 53-54).

33.    No response was received from Sellers. Buyers gave Sellers a further opportunity to respond and on 17 August 2007, Buyers wrote to Sellers referring to its previous messages of 15 and 16 August 2007 (pages 55-56).

34.    By this time, the price of Russian Milling Wheat had increased significantly to approximately US$300 per metric ton.

35.    Buyers requested that Sellers immediately confirm their intentions as regards loading of the vessel. Buyers gave Sellers until 11 am local time on 21 August 2007 to confirm (a) that Sellers intend to load the vessel and provide a reasonable quick and short loading

4

date; or (b) to commence loading. Buyers indicated that if Sellers failed to give the requisite confirmation then Buyers would hold Sellers in default (page 55).

36. Sellers failed to respond within the requested deadline and no steps whatsoever were taken by Sellers to berth or load the vessel. Accordingly, by their message dated 21 August 2007, Buyers declared Sellers in default (page 57).

BUYERS' NOTICE OF ARBITRATION

37. On 20 September 2007, Buyers wrote to Sellers claiming arbitration in respect of the substantial damages, additional expenses and costs incurred by reason of Sellers failure to berth and load the M.V. SOUTHGATE in accordance with the Contract.

38. Buyers appointed Mr Martin Sage as arbitrator in respect of its claims. On 28 September 2007, Sellers appointed Mr Peter Brown as arbitrator in response to Buyers' claims.

SUBMISSIONS

39. Buyers' case is that Sellers - in breach of their obligations as FOB seller under the Contract - failed to make arrangements to berth the vessel at the port of Novorossiysk and failed to load the cargo on board the M.V. SOUTHGATE. Buyers have suffered losses as a result of that breach.

40. Buyers' vessel arrived at Novorossiysk port on 1 August 2008. The M.V. SOUTHGATE was fit and ready for loading as from 3 August 2008 as evidenced by the Holds Inspection by SGS dated 3 August 2007 (pages 58-64).

41. Buyers repeatedly asked Sellers to confirm their intentions in respect of loading of the vessel, as detailed at paragraphs 8 to 36 above. However, Sellers failed to make arrangements to berth and load the vessel or to co-operate with Buyers within the delivery period. This was against the background of the confirmation from Sellers' forwarder and Buyers' agents that Sellers had "cancelled" the vessel for loading within the contractual delivery period.

42. Buyers waited for an additional 6 days after the end of the delivery period before declaring Sellers in default. This was more than reasonable in the circumstances. Faced with Sellers' intransigence, and with no prospect of the M.V. SOUTHGATE being allowed to berth at Novorossiysk, Buyers had no option but to declare Sellers in default and re-fix the vessel.

43. The "window" given by Sellers on 20 July 2007 of 10-11 August was of no contractual effect since it was given too late under the Contract and, in any event, a window of 1-15 August had already been declared. Any further narrowing was not in accordance with the Contract, nor Buyers' message of 13 July 2007 (page 14).

44. Even if (which is denied), the window of 10-11 August was contractual:

   • The vessel arrived and was ready to load within the delivery period.

- The Port State Control inspection of the vessel did not affect its readiness to receive the cargo and in any event, the inspection was completed on 11 August and the vessel passed.

- The consequences of not meeting the window are set out in the Contract and Sellers were still obliged to load as the Delivery Period was still open until 15 August 2007

45.  In short, Buyers gave effective shipping instructions, Sellers accepted the vessel and the vessel was ready to load within the delivery period. Buyers fulfilled all of their obligations under the Contract. Sellers failed to ship the cargo and were in default.

## DAMAGES

46.  As a result of Sellers' breach of contract, Buyers' have incurred considerable losses. We set out below details of the sums Buyers now claim from Sellers.

### Default Damages

47.  The damages recoverable for default are set out in the GAFTA default clause (clause 20 of GAFTA 49). Clause 20 provides:

> "(a) The party other than the defaulter shall, at their discretion have the right, after serving notice on the defaulter, to sell or purchase, as the case may be, against the defaulter, and such sale or purchase shall establish the default price.
>
> (b) If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be mutually agreed, then the assessment of damages shall be settled by arbitration.
>
> (c) The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price established under (a) above or upon the actual or estimated value of the goods on the date of default established under (b) above."

48.  Buyers claim damages under GAFTA 24(c). Buyers declared Sellers in default on 21 August 2007. Accordingly, the date of default for the purpose of establishing the default price is 21 August 2007.

49.  Buyers refer the Tribunal to the market price evidence summarised in the attached table (page 65). The statements of independent brokers, Allgrain Brokers (page 66) and Vicorus Commodity Brokers (page 67) are the best evidence of the market price for Russian Milling Wheat on the date of default. Taking an average of the two statements, the market price at the time of default was US$297.00 per metric tonne. Accordingly, Buyers claim damages of US$3,125,000 being the difference between the contract price of US$172.00 and the market price of US$297.00 in respect of the mean contractual quantity of 25,000 mts.

6

Wasted Vessel Costs

50.    GAFTA 20 (d) provides as follows:

> "*In all cases the damages shall, in addition, include any proven additional expenses which would directly and naturally result in the ordinary course of events from the defaulter's breach of contract…*"

51.    Buyers paid hire on the vessel chartered to perform the Contract in the total sum of US$1,364,515.59. They also paid bunker costs of US$131,520 and port costs of US$26,000. The vessel was delivered and gave NOR on 2 August 2007, within the delivery period and original "window". Accordingly, pursuant to GAFTA 20(d) Buyers are entitled to those wasted vessel costs incurred as a result of Sellers' default less any sums obtained from Buyers re-letting the vessel. Buyers were able to re-let the vessel as from the date of default (21 August 2007) for the amount of US$733,411.72. Buyers therefore claim total wasted vessel costs in the sum of US$788,623.87.

## CONCLUSION

52.    Sellers were plainly in default of the Contract. Accordingly, Buyers are entitled to default damages in the sum of US$3,125,000.00 based on the difference between Contract and market price.

53.    Buyers are also entitled to wasted costs of US$788,623.87.

54.    Buyers ask the Tribunal for an Award in the following terms:

    (a)    Sellers were in default of Contract by virtue of their failure to load the cargo.

    (b)    Sellers pay Buyers' damages (including proven additional expenses) in the sum of US$3,913,623.87 (paragraphs 49 to 51 above).

    (c)    Sellers to pay the costs of the arbitration.

    (d)    Sellers to pay compounded interest on all principal sums awarded from the date of default to the date of payment and Sellers to pay interest on arbitration costs from the date of the Award until payment.

26 November 2007

7

EXHIBIT "D"



**Noble Resources S.A.**
**c/o Reed Smith**
Beaufort House
15 St Botolph Street
London, EC3A 7EE
Fax No: 020 7247 5091
**BY FAX & COURIER – ORIGINAL**

4th July 2008

Dear Sirs,

**Award of Arbitration No. 13-710**
**Noble Resources S.A. v. Yugtranzitservis Ltd**

Having received your remittance of £6,671.28, I enclose herewith your copy of the above Award of Arbitration, which is dated today 4th July 2008. Copies have been sent to those mentioned below.

Please note that if any party intends lodging any appeal against the above Award of Arbitration, the notifications and appeal deposit fee must reach the Association, as required by the Arbitration Rules, no later than 12 noon on the 30th consecutive day after the date of the Arbitration Award.

Yours faithfully,

**Dispute Resolution Service**
Ref: 13-710/pn

| cc: | **Yugtranzitservis Ltd** | cc: | **Noble Resources S.A.** |
|---|---|---|---|
| | **c/o J Covo – BY EMAIL & POST** | Fax No: | 0041 21 331 0891 |

| cc: | **Yugtranzitservis Ltd** | cc: | **Members of the Tribunal** |
|---|---|---|---|
| | Poumpoulinas 15 | | M Sage |
| | Office 301/302 P.C. | | P M Brown |
| | 1060 Nicosia | | A Oakley – (Chairman) |
| | Cyprus | | **BY POST** |
| Fax No: | 00357 2535 5174 | | |

**BY FAX & COURIER - ORIGINAL**

**The Grain and Feed Trade Association**

GAFTA
1-1-1607
Leading International Center
No.1 Guang Qu Men Nan Xiao Jie,
ChongWen District
100061, Beijing, China
Telephone: +86 10 6712 1741
Facsimile: +86 10 6712 1742
E-mail: gafta@263.net

GAFTA House,
6 Chapel Place
Rivington Street,
London EC2A 3SH
United Kingdom
Telephone: +44 20 7814 9666
Facsimile: +44 20 7814 8383
E-mail: Post@gafta.com
Website: www.gafta.com

GAFTA
8, Saperno- Slobodskaya Street
Office # 1,
Kiev 03026
Ukraine
Telephone: +380 44 524 0329
Facsimile: +380 44 524 0231
E-mail: golodova@gaftakyiv.com

Registered in England with liability limited by guarantee under number 1006456

*Page 2*

Gafta

To:        **Noble Resources S.A.**
           **c/o Reed Smith**
Fax No:    020 7247 5091

To:        **Yugtranzitservis Ltd**
Fax No:    00357 2535 5174

**Award of Arbitration No. 13-710**
**Noble Resources S.A. v. Yugtranzitservis Ltd**

The Association's International Contracts Policy Committee has asked the secretariat to be more active in publishing final awards of arbitration to Members for information. Such publications would be anonymous by removing the names of the parties, specific contract details, vessels names etc.

To date we have relied on Arbitrators to recommend an award they consider could be published in this way. However, as this has not worked, if you would be willing and consider it appropriate for the substance of this Award to be published, anonymously, would you please sign and return the slip at the foot of the page.

No award will be published without both the Parties' agreement.

..............................................................................................

**AWARD OF ARBITRATION NO:  13-710**

I agree to the above Award of Arbitration being published to Members anonymously.

**Signed:**............................................................................................

**Company:**............................................................................................

# Award of Arbitration



## Gafta

The Grain and Feed Trade Association
Gafta House, 6 Chapel Court, Chapel Place
Rivington Street, London EC2A 3DQ
United Kingdom

0 4 JUL 2008

**ARBITRATION NO: 13-710**

<u>COPY</u>

## IN THE MATTER OF THE ARBITRATION ACT 1996

### and

## IN THE MATTER OF AN ARBITRATION PURSUANT TO THE ARBITRATION RULES NO. 125 OF THE GRAIN AND FEED TRADE ASSOCIATION

BETWEEN:-

**CLAIMANTS**          **NOBLE RESOURCES S.A.**
                       of Lausanne, Switzerland
                       **(BUYERS)**

-v-

**RESPONDENTS**        **YUGTRANZITSERVIS LTD**
                       of Nicosia, Cyprus.
                       **(SELLERS)**

By a contract dated 13th April 2007, made in respect of 25,000 tonnes of Russian milling wheat, delivery FOB at Novorossiysk.

**WE DO HEREBY FIND AS FOLLOWS:**

1.  **<u>WHEREAS:</u>**

1.1.   By a contract agreed on 13th April 2007 ("the Contract"), Noble Resources S.A. of Lausanne ("the Buyers") agreed to buy and Yugtranzitservis Ltd of Nicosia ("the

# Gafta

**ARBITRATION NO: 13-710**

Sellers") agreed to sell 25,000 tonnes of Russian milling wheat ("the cargo") 10% more or less in the Buyers' option basis delivery FOB at Novorossiysk.

1.2.  The terms of the Contract provided for any disputes arising thereunder to be referred to arbitration in London in accordance with English law and the GAFTA Arbitration Rules No. 125 ("the arbitration clause").

1.3.  Following a dispute between the parties, the Buyers appointed me, Martin Sage, as their nominated arbitrator and the Sellers nominated me, Peter Brown, as their nominated arbitrator. GAFTA duly appointed me, Alan Oakley as third arbitrator and Chairman of the Tribunal. The seat of the arbitration is in England.

1.4.  In this arbitration, the Buyers claimed damages, by way of the Sellers' default, in the overall sum of US$3,913,623.87 together with interest and costs. The Sellers denied liability for the Buyers' claim for damages.

1.5.  The Buyers were represented by the firm of Reed Smith Richards Butler of London. The Sellers were represented by Mr Jacques Covo of Geneva. Both parties served written submissions. The Sellers initially requested an oral hearing. However, this request was subsequently withdrawn and matters were decided on the basis of the parties' written submissions.

## 2.   THE CONTRACT:

2.1.  The terms of the Contract were evidenced by a contract note dated 14th April 2007. Neither party disputed the terms of the contract note, which was agreed on the basis of the GAFTA Contract Form No. 49 and included the Arbitration Rules No. 125.

2.2.  The relevant terms of the Contract are as follows:

"*Quantity*      *25,000 metric tons, plus or minus 10% at Buyers' option …*

*Delivery*      *within July 15th – August 15th, 2007; both dates included to be narrowed in Seller's option as a "window" for loading in Novorossiysk port. Vessel nominated by Buyers to tender her Notice of readiness at Novorossiysk loading port and to be in all respects ready to load the cargo in Novorossiysk port "window" dates, without extension. First and last day of the "window" to be*

THE GRAIN AND FEED TRADE ASSOCIATION

3

**Ga**f**ta**

**ARBITRATION NO: 13-710**

*included and to be advised by Sellers at the beginning of July 2007, before shipping period commences. ...*

Price            USD 172 ... per metric ton, FOB Stowed/Trimmed Novorossiysk port ...

*General Conditions*
*All other terms, conditions and rules, not in contradiction with the above contained in Form 49 of GAFTA of which the parties admit that they have knowledge and notice, apply to this transaction and the details above given shall be taken as having been written into such form in the appropriate places. ...*

*Arbitration clause*
*Any dispute arising out or under this contract shall be settled by arbitration in accordance with the Arbitration Rules no. 125 of the Grain and Feed Trade Association ...*
*Arbitration to take place in London/England. ..."*

## 3.    THE BACKGROUND TO THE CASE.

3.1.    The background to this dispute is relatively straightforward and can be summarised from the Buyers' submissions as follows (all dates are 2007).

3.2.    On 11th July, the Sellers declared a shipment "window" of 1 – 15 August. Following the Sellers' insistence that they be given the name of the performing vessel, the Buyers nominated the "ISLAND SKIPPER", the "GALINA III" and the "PANAGIA 1", all of which were rejected by the Sellers due to technical reasons. The Sellers then, on 20th July, gave a two day window for loading 10 -11 August and, on 24th July, the Buyers nominated and the Sellers accepted the nomination of the "SOUTHGATE" ("the vessel"), ETA 10TH August.

3.3.    On 1st August, the vessel arrived at Novorossiysk and on 2nd August the master tendered the Notice of Readiness. The following day, the vessel's holds were inspected and passed by SGS as being clean and suitable to load the cargo.

3.4.    On 9th August, the Buyers were informed that the vessel was not expected to berth before 10th or 11th August due to the unavailability of the cargo. The vessel then waited for loading orders, though had to undergo some repair work on 10th August at the behest of the Russian Maritime authorities. This work was completed and

THE GRAIN AND FEED TRADE ASSOCIATION          4                    Gafta

**ARBITRATION NO: 13-710**

approved by 11th August. However, on 12th August, the Buyers were informed by Silverstone SA of Lausanne (who the Buyers described as the Sellers' guarantor) that the loading of the "SOUTHGATE" had been cancelled. On 13th August, the Buyers' local agent, Global Ocean Agency Ltd, advised that they had been told by local forwarders that the shippers, who they named as "Silverstone" had cancelled the loading of this vessel.

3.5.    The following day, the Buyers sought clarification from the Sellers, who later advised them that the contract had been "frustrated" due to the vessel having missed the loading "window" of 10 – 11 August and, as a consequence, the vessel had lost her position in the loading queue. The Buyers then sought further clarification from the Sellers. However, the Sellers failed to respond to their enquiries and on 21st August, the Buyers declared the Sellers in default of the Contract.

4.      **THE ISSUES:**
4.1.    The Buyers claimed damages as follows:

> (i)     default damages        US$3,125,000.00; and
> (ii)    wasted costs           US$   788,623.87
> - total                        US$3,913,623.87

4.2.    The Sellers accepted liability for default in failing to deliver the goods in accordance with the terms of the Contract. However, they denied liability for the Buyers' claim for damages: though it could be construed that the Sellers accepted liability in the minimum sum of US$1,250,000 (25,000 metric tons being the mean quantity x US$50 being their minimum value of US$222 on the day of default less the contract price of US$172).

4.3.    The issues in dispute were identified as follows:

> (i)     default damages:
>         (a)  the date of the default; and
>         (b)  quantum.
> (ii)    wasted costs:
>         (a)  the Buyers' entitlement to damages by way of wasted costs; and

G*a*fta

**ARBITRATION NO: 13-710**

(b) quantum.

## 5.    DEFAULT DAMAGES:

5.1.    Essentially, the Sellers argued that the date of the default was 16th (or 15th) August, whereas the Buyers argued that it was 21st August.

5.2.    The relevant provision of the Contract is clause 20 of Gafta No. 49, which provides as follows:

> *"DEFAULT-*
> *In default of fulfilment of contract by either party, the following provisions shall apply: -*
> *(a) The party other than the defaulter shall, at their discretion have the right, after serving notice on the defaulter, to sell or purchase, as the case may be, against the defaulter, and such sale or purchase shall establish the default price.*
> *(b) If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be mutually agreed, then the assessment of damages shall be settled by arbitration.*
> *(c) The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price established under (a) above or upon the actual or estimated value of the goods on the date of default established under (b) above.*
> *(d) In all cases the damages shall, in addition, include any proven additional expenses which would directly and naturally result in the ordinary course of events from the defaulter's breach of contract, but shall in no case include loss of profit on any sub-contracts made by the party defaulted against or others unless the arbitrator(s) or board of appeal, having regard to special circumstances, shall in his/their sole and absolute discretion think fit.*
> *(e) Damages, if any, shall be computed on the quantity called for, but if no such quantity has been declared then on the mean contract quantity and any option available to either party shall be deemed to have been exercised accordingly in favour of the mean contract quantity."*

5.3.    The default date was therefore important since it was the date on which damages could be assessed.

5.4.    The Buyers argued that they were entitled to wait until 21st August before accepting the Sellers' conduct as a repudiatory breach. Having given notice of the Sellers' default on 21st August, they argued that this date should be taken as the default date under clause 20 of Gafta No. 49 for the purpose of calculating damages.

**ARBITRATION NO: 13-710**

5.5.    The Sellers argued that the default date was the date that the Sellers were in breach, namely 16th (or 15th) August: the Sellers referred us to the authorities of Toprak Mahsulleri Ofisi v Finagrain Compagnie Commerciale Agricole et Financiere S.A. [1979] 2 Lloyd's Rep. 98 ("Toprak v Finagrain") and Bremerhandel v Vanden Avenne [1978] 2 Lloyd's Rep. 109 ("Bremerhandel vs Vanden Avenne").

5.6.    Although the Buyers argued that the Court of Appeal decision in the case of Toprak v Finagrain supported their view that the default date was 21st August, it seems to us that there is a distinction between that case and the circumstances that we have here. The reason that the Court of Appeal allowed the default date to fall back from 31st March to 30th April 1975 was because it was effectively *"extended by the conduct of the parties"*: see the final paragraph on page 21 of the decision. This was not the case here since the Sellers gave no indication after 15th August that they intended to perform the Contract and, indeed, the evidence was that on 12th August, Silverstone SA (who the Buyers accepted as the Sellers' guarantors) had notified the Buyers that the port had cancelled the loading of the "SOUGHGATE". Therefore, when the Sellers failed to provide a load berth, or load the vessel, by 15th August, the Buyers had no reason to believe that the Sellers would perform the Contract thereafter. The fact that the Sellers failed to respond to the Buyers' enquiries about the status of the cargo should have been sufficient indication to the Buyers that the Sellers did not intend to perform the Contract.

5.7.    Furthermore, in their message dated 14th August, the Sellers stated *"Proceeding from the circumstances that performance of contract had been frustrated from the Buyers side we hereby reserve ourselves the rights to recover all incurred costs from blamed party strictly in accordance with sales ctr...".* Therefore, the clear inference was that on 14th August, the Sellers considered that the contract was at an end. What is more, there was no evidence after 14th August to suggest that the Sellers had changed their position or that they would perform the Contract.

5.8.    We therefore accept the Sellers' evidence that their failure to perform the Contract by latest 15th August meant that they were in default effective 00:01 on 16th August and not 21st August as the Buyers claimed. The default date was therefore 16th August,

COPY

THE GRAIN AND FEED TRADE ASSOCIATION          7

# Gafta

**ARBITRATION NO: 13-710**

being the first day following the last day of the contractual period of performance: see Bremerhandel vs Vanden Avenne.

5.9.   We now turn to the issue of damages. The Buyers calculated damages as follows: Contract price of US$172.00 less the estimated average price on 21st August 2007 of US$297 = US$125 x 25,000 mt (being the mean quantity) = US$3,125,000 damages.

5.10.  Effectively, the parties relied on the following reports as evidence of the price of the goods at the time of default:

   (I)   Buyers' evidence:

       (i)    Allgrain Brokers BV report dated 28th August 2007 which estimated the average price on 21st August 2007 at US$300 per mt.

       (ii)   Vicorus SA report dated 11th October 2007, which estimated the market price on 21st August 2007 at US$294 per mt.

       (iii)  Allgrain Brokers BV report dated 12th February 2008 which estimated the market price on 15th August 2007 at US$295.

       (iv)   Vicorus SA report dated 12th February 2008, which estimated the market price on 15th August 2007 at US$294 per mt.

       (v)    SovEcon undated report which estimated the market price on 16th August at US$280 per mt and on 24th August at US$300 per mt.

   (II)  Sellers' evidence:

       (vi)   KASSIR report dated 7th February 2008 which estimated the price on 16TH August 2007 at US$272 per mt.

       (vii)  Atlantic Middle East (AME) undated report which estimated the price on 15/16 August 2007 at US$260-265.

       (viii) GTS report dated 5th February 2008 estimated the price "for shipment end August" at US$260-265 per mt.

       (ix)   Dialogue IRS report dated 19th March 2008 estimated the price at US$230 per mt.

(x)     Contract between Silverstone SA and Nidera – wash out proposal made in July 2007 at US$222 per mt.

(xi)    Chamber of Commerce Certificate dated 19th March 2008 with a price of US$230.

5.11.   The evidence of the KASSIR and SovEcon reports are therefore extremely helpful to us. Despite the Buyers' criticism of the KASSIR report, it does establish, even on the Sellers' case, that they must accept that the minimum price on the date of default was US$272 per mt. We can therefore disregard the other evidence provided by the Sellers. The SovEcon evidence is of equal importance since, even on the Buyers' case, they must accept that the minimum price on the date of default was US$280. Ironically, the Buyers included this report in evidence but did not refer to it in submissions: see their final submissions and the last page of their evidence. However the net result is that we can disregard the other reports provided by the Buyers except for the witness evidence of Mr Nico De Deugd of Vicorus SA. This witness is a very experienced trader and explained the difference between the forward price for September shipment as opposed to the "day price" for immediate shipment. The market was clearly very strong at the time and the Buyers had a vessel on charter at US$28,000 per day, i.e. equivalent to more than US$1.15 per metric ton for every day that shipment was delayed. Therefore, it is reasonable to assume that the Buyers would have had to pay a premium rate to obtain a cargo for immediate shipment, otherwise their losses would have increased at an alarming daily rate. Therefore, given that KASSIR's evidence was deficient to the extent that it did not refer to the contractual specification and that it was not necessarily available for immediate shipment, we err in favour of the price quoted by SovEcon as more accurately reflecting the specification of the goods and the prompt shipment position. We therefore accept that the default price was US$280 per mt.

5.12.   We therefore calculate damages as follows:

The estimated average price on 15th August 2007 of US$280 less the Contract price of US$172 = US$108 x 25,000 mt (being the mean quantity) = US$2,700,000.

ARBITRATION NO: 13-710

5.13. We therefore award the Buyers the sum of US$2,700,000 as damages under this head of claim.

## 6.    WASTED COSTS:

6.1.    We now turn to the Buyers' claim for wasted costs. The Buyers claimed wasted costs of US$788,623.87 pursuant to clause 20(d) of Gafta No. 49; see above. Their claim was based on the evidence that they chartered the "SOUTHGATE" at US$29,000 per day basis delivery Bourgas on 31st July 2007. However, after declaring that the Sellers were default on 21st August, they immediately re-let the vessel and redelivered her on 4th September 2007 at Damietta, Egypt. The simple arithmetic of the Buyers' claim was that they incurred costs of US$1,364,515.59 between 31st July and 4th September, against which they offset income under the re-let charter of US$733,411.72, which left them with a loss of US$788,623.87. However, these costs were not particularised.

6.2.    The Sellers argued that the Buyers were not entitled to recover such wasted costs as damages under the Contract, since an FOB contract did not include a mandate for the goods to be sent elsewhere and the Seller's contractual liability ended on delivery.

6.3.    Contrary to the Seller's submissions, we accept that the Buyers are entitled to damages pursuant to clause 20(d) of Gafta No. 49 where the Sellers have failed to perform an FOB contract. Despite the Sellers' submission that their responsibility finished once the cargo was loaded on board the vessel, paragraph 20(d) makes provision for "*any proven additional expenses which would directly and naturally result in the ordinary course of events from the defaulter's breach of contract*". Clearly, FOB sellers know that buyers need to make shipping arrangements for the cargo so that good delivery can be effected. Therefore, it is within the reasonable contemplation of a seller that if they default, the buyers will be left with costs associated to the shipping of the cargo: see Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Rep. 145 [1854]. It therefore follows that the Sellers are liable for damages associated to the "SOUTHGATE" charter.

THE GRAIN AND FEED TRADE ASSOCIATION          10                              Ga*fta

**ARBITRATION NO: 13-710**

6.4.    Therefore, the question arises whether the Buyers' decision to re-let the vessel on 21st August was reasonable and their claim properly formulated. The principles of mitigation are as follows - see paragraph 26-092 of Chitty on Contracts:

> *"MITIGATION: There are three rules often referred to under the comprehensive heading of mitigation. They will be considered in turn. First, the claimant cannot recover damages for any part of his loss consequent upon the defendant's breach of contract which the claimant could have avoided by taking reasonable steps. Secondly, if the claimant in fact avoids or mitigates his loss consequent upon the defendant's breach, he cannot recover for such avoided loss, even though the steps he took were more than could be reasonably required of him under the first rule. Thirdly, where the claimant incurs loss or expense in the course of taking reasonable steps to mitigate the loss resulting from the defendant's breach the claimants may recover this further loss or expense from the defendant."*

6.5.    The first rule makes it clear that the claimant must act reasonably in seeking to mitigate his loss. However, there are two important considerations in this respect. Firstly, that the burden on the claimant to show that he has acted reasonably is relatively light. Secondly, that the defendant bears the burden of showing that the claimant did not act reasonably.

6.6.    However, since the Sellers did not challenge the Buyers' decision to re-let the vessel for business to Damietta, we accept that the Buyers acted reasonably in mitigating their loss on the "SOUTHGATE". Therefore, we must consider whether the Buyers' claim was properly formulated in this regard.

6.7.    The first question that arises is whether the Buyers are effectively entitled to damages from 31st July. The Sellers did not articulate their argument with any degree of clarity and referred to demurrage – when such was not claimed. However, we assume that they were questioning whether they should be liable for the Buyers' costs prior to the window of 10th – 11th August. The vessel had delivered to the Buyers on 31st July and the Notice of Readiness was tendered on 2nd August. However, although the Sellers claimed that the window was fixed as 10th – 11th August – and presumably that damages incurred before that date should not count - they had failed to declare the window in early July as required by the terms of the Contract – and were therefore in breach of that requirement. As it was, on 11th July, the Sellers declared the window for 1st – 15th August and it was only on 20th July that the Sellers nominated 10th – 11th August. Therefore, we accept the Buyers' evidence that the Sellers were effectively in

breach of the Contract when they failed to declare the window in early July and that they were then committed to the load window of 1st – 15th August, which they declared on 11th July and which the Buyers accepted and nominated the "SOUTHGATE". It therefore follows that the Sellers' nomination of 10th – 11th August was too late and the Buyers' obligation only extended to providing a vessel within the window of 1st – 15th August dates, which they did. It also follows that the Buyers are therefore entitled to damages on the basis of the window 1st – 15th August and not 10th – 11th August. A further consequence of this finding is that the delay caused by the vessel having to repair on 10th – 11th August is irrelevant to the issue of whether the vessel was ready to load the cargo within the requisite window. The vessel had been ready since 2nd August when the Notice of Readiness was tendered and was therefore available to the Sellers to load within the declared "window" of 1st – 15th August. The Sellers were therefore liable for damages from the time of the vessel's delivery on 31st July. Since the Sellers did not challenge the Buyers' evidence that the vessel was available to load when being repaired on 10th – 11th August, we have included this period in the calculation of damages since it does not show as off-hire on the hire statement with the head owners. In any event, the Sellers' cargo was clearly not ready during that time and therefore no time as such would have been lost because of the repairs.

6.8.   The second question that arises is whether the Buyers are liable for damages after the date of default, namely 15th August. However, it seems to us that on the basis of the general principles of mitigation, provided the Buyers acted reasonably, damages could be assessed after the date of default. Since the Sellers bore the burden of showing that the Buyers did not act reasonably when re-letting the vessel, which they failed to do, it seems to us that damages can therefore be assessed to 21st August.

6.9.   The next question that arises is whether the Buyers' claim is formulated on the correct basis – which also addresses the issue whether damages can be assessed after 21st August. Unfortunately, the Sellers did not articulate their defence or challenge the Buyers' evidence very thoroughly. To this extent, it is not our role to test a party's evidence, except in this case we consider that any doubt must be resolved in favour of the Sellers. We have therefore scrutinised the Buyers' evidence more thoroughly than we would normally expect to do.

THE GRAIN AND FEED TRADE ASSOCIATION      12

Gafta

**ARBITRATION NO: 13-710**

6.10. As explained in paragraph 6.1 above, the Buyers formulated their claim on a very simple basis, with no supporting evidence other than a provisional hire statement which covered the period from 31st July to 4th September. They did not provide details or even a copy of the re-let charter. Therefore, it was not possible for us to determine the accuracy of their statement that they received income of US$733,411.72. We also had no idea how the subsequent business to Egypt compared with their intended voyage for this cargo and could not assess their daily earnings or such variables as duration, profitability and destination. The Buyers' calculation was, as best, somewhat vague.

6.11. Therefore, we are not prepared to assess the Buyers' damages on the basis of their calculation. However, since the vessel was originally fixed on the basis of loading 1st – 15th August and was only re-let on 21st August, we accept the premise that all costs incurred between delivery on 31st July and 21st August fall as wasted costs and can be recovered as damages. In making this decision, we are aware that the vessel was nominated on the basis of "ETA 10th August": see paragraph 3.2 above. However, as we found in paragraph 6.7 above, the Sellers were committed to the "window" of 1st – 15th August and the vessel was effectively idle from (say) 01:32 GMT on 31st July 2007 to 01:32 on 21st August (this is an arbitrary time basis GMT since we do not know the actual time when the Buyers re-let the vessel) and we calculate damages as follows:

21 days x US$29,000 per day = US$609,000.

6.12. In addition, we have included incidental costs to cover such expenditure as Novorossiysk port and survey costs and bunkers in the overall sum of US$53,400 (which we have assessed on a summary basis), having taken the following costs into account:

Bunkers:

1 day steaming x 35 mt IFO @ US$400 mt  = US$14,000

1 day steaming x 2 mt MDO @ US$700 mt = US$ 1,400

20 days idle x 2 mt MDO @ $700 mt      = US$28,000

Total                                   = US$43,400

COPY

THE GRAIN AND FEED TRADE ASSOCIATION    13    Gafta

**ARBITRATION NO: 13-710**

In addition, we have included incidental costs of US$10,000 to cover port expenses and survey costs, etcetera.

6.13. We therefore award the Buyers the sum of US$662,400 (US$609,000 plus US$53,400) by way of wasted costs.

7.    **QUANTUM AND INTEREST:**

7.1.    We award the Buyers the sum of US$3,362,400 (US$2,700,000 plus US$662,400), together with interest at a commercial rate from 16th August 2007, being the date of the default.

8.    **COSTS:**

8.1.    The normal rule is that costs follow the event. However, pursuant to paragraph 16.2 of Gafta No. 125, a successful party's legal costs may only be recovered where there has been agreement between the parties. Since there was no agreement in this case, the Buyers cannot recover the costs of their legal representative, Reed Smith Richards Butler. Therefore, each party shall bear their own costs of the reference.

8.2.    However, in accordance with the normal rule that costs follow the event, the Sellers shall bear our costs, including the costs of Gafta.

NOW WE, the said Martin Sage, Peter Brown and Alan Oakley having taken upon ourselves the burden of this reference and having carefully and conscientiously considered the evidence and written submissions put before us by both parties and having given due weight thereto **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **ARBITRATION AWARD** as follows:

**WE FIND that:**

1. the Sellers were in default of the Contract;

2. the date of default pursuant to paragraph 16(c) of Gafta No. 125 was 16th August 2007; and

THE GRAIN AND FEED TRADE ASSOCIATION          14          

**ARBITRATION NO: 13-710**

3.  the Buyers' claim succeeds in the sum of US$3,362,400 and no more.

**WE THEREFORE FIND AND DIRECT that:**

4.  the Sellers shall forthwith pay to the Buyers the sum of US$3,362,400 (three million three hundred and sixty-two thousand, four hundred United States dollars), together with interest payable at the rate of 7.5% (seven and one-half percent) per annum compounded at three-monthly rests from 16th August 2007, until the date of payment;

5.  each party shall bear their own costs of the reference; and

6.  the Sellers shall bear the fees and expenses of this arbitration award, including our interlocutory costs and GAFTA's fees and expenses as set out below, provided that if, in the first instance, the Buyers shall have paid any amount in respect of our fees, they shall be entitled to an immediate refund of that amount from the Sellers, together with interest on that sum calculated at the rate of 7.5% (seven and one-half percent) per annum, compounded at three-monthly rests from the date of payment to GAFTA, until the date of reimbursement by the Sellers.

**ARBITRATORS:-**

Martin Sage          Peter Brown          Alan Oakley
                                          Chairman

THE GRAIN AND FEED TRADE ASSOCIATION    15    Gafta

**ARBITRATION NO: 13-710**

## ARBITRATION FEES AND EXPENSES

The Fees and Expenses of this Arbitration are as under:-

|  | £ |
|---|---|
| Association's Fees | 745.50 |
| Non-Members Charge | 1,575.00 |
| Arbitrators' Fees | 7,900.00 |
| VAT | 1,650.78 |
| £ | 11,871.28 |

£11,083.78 (including non-member fee of £787.50 + VAT) to be paid by Sellers, and the non-member fee of £787.50 to be paid by Buyers.

*In the event of an Appeal being lodged against this Award, Appeal fee for Members and Non-Members shall be: £6,000.00*

GAFTA's VAT Identification No: GB 243 8967 24
Sellers' VAT Identification No:   Not provided
Buyers' VAT Identification No:   Not Applicable