UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
NOBLE RESOURCES S.A.,                        :

            Plaintiff,                 :

                             :          08 CV 3876 (LAP)
     - against -                      :          ECF CASE
                             :
YUGTRANZITSERVIS LTD. a.k.a.                 :
YUGTRANZIT SERVIS LIMITED,                   :
AND SILVERSTONE S.A.,                        :

            Defendants.                :
-----------------------------------------------------------X

## DECLARATION OF CLAURISSE CAMPANALE-OROZCO IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION TO VACATE MARITIME ATTACHMENT

      Claurisse Campanale-Orozco declares under penalty of perjury of the laws of the United States of America as follows:

      1.      I am an attorney with the firm of Tisdale Law Offices, LLC, counsel for Plaintiff Noble Resources S.A. ("Noble" or "Plaintiff"), and I make this declaration based upon my own personal knowledge and upon documents that I believe to be true and accurate.

      2.      I submit this Declaration in Support of Plaintiff's Opposition to Defendants' Yugtranzitservis Ltd. a.k.a. Yugtranzit Servis Limited ("YTS"), and Silverstone S.A.'s ("Silverstone") (collectively "Defendants") motion to vacate the maritime attachment.

## THE FACTS

      3.      Pursuant to the terms of a contract dated April 13, 2007, Plaintiff agreed to buy 25,000 mt of Russian Milling Wheat (the "cargo") from YTS. *See Verified Amended Complaint attached hereto as Exhibit 1; See Contract between Noble and YTS attached hereto as Exhibit 2.*

4.    Silverstone agreed to guarantee YTS's performance of the contract without limitation. *See Silverstone Guarantee attached hereto as Exhibit 3.*

5.    The contract provided for delivery of the cargo "within July 15 – August 15, 2007, both dates included, to be narrowed in Seller's option as a "window" for loading in Novorossiysk port." *See Contract, Exhibit 2 at 1. See also Verified Amended Complaint, Exhibit 1, at ¶ 6.*

6.    The contract required Noble to nominate a suitable vessel and tender her Notice of Readiness at Novorossiysk loading port and "to be in all respects ready to load the cargo in Novorossiysk port "window" dates, without extension." *See Contract, Exhibit 2 at 1; see also Verified Amended Complaint, Exhibit 1 at ¶ 7.*

7.    The contract identified the loading method to be used to load the cargo and required that the vessel nominated by Noble to perform the contract was to be confirmed by YTS. *See Contract, Exhibit 2, at 1.*

8.    The contract identified the price of the cargo as per metric ton and stated that "[i]n case second berth at loading shifting expenses to be for Owners/Buyers account." *See id.*, at 2.

9.    The contract required Noble to provide YTS with 7/5/3 days and 24 hours of pre-advise on the Vessel, including it's ETA, name, flag, and multiple specifications. *See id.*, at 2.

10.    The contract outlined loading instructions and loading rates for the cargo, as well as instructions for the Vessel's notice of readiness. *See id.*

11.    The contract identified laytime and demurrage rates and charges. *See id.*

2

12.    The terms of the contract were not disputed by either party. *See Award of Arbitration ("Award") at ¶ 3.2 attached hereto as Exhibit 4.*

13.    All disputes under the contract were to be submitted to arbitration pursuant to GAFTA rules in London, England. *See Contract, Exhibit 2, at 3.*

14.    On July 11, YTS declared its first shipment window within the 1-15 August range and insisted that they be provided with the names of the vessels nominated to perform the contract. *See Award, Exhibit 4 at ¶3.2.*

15.    Noble provided the names of three vessels to YTS, and each vessel was promptly rejected due to "technical reasons." *See id.*

16.    On July 20, YTS provided Noble with a new window for loading cargo with dates of 10-11 August and Noble thereafter nominated the MV SOUTHGATE ("Vessel") to perform the voyage with an ETA of August 10, 2007. The SOUTHGATE was accepted by YTS. *See id.*

17.    On August 1, 2007, the Vessel arrived at its loadport and her Master tender notice of readiness on August 2, 2007. *See id* at 3.3.

18.    On August 9, 2007, after the Vessel passed inspection, Noble was informed that the Vessel would not berth before 10 – 11 August because of cargo unavailability. *See id.*

19.    During this time, the vessel underwent a minor repair, but was ready to receive her cargo on August 11, 2007, when she was approved by the local authorities. *See id.* at 3.4.

20.    On August 12, 2007, Noble was advised by Silverstone that "the loading of the SOUTHGATE had been cancelled." Noble's agent was told that Silverstone "had cancelled the loading of the vessel." *See Award, Exhibit 3, at 3.4.*

21.    On August 14, 2007, YTS, through Silverstone, advised Noble that the contract was frustrated because "the vessel having missed the loading window of 10-11 August and, as a consequence, the vessel had lost her position in the loading queue." *See id.* at 3.5.

22.    Noble's requests for further clarification from YTS went unanswered and on August 21, 2007, Noble declared YTS to be in default of the contract. *See id.*

23.    In an effort to mitigate their damages, Noble made arrangements to re-charter the Vessel under a substitute charter. *See id at ¶6.1.*

24.    Thereafter, pursuant to the terms of the contract, Noble commenced arbitration proceedings and an Award was issued in its favor on July 4, 2008. *See Noble's Arbitration Submission, attached hereto as Exhibit 5; See Award, Exhibit 4.*

## THE RULE B APPLICATION

25.    In order to obtain personal jurisdiction over the Defendants, and to obtain security for an anticipated arbitration award, Plaintiff commenced this action on April 24, 2008 and filed an Amended Verified Complaint on June 17, 2008, which included a prayer for an Ex-Parte Order for Process of Maritime Attachment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and the Federal Arbitration Act, 9 U.S.C. §§ 1 and 8.

26.    On April 29, 2008, the Court issued an Ex-Parte Order of Maritime Attachment and Garnishment. The Ex-Parte Order authorized Plaintiff to attach

4

Defendant's property up to the sum of $5,150,915.50, located within this judicial district and belonging to the Defendants Yugtranzitservis Ltd. and Silverstone S.A.

27.    The Ex-Parte Order and Process of Maritime Attachment and Garnishment ("PMAG") named garnishee banks believed to have assets due and owing to the Defendants. The Ex-Parte Order and PMAG were served upon the banks, including ABN Amro, American Express Bank, Bank of America, Bank of New York, Citibank, Deutsche Bank, HSBC (USA) Bank, JP Morgan Chase, Standard Chartered Bank, Wachovia Bank.

28.    On June 19, 2008, the court issued an Amended Ex-Parte Order of Maritime Attachment and Garnishment.  The Amended Ex-Parte Order authorized Plaintiff to attach Defendant's property up to the sum of $5,150,915.50, located within this judicial district and belonging to the Defendants Yugtranzitservis Ltd., Yugtranzit Servis Limited, and Silverstone S.A.

29.    On June 24, 2008 funds belonging to Silverstone were restrained at Deutsche Bank in the sum of $161,941.98.

30.    On June 25, 2008 funds belonging to Silverstone were restrained at Deutsche Bank in the sum of $2,499,411.09.

31.    On June 29, 2008 funds belonging to Silverstone were restrained at Wachovia Bank in the sum of $1,312,692.00.

32.    On July 17, 2008 funds belonging to Silverstone were restrained at Deutsche Bank in the sum of $ $27,000.00.

33.    Plaintiff sent three notices in total to Silverstone of the attachment (dated June 24, 2008, June 29, 2008 and July 17, 2008, respectively) via United States Postal

Service, registered, return receipt requested, the first of which contained copies of all pleadings filed in the instant action.

34.    In total, Plaintiff has attached the sum of $4,001,045.07 of Silverstone's funds.

**THE ARBITRATION**

35.    The arbitration award issued on July 4, 2008 held that YTS was in default of the contract when it 'failed to provide a load berth, or load the vessel, by 15th August." *See Award, Exhibit 3, at ¶ 5.6.*

36.    The Award calculated damages in favor of Noble, as a result of YTS's default to be in the amount of USD $2,700,000.00 for 25,000 metric tons of cargo that should have been loaded aboard the SOUTHGATE. *See Award, Exhibit 3, at ¶5.12.*

37.    The Award further held that Noble was entitled to damages that represented wasted costs for the Vessel, which included the costs associated with shipping the cargo, re-fixing the SOUTHGATE under a new charter, extra bunkers consumed and port and survey costs in the amount of USD $662,400.00. *See Award, Exhibit 3, at ¶¶6.3, 6.11 – 6.13.*

38.    The Award allowed damages to Noble in the total amount of $3,362,400.00 plus interest at the rate of 7.5 % from August 15, 2007 until such time as the Award is paid. *See Award, Exhibit 3, at pg. 14 ¶ 4.*

39.    Attached hereto as Exhibit 6 is a copy of the decision in *C. Transport Panamax Ltd. v. Kremikovtzi Trade E.O.O.D., et al,* 07 cv 0893 (LAP), which is cited in Plaintiff's brief.

I declare under penalty of perjury that the foregoing is true and correct.

6

Executed on July 22, 2008 in Southport, CT.

Claurisse Campanale Orozco

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
NOBLE RESOURCES S.A.,                        :

              Plaintiff,                        :

    - against -                        :

YUGTRANZITSERVIS LTD. a.k.a.                        :
YUGTRANZIT SERVIS LIMITED,                        :
AND SILVERSTONE S.A.,                        :

            Defendants.                        :
------------------------------------------------------X



08 CV 3876 (LAP)
ECF CASE

RECEIVED
JUN 1 7 2008
U.S.D.C. S.D.N.Y.
CASHIERS

## <u>VERIFIED AMENDED COMPLAINT</u>

    Plaintiff, NOBLE RESOURCES S.A. (hereinafter referred to as "Plaintiff" or "Noble"),

by and through its attorneys, Tisdale Law Offices LLC, as and for its Verified Amended

Complaint against the Defendants, YUGTRANZITSERVIS LTD. a.k.a. YUGTRANZIT

SERVIS LIMITED (hereinafter referred to as "YTS") and SILVERSTONE S.A. (hereinafter

referred to as "Silverstone")(collectively referred to as "Defendants") alleges, upon information

and belief, as follows:

    1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.

    2.     At all times material to this action, Plaintiff was, and still is, a foreign company

duly organized and operating under foreign law with a principal place of business in Switzerland.

    3.     Upon information and belief, Defendant YTS was, and still is, a foreign

corporation or other business entity organized under and existing by virtue of foreign law with a

place of business in Nicosia, Cyprus.

4.     Upon information and belief, Defendant Silverstone was, and still is, a foreign corporation or other business entity organized under and existing by virtue of foreign law with a place of business in Lausanne, Switzerland.

5.     By a contract dated April 13, 2007, Plaintiff agreed to buy 25,000 mt of Russian Milling Wheat (the "cargo") from the defendant YTS. *See April 13, 2007 Contract annexed hereto as Exhibit "1."*

6.     The contract provided that the cargo be delivered "within July 15 – August 15, 2007" for loading in Novorossiysk port.

7.     The contract further provided that the Plaintiff was to nominate a suitable vessel and tender her Notice of Readiness at Novorossiysk loading port and to be ready to load the cargo without extension.

8.     Silverstone agreed to guarantee YTS's performance of the contract without limitation. *See Silverstone Guarantee annexed hereto as "Exhibit "2."*

9.     On or about July 14, 2007, the Plaintiff nominated the M/V SOUTHGATE (hereinafter the "Vessel") and on or about July 24, 2007, the defendant YTS accepted the Plaintiff's nomination.

10.     In accordance with the contract, the Vessel arrived at the port of Novorossiysk and tendered her Notice of Readiness on August 2, 2007. On August 3, 2007, the Vessel passed its hold inspection and was ready to load cargo.

11.     Despite due demand, the Defendants failed to make arrangements to berth and load the Vessel or to cooperate with the Plaintiff within the delivery period agreed to in the contract.

2

12.    After waiting for an additional six days after the end of the delivery period, the Plaintiff had no option but to declare the Defendants in default and to re-fix the Vessel.

13.    As a result of Defendants' breaches of the contract, Plaintiff has suffered damages in the principal amounts of $3,125,000 for the Defendants' default and $788,623.87 for wasted vessel costs. *See Plaintiff's Arbitration Claim Submission annexed hereto as Exhibit "3" at 7.*

14.    Pursuant to the contract, any disputes arising thereunder shall be referred to arbitration in London, England in accordance with GAFTA rules.

15.    Plaintiff has commenced arbitration in accordance with the contract and appointed its arbitrator.

16.    Despite due demand, Defendants have failed to pay the sums due and owing as a result of its breaches of the contract.

17.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party in London Arbitration proceedings. As best as can now be estimated, Plaintiff expects to recover the following amounts:

| | | | | |
|---|---|---|---|---|
| A. | Principal claim: | | | $3,913,623.87 |
| | a. | Default Damages | $3,125,000.00 | |
| | b. | Wasted Vessel Costs | $788,623.87 | |
| B. | Estimated interest on claims: 3 years at 7.5% | | | $978,291.75 |
| C. | Estimated attorneys' fees: | | | $250,000.00 |
| **Total** | | | | **$5,150,915.50** |

18.    The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during

the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendants.

19.    The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia,* any property of the Defendants held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendants, to compel arbitration and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Verified Amended Complaint, failing which default judgment be entered against it in the sum of **$5,150,915.50.**

B.    That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$5,150,915.50** belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial

institutions and/or other institutions or such other garnishee(s) to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Verified Amended Complaint;

    C.    That pursuant to 9 U.S.C. §§201 et seq. this Court recognize and confirm any London arbitration award in Plaintiff's favor against the Defendants as a judgment of this Court;

    D.    That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

    E.    That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: June 17, 2008
      New York, NY

                  The Plaintiff,
                  NOBLE RESOURCES SA,

By:

                  Lauren C. Davies (LD 1980)
                  Thomas L. Tisdale (TT 5263)
                  TISDALE LAW OFFICES LLC
                  11 West 42nd Street, Suite 900
                  New York, NY 10036
                  (212) 354-0025 – phone
                  (212) 869-0067 – fax
                  ldavies@tisdale-law.com
                  ttisdale@tisdale-law.com

## ATTORNEY'S VERIFICATION

State of Connecticut )
                  )  ss.:  City of Southport
County of Fairfield )

1.      My name is Lauren C. Davies.

2.      I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.      I am an Attorney in the firm of Tisdale Law Offices, LLC, attorneys for the Plaintiff.

4.      I have read the foregoing Verified Amended Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.      The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.      The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.      I am authorized to make this Verification on behalf of the Plaintiff.

Dated:     June 17, 2008
            Southport, CT

                                    Lauren C. Davies

6

# EXHIBIT 2

Yugtranzitservis Ltd.
Poumpoulinas 15 Office 301/302 P.C.
1060 Nicosia
Cyprus

Contract nr : 200704147
Date      : 13-04-2007
Page 1

| | | |
|---|---|---|
| Sellers | : | Yugtranzitservis Ltd., Poumpoulinas 15 Office 301/302 P.C., 1060 Nicosia - Cyprus |
| Buyers | : | Noble Resources S.A., Avenue des Mousquines 4, 1005 Lausanne – Switzerland |
| Commodity | : | Russian Milling Wheat. Sound, loyal, merchantable, new crop, Free from alive insects and foreign smell. |

Quality:

| | | |
|---|---|---|
| — Moisture | : | max.  14.0% |
| — Foreign matter | : | max.   2.0% |
| — Protein | : | min.  11.5% (Nit 5.7) on dry matter basis |
| — Falling no. (Hagberg) | : | min.  230 sec. |
| — Wet gluten | : | min.  23.0% as per ISO |
| — Test weight | : | min.  77 kgs/hl |
| — Alveograph W | : | min.  160 |
| — Bug damaged | : | max.  1.5% |

Tests as per EU method (ISO).
Quality and condition final at loading as per certificates issued by GAFTA approved surveyor at Sellers' option and costs.
Weight final at loading as per weight certificate issued by GAFTA approved surveyor at Sellers' option and costs.
Fumigation at Sellers' expense. If fumigation with the active (forced) recirculation is required, additional expenses related to it to be compensated by Buyers.

| | | |
|---|---|---|
| Quantity | : | 25,000 metric tons, plus or minus 10% at Buyers' option and at contract price. |
| Delivery | : | within July 15th – August 15th, 2007, both dates included, to be narrowed in Sellers' option as a "window" for loading in Novorossiysk port. |

Vessel nominated by Buyers to tender her Notice of Readiness at Novorossiysk loading port and to be in all respects ready to load the cargo in Novorossiysk port "window" dates, without extension.
First and last day of the "window" to be included and to be advised by Sellers at the beginning of July, 2007, before shipping period commences. If the vessel will not arrive within the stipulated "window" days, Buyers to bear all expenses incurred in this connection, including but not limited to carrying charges, storage, expenses for loading, demurrage, detention, demurrage and/or detention of other arriving vessels in the port queue, interest, insurance and other normal carrying expenses.
Clauses 6 and 8 of GAFTA 49 not to apply.
Loading to be executed by direct method (wagon – board of the vessel).
Buyers to present self-trimming bulk carrier single decker vessel suitable for direct loading (wagon – board of the vessel). The vessel being nominated by Buyers should be confirmed or rejected by Sellers in writing (by means of E-mail or telefax) with indication of the vessel's parameters unacceptable to the loadport within 4 Novorossiysk port working hours after Buyers having presented vessel's description.

Contract nr : 200704147
Date       : 13-04-2007
Page 2

| | | |
|---|---|---|
| Price | : | USD 172.00 (say one hundred and seventy two US Dollars and nil cents) per metric ton, FOB Stowed/Trimmed Novorossiysk port, one/two berth (s). In case second berth at loading shifting expenses to be for Owners/Buyers account. |
| Payment | : | Payment shall be made 100 pct net CAD within 48 hours upon presentation of documents at Buyer's First Class European bank and shall be effected by telegraphic transfer. Costs for TT for Buyers' account. |
| | | Costs/commissions in Buyer's bank for Buyers' account. |
| | | Costs/commissions in Sellers' bank to be for Sellers' account. |

Sellers will supply the following documents:
— Commercial invoice stamped and signed;
— Full set of 3/3 Congen B/L, clean on board, freight prepaid
— Official Certificate of origin
— Official Phytisanitary certificate
— Non radiation certificate.
— Fumigation certificate
— Quality and condition certificate of first class superintendent company proving the goods quality at time and place of loading
— Weight certificate of first class superintendent company proving the quantity loaded
— Holds cleanliness certificate

| | | |
|---|---|---|
| Pre-advice | : | Buyers to give to Sellers 7 days provisional and 5/3 days, 24 hrs definite pre-advice with the following information: |

— ETA
— Vessel's name
— Flag
— Dimensions of the vessel (LOA/BEAM/DM)
— Vessels' hatches, holds dimensions
— DWT
— AIRDRAFT

| | | |
|---|---|---|
| C/P | : | Buyers to despatch copy of C/P / fixture recap to Sellers upon their request. |
| Loading Instructions | : | Buyers to provide Sellers with final and precise documentary and fumigation instructions latest three working days before vessels' arrival at port of loading. All the shipping documents shall be made in English and/or with English translation. |
| Loading rate | : | 5.000 metric tons per WWD of 24 consecutive hrs or pro rata, SSHEX EIU. |
| Notice | : | Notice of Readiness shall be tendered at the office of the agent at the load port between 08.00 AM and 05.00 PM local time on all days except Saturdays, Sundays and holidays. WIPON / WIFPON / WICCON / WIBON. |
| Laytime | : | Laytime shall commence at 08:00 hrs next working day after tender of valid Notice of Readiness (NOR). Time from Friday 5 p.m. (or from 5 p.m. on day preceding holidays) until 8 a.m. on Monday (or 8 a.m. on next business day) shall not to count even if used. |

2

Contract nr : 200704147
Date         : 13-04-2007
Page 3

| | | |
|---|---|---|
| Demurrage | : | Demurrage as per relevant C/P / fixture recap or if timecharter daily hire.  But max demurrage USD 16'000.—.  Despatch half demurrage.  Calculation as per N.O.R. and S.O.F both signed by masters/shippers and ships agents and sent by fax to Seller and Buyer. Payment of agreed demurrage/despatch if any, to be settled within 60 days from vessels completion. |
| Vessel's agent | : | Vessel agents at loadport to be nominated by Owners and-for the Owners' account and in Sellers' option. |
| Insurance | : | To be covered by Buyers at their own risk and costs, from the moment the goods pass the ship's rail at loading until completion of discharge. Buyers undertake to confirm insurance coverage upon first request from Sellers. |
| General conditions | : | All other terms, conditions and rules, not in contradiction with the above contained in Form 49 of GAFTA of which the parties admit that they have knowledge and notice, apply to this transaction and the details above given shall be taken as having been written into such form in the appropriate places. |
| Arbitration clause | : | Any dispute arising out or under this contract shall be settled by arbitration in accordance with the Arbitration Rules no.125 of the Grain and Feed Trade Association, in the edition current at the date of this contract, such rules forming part of this contract and of which both parties hereto shall be deemed to be cognizant. Arbitration to take place in London/England. |
| Commission | : | US$ 0,50 per mton payable by sellers |

On behalf of Buyers:                    Allgrain Brokers :                    On behalf of Sellers:

3

# EXHIBIT 3



From: Silverstone S.A. ("the Guarantor")

To: Noble Resources S.A. ("the Buyers")

Dear Sirs,

Yugtranzit Servis Limited sale/purchase Contract 200704147 dated 13.04.07
(the "Contract").

## GUARANTEE

The Guarantor irrevocably and unconditionally:

(a) as principal obligor guarantees to the Buyers the prompt performance by the Yugtranzit Servis Limited of all its obligations under the Contract ;

(b) undertakes with the Buyers that whenever the Yugtranzit Servis Limited does not pay the agreed and confirmed amount when due under or in connection with the Contract the Guarantor shall forthwith on demand by the Buyers pay that amount (in the currency in which it is due) as if the Guarantor instead of the Yugtranzit Servis Limited were expressed to be the principal obligor; and

(c) indemnifies the Buyers on demand against any loss or liability suffered by it if any obligation guaranteed by the Guarantor is or becomes unenforceable, invalid or illegal.

Yours faithfully,
Silverstone S.A.



Rue du Grand-Chene 6 1003  Lausanne Switzerland
el.: 0041 21 317 52 30  fax: 0041 21 317 52 31
-mail: info@silverstone-europe.com

# EXHIBIT 4

04/07 2008 13:44 FAX 00442078148383        GAFTA        @003/016

# Award of Arbitration



The Grain and Feed Trade Association
Gafta House, 6 Chapel Court, Chapel Place
Rivington Street, London EC2A 3DQ
United Kingdom

**ARBITRATION NO: 13-710**

COPY

## IN THE MATTER OF THE ARBITRATION ACT 1996

and

## IN THE MATTER OF AN ARBITRATION PURSUANT TO THE ARBITRATION RULES NO. 125 OF THE GRAIN AND FEED TRADE ASSOCIATION

BETWEEN:-

CLAIMANTS                              NOBLE RESOURCES S.A.
                                       of Lausanne, Switzerland
                                       (BUYERS)

-v-

RESPONDENTS                            YUGTRANZITSERVIS LTD
                                       of Nicosia, Cyprus.
                                       (SELLERS)

By a contract dated 13th April 2007, made in respect of 25,000 tonnes of Russian milling wheat, delivery FOB at Novorossiysk.

## WE DO HEREBY FIND AS FOLLOWS:

1.  **WHEREAS:**

1.1.  By a contract agreed on 13th April 2007 ("the Contract"), Noble Resources S.A. of Lausanne ("the Buyers") agreed to buy and Yugtranzitservis Ltd of Nicosia ("the

04/07 2008 13:44 FAX 00442078148383   GAFTA   ☑ 004/01☐☐

THE GRAIN AND FEED TRADE ASSOCIATION       2

ARBITRATION NO: 13-710

Sellers") agreed to sell 25,000 tonnes of Russian milling wheat ("the cargo") 10% more or less in the Buyers' option basis delivery FOB at Novorossiysk.

1.2.   The terms of the Contract provided for any disputes arising thereunder to be referred to arbitration in London in accordance with English law and the GAFTA Arbitration Rules No. 125 ("the arbitration clause").

1.3.   Following a dispute between the parties, the Buyers appointed me, Martin Sage, as their nominated arbitrator and the Sellers nominated me, Peter Brown, as their nominated arbitrator. GAFTA duly appointed me, Alan Oakley as third arbitrator and Chairman of the Tribunal. The seat of the arbitration is in England.

1.4.   In this arbitration, the Buyers claimed damages, by way of the Sellers' default, in the overall sum of US$3,913,823.87 together with interest and costs. The Sellers denied liability for the Buyers' claim for damages.

1.5.   The Buyers were represented by the firm of Reed Smith Richards Butler of London. The Sellers were represented by Mr Jacques Covo of Geneva. Both parties served written submissions. The Sellers initially requested an oral hearing. However, this request was subsequently withdrawn and matters were decided on the basis of the parties' written submissions.

## 2.   THE CONTRACT:

2.1.   The terms of the Contract were evidenced by a contract note dated 14th April 2007. Neither party disputed the terms of the contract note, which was agreed on the basis of the GAFTA Contract Form No. 49 and included the Arbitration Rules No. 125.

2.2.   The relevant terms of the Contract are as follows:

"*Quantity*        *25,000 metric tons, plus or minus 10% at Buyers' option ...*

*Delivery*        *within July 15th – August 15th, 2007, both dates included to be narrowed in Seller's option as a "window" for loading in Novorossiysk port. Vessel nominated by Buyers to tender her Notice of readiness at Novorossiysk loading port and to be in all respects ready to load the cargo in Novorossiysk port "window" dates, without extension. First and last day of the "window" to be*

04/07 2008 13:45 FAX  00442078148383        GAFTA                    ☑005/01

THE GRAIN AND FEED TRADE ASSOCIATION

*Gafta*

3.

ARBITRATION NO: 13-710

*included and to be advised by Sellers at the beginning of July 2007, before shipping period commences. ...*

Price           *USD 172 ... per metric ton, FOB Stowed/Trimmed Novorossiysk port ...*

*General Conditions*
*All other terms, conditions and rules, not in contradiction with the above contained in Form 49 of GAFTA of which the parties admit that they have knowledge and notice, apply to this transaction and the details above given shall be taken as having been written into such form in the appropriate places. ...*

*Arbitration clause*
*Any dispute arising out or under this contract shall be settled by arbitration in accordance with the Arbitration Rules no. 125 of the Grain and Feed Trade Association ...*
*Arbitration to take place in London/England. ..."*

3.    **THE BACKGROUND TO THE CASE**

3.1.   The background to this dispute is relatively straightforward and can be summarised from the Buyers' submissions as follows (all dates are 2007).

3.2.   On 11th July, the Sellers declared a shipment "window" of 1 – 15 August. Following the Sellers' insistence that they be given the name of the performing vessel, the Buyers nominated the "ISLAND SKIPPER", the "GALINA III" and the "PANAGIA 1", all of which were rejected by the Sellers due to technical reasons. The Sellers then, on 20th July, gave a two day window for loading 10 -11 August and, on 24th July, the Buyers nominated and the Sellers accepted the nomination of the "SOUTHGATE" ("the vessel"), ETA 10TH August.

3.3.   On 1st August, the vessel arrived at Novorossiysk and on 2nd August the master tendered the Notice of Readiness. The following day, the vessel's holds were inspected and passed by SGS as being clean and suitable to load the cargo.

3.4.   On 9th August, the Buyers were informed that the vessel was not expected to berth before 10th or 11th August due to the unavailability of the cargo. The vessel then waited for loading orders, though had to undergo some repair work on 10th August at the behest of the Russian Maritime authorities. This work was completed and

*Gafta*

THE GRAIN AND FEED TRADE ASSOCIATION    4

ARBITRATION NO: 13-710.

approved by 11th August. However, on 12th August, the Buyers were informed by Silverstone SA of Lausanne (who the Buyers described as the Sellers' guarantor) that the loading of the "SOUTHGATE" had been cancelled. On 13th August, the Buyers' local agent, Global Ocean Agency Ltd, advised that they had been told by local forwarders that the shippers, who they named as "Silverstone" had cancelled the loading of this vessel.

3.5. The following day, the Buyers sought clarification from the Sellers, who later advised them that the contract had been "frustrated" due to the vessel having missed the loading "window" of 10 – 11 August and, as a consequence, the vessel had lost her position in the loading queue. The Buyers then sought further clarification from the Sellers. However, the Sellers failed to respond to their enquiries and on 21st August, the Buyers declared the Sellers in default of the Contract.

4.    **THE ISSUES:**

4.1.    The Buyers claimed damages as follows:

|     |     |     |
| --- | --- | --- |
| (i)   | default damages | US$3,125,000.00; and |
| (ii)  | wasted costs | US$ 788,623.87 |
|       | - total | US$3,913,623.87 |

4.2.    The Sellers accepted liability for default in failing to deliver the goods in accordance with the terms of the Contract. However, they denied liability for the Buyers' claim for damages: though it could be construed that the Sellers accepted liability in the minimum sum of US$1,250,000 (25,000 metric tons being the mean quantity x US$50 being their minimum value of US$222 on the day of default less the contract price of US$172).

4.3.    The issues in dispute were identified as follows:

      (i)    default damages:

          (a)    the date of the default; and

          (b)    quantum.

      (ii)    wasted costs:

          (a)    the Buyers' entitlement to damages by way of wasted costs; and

COPY

# Gafta

THE GRAIN AND FEED TRADE ASSOCIATION                    5

ARBITRATION NO: 13-710

(b) quantum.

**5.     DEFAULT DAMAGES:**

5.1.    Essentially, the Sellers argued that the date of the default was 16th (or 15th) August, whereas the Buyers argued that it was 21st August.

5.2.    The relevant provision of the Contract is clause 20 of Gafta No. 49, which provides as follows:

"*DEFAULT-*
*In default of fulfilment of contract by either party, the following provisions shall apply: -*
*(a) The party other than the defaulter shall, at their discretion, have the right, after serving notice on the defaulter, to sell or purchase, as the case may be, against the defaulter, and such sale or purchase shall establish the default price.*
*(b) If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be mutually agreed, then the assessment of damages shall be settled by arbitration.*
*(c) The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price established under (a) above or upon the actual or estimated value of the goods on the date of default established under (b) above.*
*(d) In all cases the damages shall, in addition, include any proven additional expenses which would directly and naturally result in the ordinary course of events from the defaulter's breach of contract, but shall in no case include loss of profit on any sub-contracts made by the party defaulted against or others unless the arbitrator(s) or board of appeal, having regard to special circumstances, shall in his/their sole and absolute discretion think fit.*
*(e) Damages, if any, shall be computed on the quantity called for, but if no such quantity has been declared then on the mean contract quantity and any option available to either party shall be deemed to have been exercised accordingly in favour of the mean contract quantity.*"

5.3.    The default date was therefore important since it was the date on which damages could be assessed.

5.4.    The Buyers argued that they were entitled to wait until 21st August before accepting the Sellers' conduct as a repudiatory breach. Having given notice of the Sellers' default on 21st August, they argued that this date should be taken as the default date under clause 20 of Gafta No. 49 for the purpose of calculating damages.

**Gafta**

THE GRAIN AND FEED TRADE ASSOCIATION                    6

ARBITRATION NO: 13-710

5.5.   The Sellers argued that the default date was the date that the Sellers were in breach, namely 16th (or 15th) August. The Sellers referred us to the authorities of Toprak Mahsulleri Ofisi v Finagrain Compagnie Commerciale Agricole et Financiere S.A. [1979] 2 Lloyd's Rep. 98 ("Toprak v Finagrain") and Bremerhandel v Vanden Avenne [1978] 2 Lloyd's Rep. 109 ("Bremerhandel vs Vanden Avenne").

5.6.   Although the Buyers argued that the Court of Appeal decision in the case of Toprak v Finagrain supported their view that the default date was 21st August, it seems to us that there is a distinction between that case and the circumstances that we have here. The reason that the Court of Appeal allowed the default date to fall back from 31st March to 30th April 1975 was because it was effectively *"extended by the conduct of the parties"*: see the final paragraph on page 21 of the decision. This was not the case here since the Sellers gave no indication after 15th August that they intended to perform the Contract and, indeed, the evidence was that on 12th August, Silverstone SA (who the Buyers accepted as the Sellers' guarantors) had notified the Buyers that the port had cancelled the loading of the "SOUGHGATE". Therefore, when the Sellers failed to provide a load berth, or load the vessel, by 15th August, the Buyers had no reason to believe that the Sellers would perform the Contract thereafter. The fact that the Sellers failed to respond to the Buyers' enquiries about the status of the cargo should have been sufficient indication to the Buyers that the Sellers did not intend to perform the Contract.

5.7.   Furthermore, in their message dated 14th August, the Sellers stated *"Proceeding from the circumstances that performance of contract had been frustrated from the Buyers side we hereby reserve ourselves the rights to recover all incurred costs from blamed party strictly in accordance with sales ctr..."*. Therefore, the clear inference was that on 14th August, the Sellers considered that the contract was at an end. What is more, there was no evidence after 14th August to suggest that the Sellers had changed their position or that they would perform the Contract.

5.8.   We therefore accept the Sellers' evidence that their failure to perform the Contract by latest 15th August meant that they were in default effective 00:01 on 16th August and not 21st August as the Buyers claimed. The default date was therefore 16th August,

COPY

THE GRAIN AND FEED TRADE ASSOCIATION          7                                    *Gafta*

ARBITRATION NO: 13-710

being the first day following the last day of the contractual period of performance: see Bremerhandel vs Vanden Avenne.

5.9.   We now turn to the issue of damages. The Buyers calculated damages as follows: Contract price of US$172.00 less the estimated average price on 21st August 2007 of US$297 = US$125 x 25,000 mt (being the mean quantity) = US$3,125,000 damages.

5.10.  Effectively, the parties relied on the following reports as evidence of the price of the goods at the time of default:

    (I)   Buyers' evidence:
        (i)    Allgrain Brokers BV report dated 28th August 2007 which estimated the average price on 21st August 2007 at US$300 per mt.
        (ii)   Vicorus SA report dated 11th October 2007, which estimated the market price on 21st August 2007 at US$294 per mt.
        (iii)  Allgrain Brokers BV report dated 12th February 2008 which estimated the market price on 15th August 2007 at US$295.
        (iv)   Vicorus SA report dated 12th February 2008, which estimated the market price on 15th August 2007 at US$294 per mt.
        (v)    SovEcon undated report which estimated the market price on 16th August at US$280 per mt and on 24th August at US$300 per mt.

    (II)  Sellers' evidence:
        (vi)   KASSIR report dated 7th February 2008 which estimated the price on 16TH August 2007 at US$272 per mt.
        (vii)  Atlantic Middle East (AME) undated report which estimated the price on 15/16 August 2007 at US$260-265.
        (viii) GTS report dated 5th February 2008 estimated the price "for shipment end August" at US$260-265 per mt.
        (ix)   Dialogue IRS report dated 19th March 2008 estimated the price at US$230 per mt.

04/07 2008 13:46 FAX  00442078148383          GAFTA                              ☒010/01☐

THE GRAIN AND FEED TRADE ASSOCIATION                    8                        Gafta

ARBITRATION NO: 13-710

    (x)   Contract between Silverstone SA and Nidera – wash out proposal made
           in July 2007 at US$222 per mt.

    (xi)  Chamber of Commerce Certificate dated 19th March 2008 with a price of
           US$230.

5.11.  The evidence of the KASSIR and SovEcon reports are therefore extremely helpful to
us. Despite the Buyers' criticism of the KASSIR report, it does establish, even on the
Sellers' case, that they must accept that the minimum price on the date of default was
US$272 per mt. We can therefore disregard the other evidence provided by the
Sellers. The SovEcon evidence is of equal importance since, even on the Buyers'
case, they must accept that the minimum price on the date of default was US$280.
Ironically, the Buyers included this report in evidence but did not refer to it in
submissions: see their final submissions and the last page of their evidence. However,
the net result is that we can disregard the other reports provided by the Buyers except
for the witness evidence of Mr Nico De Deugd of Vicorus SA. This witness is a very
experienced trader and explained the difference between the forward price for
September shipment as opposed to the "day price" for immediate shipment. The
market was clearly very strong at the time and the Buyers had a vessel on charter at
US$28,000 per day, i.e equivalent to more than US$1.16 per metric ton for every day
that shipment was delayed. Therefore, it is reasonable to assume that the Buyers
would have had to pay a premium rate to obtain a cargo for immediate shipment,
otherwise their losses would have increased at an alarming daily rate. Therefore,
given that KASSIR's evidence was deficient to the extent that it did not refer to the
contractual specification and that it was not necessarily available for immediate
shipment, we err in favour of the price quoted by SovEcon as more accurately
reflecting the specification of the goods and the prompt shipment position. We
therefore accept that the default price was US$280 per mt.

5.12.  We therefore calculate damages as follows:
    The estimated average price on 15th August 2007 of US$280 less the Contract
    price of US$172 = US$108 x 25,000 mt (being the mean quantity) =
    US$2,700,000.

THE GRAIN AND FEED TRADE ASSOCIATION    9    Gafta

**ARBITRATION NO: 13-710**

5.13. We therefore award the Buyers the sum of US$2,700,000 as damages under this head of claim.

6.  **WASTED COSTS:**

6.1.   We now turn to the Buyers' claim for wasted costs. The Buyers claimed wasted costs of US$788,623.87 pursuant to clause 20(d) of Gafta No. 49: see above. Their claim was based on the evidence that they chartered the "SOUTHGATE" at US$29,000 per day basis delivery Bourgas on 31st July 2007. However, after declaring that the Sellers were default on 21st August, they immediately re-let the vessel and redelivered her on 4th September 2007 at Damietta, Egypt. The simple arithmetic of the Buyers' claim was that they incurred costs of US$1,364,515.59 between 31st July and 4th September, against which they offset income under the re-let charter of US$733,411.72, which left them with a loss of US$788,623.87. However, these costs were not particularised.

6.2.   The Sellers argued that the Buyers were not entitled to recover such wasted costs as damages under the Contract, since an FOB contract did not include a mandate for the goods to be sent elsewhere and the Sellers contractual liability ended on delivery.

6.3.   Contrary to the Sellers' submissions, we accept that the Buyers are entitled to damages pursuant to clause 20(d) of Gafta No. 49 where the Sellers have failed to perform an FOB contract. Despite the Sellers' submission that their responsibility finished once the cargo was loaded on board the vessel, paragraph 20(d) makes provision for *"any proven additional expenses which would directly and naturally result in the ordinary course of events from the defaulter's breach of contract"*. Clearly, FOB sellers know that buyers need to make shipping arrangements for the cargo so that good delivery can be effected. Therefore, it is within the reasonable contemplation of a seller that if they default, the buyers will be left with costs associated to the shipping of the cargo: see Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Rep. 145 [1854]. It therefore follows that the Sellers are liable for damages associated to the "SOUTHGATE" charter.



THE GRAIN AND FEED TRADE ASSOCIATION          10

**ARBITRATION NO: 13-710**

6.4.    Therefore, the question arises whether the Buyers' decision to re-let the vessel on 21st August was reasonable and their claim properly formulated. The principles of mitigation are as follows - see paragraph 26-092 of Chitty on Contracts:

> "MITIGATION: There are three rules often referred to under the comprehensive heading of mitigation. They will be considered in turn. First, the claimant cannot recover damages for any part of his loss consequent upon the defendant's breach of contract which the claimant could have avoided by taking reasonable steps. Secondly, if the claimant in fact avoids or mitigates his loss consequent upon the defendant's breach, he cannot recover for such avoided loss, even though the steps he took were more than could be reasonably required of him under the first rule. Thirdly, where the claimant incurs loss or expense in the course of taking reasonable steps to mitigate the loss resulting from the defendant's breach the claimants may recover this further loss or expense from the defendant."

6.5.    The first rule makes it clear that the claimant must act reasonably in seeking to mitigate his loss. However, there are two important considerations in this respect. Firstly, that the burden on the claimant to show that he has acted reasonably is relatively light. Secondly, that the defendant bears the burden of showing that the claimant did not act reasonably.

6.6.    However, since the Sellers did not challenge the Buyers' decision to re-let the vessel for business to Damietta, we accept that the Buyers acted reasonably in mitigating their loss on the "SOUTHGATE". Therefore, we must consider whether the Buyers' claim was properly formulated in this regard.

6.7.    The first question that arises is whether the Buyers are effectively entitled to damages from 31st July. The Sellers did not articulate their argument with any degree of clarity and referred to demurrage – when such was not claimed. However, we assume that they were questioning whether they should be liable for the Buyers' costs prior to the window of 10th – 11th August. The vessel had delivered to the Buyers on 31st July and the Notice of Readiness was tendered on 2nd August. However, although the Sellers claimed that the window was fixed as 10th – 11th August – and presumably that damages incurred before that date should not count - they had failed to declare the window in early July as required by the terms of the Contract – and were therefore in breach of that requirement. As it was, on 11th July, the Sellers declared the window for 1st – 15th August and it was only on 20th July that the Sellers nominated 10th – 11th August. Therefore, we accept the Buyers' evidence that the Sellers were effectively in

Gafta

THE GRAIN AND FEED TRADE ASSOCIATION          11

ARBITRATION NO: 13-710

breach of the Contract when they failed to declare the window in early July and that they were then committed to the load window of $1^{st} - 15^{th}$ August, which they declared on 11th July and which the Buyers accepted and nominated the "SOUTHGATE". It therefore follows that the Sellers' nomination of $10^{th} - 11^{th}$ August was too late and the Buyers' obligation only extended to providing a vessel within the window of $1^{st} - 15^{th}$ August dates, which they did. It also follows that the Buyers are therefore entitled to damages on the basis of the window $1^{st} - 15^{th}$ August and not $10^{th} - 11^{th}$ August. A further consequence of this finding is that the delay caused by the vessel having to repair on $10^{th} - 11^{th}$ August is irrelevant to the issue of whether the vessel was ready to load the cargo within the requisite window. The vessel had been ready since 2nd August when the Notice of Readiness was tendered and was therefore available to the Sellers to load within the declared "window" of $1^{st} - 15^{th}$ August. The Sellers were therefore liable for damages from the time of the vessel's delivery on 31st July. Since the Sellers did not challenge the Buyers' evidence that the vessel was available to load when being repaired on $10^{th} - 11^{th}$ August, we have included this period in the calculation of damages since it does not show as off-hire on the hire statement with the head owners. In any event, the Sellers' cargo was clearly not ready during that time and therefore no time as such would have been lost because of the repairs.

6.8.   The second question that arises is whether the Buyers are liable for damages after the date of default, namely 15th August. However, it seems to us that on the basis of the general principles of mitigation, provided the Buyers acted reasonably, damages could be assessed after the date of default. Since the Sellers bore the burden of showing that the Buyers did not act reasonably when re-letting the vessel, which they failed to do, it seems to us that damages can therefore be assessed to 21st August.

6.9.   The next question that arises is whether the Buyers' claim is formulated on the correct basis – which also addresses the issue whether damages can be assessed after 21st August. Unfortunately, the Sellers did not articulate their defence or challenge the Buyers' evidence very thoroughly. To this extent, it is not our role to test a party's evidence, except in this case we consider that any doubt must be resolved in favour of the Sellers. We have therefore scrutinised the Buyers' evidence more thoroughly than we would normally expect to do.

THE GRAIN AND FEED TRADE ASSOCIATION                12

_Gafta_

ARBITRATION NO: 13-710

6.10. As explained in paragraph 6.1 above, the Buyers formulated their claim on a very simple basis, with no supporting evidence other than a provisional hire statement which covered the period from 31st July to 4th September. They did not provide details or even a copy of the re-let charter. Therefore, it was not possible for us to determine the accuracy of their statement that they received income of US$733,411.72. We also had no idea how the subsequent business to Egypt compared with their intended voyage for this cargo and could not assess their daily earnings or such variables as duration, profitability and destination. The Buyers' calculation was, as best, somewhat vague.

6.11. Therefore, we are not prepared to assess the Buyers' damages on the basis of their calculation. However, since the vessel was originally fixed on the basis of loading 1st – 15th August and was only re-let on 21st August, we accept the premise that all costs incurred between delivery on 31st July and 21st August fall as wasted costs and can be recovered as damages. In making this decision, we are aware that the vessel was nominated on the basis of "ETA 10th August": see paragraph 3.2 above. However, as we found in paragraph 6.7 above, the Sellers were committed to the "window" of 1st – 15th August and the vessel was effectively idle from (say) 01:32 GMT on 31st July 2007 to 01:32 on 21st August (this is an arbitrary time basis GMT since we do not know the actual time when the Buyers re-let the vessel) and we calculate damages as follows:

21 days x US$29,000 per day = US$609,000.

6.12. In addition, we have included incidental costs to cover such expenditure as Novorosslysk port and survey costs and bunkers in the overall sum of US$53,400 (which we have assessed on a summary basis), having taken the following costs into account:

Bunkers:

1 day steaming x 35 mt IFO @ US$400 mt = US$14,000
1 day steaming x 2 mt MDO @ US$700 mt = US$ 1,400
20 days idle x 2 mt MDO @ $700 mt        = US$28,000
Total                                     = US$43,400

04/07 2008 13:47 FAX  00442078148383        GAFTA                                ☑015/01 ᗝ ᗝ

THE GRAIN AND FEED TRADE ASSOCIATION          13          G̃afta

**ARBITRATION NO: 13-710**

In addition, we have included incidental costs of US$10,000 to cover port expenses and survey costs, etcetera.

6.13. We therefore award the Buyers the sum of US$662,400 (US$609,000 plus US$53,400) by way of wasted costs.

7.    **QUANTUM AND INTEREST:**

7.1.   We award the Buyers the sum of US$3,362,400 (US$2,700,000 plus US$662,400), together with interest at a commercial rate from 16th August 2007, being the date of the default.

8.    **COSTS:**

8.1.   The normal rule is that costs follow the event. However, pursuant to paragraph 16.2 of Gafta No. 125, a successful party's legal costs may only be recovered where there has been agreement between the parties. Since there was no agreement in this case, the Buyers cannot recover the costs of their legal representative, Reed Smith Richards Butler. Therefore, each party shall bear their own costs of the reference.

8.2.   However, in accordance with the normal rule that costs follow the event, the Sellers shall bear our costs, including the costs of Gafta.

NOW WE, the said Martin Gage, Peter Brown and Alan Oakley having taken upon ourselves the burden of this reference and having carefully and conscientiously considered the evidence and written submissions put before us by both parties and having given due weight thereto **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **ARBITRATION AWARD** as follows:

WE FIND that:

1.   the Sellers were in default of the Contract;

2.   the date of default pursuant to paragraph 16(c) of Gafta No. 125 was 16th August 2007; and

THE GRAIN AND FEED TRADE ASSOCIATION          14



**ARBITRATION NO: 13-710**

3.  the Buyers' claim succeeds in the sum of US$3,362,400 and no more.

**WE THEREFORE FIND AND DIRECT that:**

4.  the Sellers shall forthwith pay to the Buyers the sum of US$3,362,400 (three million three hundred and sixty-two thousand, four hundred United States dollars), together with interest payable at the rate of 7.5% (seven and one-half percent) per annum compounded at three-monthly rests from 16th August 2007, until the date of payment;

5.  each party shall bear their own costs of the reference; and

6.  the Sellers shall bear the fees and expenses of this arbitration award, including our interlocutory costs and GAFTA's fees and expenses as set out below, provided that if, in the first instance, the Buyers shall have paid any amount in respect of our fees, they shall be entitled to an immediate refund of that amount from the Sellers, together with interest on that sum calculated at the rate of 7.5% (seven and one-half percent) per annum, compounded at three-monthly rests from the date of payment to GAFTA, until the date of reimbursement by the Sellers.

**ARBITRATORS:**

Martin Sage                    Peter Brown                    Alan Oakley
                                                              Chairman

THE GRAIN AND FEED TRADE ASSOCIATION    15    Gafta

**ARBITRATION NO: 13-710**

## ARBITRATION FEES AND EXPENSES

The Fees and Expenses of this Arbitration are as under:-

|  | £ |
|---|---|
| Association's Fees | 745.50 |
| Non-Members Charge | 1,575.00 |
| Arbitrators' Fees | 7,900.00 |
| VAT | 1,650.78 |
| £ | 11,871.28 |

£11,083.78 (including non-member fee of £787.50 + VAT) to be paid by Sellers, and the non-member fee of £787.50 to be paid by Buyers.

*In the event of an Appeal being lodged against this Award, Appeal fee for Members and Non-Members shall be: £6,000.00*

GAFTA's VAT Identification No: GB 243 8967 24

Sellers' VAT Identification No:    Not provided

Buyers' VAT Identification No:    Not Applicable

# EXHIBIT 5

IN THE MATTER OF AN ARBITRATION AT GAFTA

BETWEEN:

NOBLE RESOURCES S.A

<u>Buyers/Claimants</u>

-and-

YUGTRANZITSERVIS LTD

<u>Sellers/Respondents</u>

## CLAIM SUBMISSIONS

1. These submissions are made on behalf of Noble Resources S.A. ("Buyers"), in their dispute with Yugtranzitservis Ltd ("Sellers") arising out of a contract dated 13 April 2007 (contract no. 200704147) for the sale of 25,000 metric tonnes (plus or minus 10% at Buyers' option) of Russian Milling Wheat ("the Contract").

2. The claim arises out of Sellers' failure to perform the Contract.

3. A paginated bundle of documents and correspondence relevant to the claim is enclosed with these submissions. References to page numbers in these submissions are references to the pages in that bundle.

### THE CONTRACT

4. By the Contract, Sellers agreed to sell and Buyers agreed to buy 25,000 mt of Russian Milling Wheat, plus or minus 10% at Buyers' option (pages 1 to 3).

5. The contract price was US$172.00 per metric ton, basis "*FOB stowed/trimmed Novorossiysk port, one/two berth(s)*". The Contract incorporated the terms of GAFTA 49 (pages 4 to 7), in so far as these were not in conflict with the Contract terms. The Contract provided for arbitration in London and in accordance with GAFTA 125.

6. In relation to delivery, the Contract provided as follows:

   **Delivery:** *within July 15th -August 15th, 2007, both dates included, to be narrowed in Sellers' option as a "window" for loading in Novorossiysk port.*
   *Vessel nominated by Buyers to tender her Notice of Readiness at Novorossiysk loading port and to be in all respects ready to load the cargo in Novorossiysk port "window" dates, without extension.*
   *First and last day of the "window" to be included and to be advised by Sellers at the beginning of July, 2007, before shipping period commences. If the vessel will not arrive within the stipulated "window" days, Buyers to bear all expenses incurred in this connection, including but not limited to carrying charges, storage, expenses for loading, demurrage, detention, demurrage and/or detention of other arriving vessels in the port queue, interest, insurance and other normal carrying expenses.*

*Clauses 6 and 8 of GAFTA 49 not to apply.*
*Loading to be executed by direct method (wagon-board of the vessel).*
*Buyers to present self-trimming bulk carrier single decker vessel suitable for direct*
*loading (wagon - board of the vessel). The vessel being nominated by Buyers should*
*be confirmed or rejected by Sellers in writing (by means of E-mail or telefax) with*
*indication of the vessel's parameters unacceptable to the loadport within 4*
*Novorossiysk port working hours after Buyers having presented vessel's description.*

7.  The Contract also provided for a loading rate of "*5,000 metric tons per WWD of 24 consecutive hrs or pro rata, SSHEX EIU*".

## THE FACTS

8.  In accordance with the terms of the Contract, Sellers were required to provide a "window" for loading in Novorossiysk port at the beginning of July 2007 and before 15 July 2007. Sellers did not do so.

9.  It was only after requests from Buyers (see messages from Buyers to Sellers of 2 and 5 July 2007 (pages 8-11) that on 11 July 2007 the Sellers declared a "window" for loading between 1 and 15 August 2007 (pages 12-13). However, Sellers indicated that they were unable to provide a more precise window.

10. Buyers responded on 13 July 2007 acknowledging Sellers' declaration of a shipment period. Buyers also insisted that Sellers notify their "*intention of loading latest by next Monday 16th of July*", referring to Sellers' failure to give a more precise window (pages 14-15).

11. On 18 July 2007, Buyers nominated the MV ISLAND SKIPPER as the performing vessel for 1 August 2007 (pages 16-17). By e-mail of the same date, Sellers rejected Buyers nominated vessel because "*the dimensions of hatch No. 1 are not suitable for loading by direct variant "wagon-board of the vessel*" (page 18).

12. On 19 July 2007, Buyers nominated the MV GALINA III as the performing vessel (pages 19-20). This vessel was also rejected by Sellers on 20 July 2007 because "*she is a tweendecker and as per terms of our cntr the vessel should be single decker suitable for direct loading "wagon-board the vessel*" (pages 21-23).

13. Buyers then nominated the MV PANAGIA I on 20 July 2007 (pages 24-26). This vessel was also rejected by Sellers on 23 July 2007 (pages 27-28).

14. On 20 July 2007, Sellers also gave a two day window for the port of 10-11 August 2007 (page 29). This message was simply too late to have any contractual effect given that Sellers had already declared the window as 1 to 15 August 2007 and the date by which such a window needed to be given had already passed.

15. At around this time, Buyers became aware that Sellers had defaulted on delivery of a shipment of Russian Milling wheat to Nidera from Novorossiysk. During discussions with Sellers at the relevant time, Buyers had raised with Sellers their concern as to whether Sellers would perform. At the time, Sellers confirmed that they would perform under the Contract subject to Buyers providing a suitable vessel.

2

16.   On 24 July 2007 Buyers nominated the MV SOUTHGATE ETA 10 August 2007 (pages 29-30). This vessel was accepted by Sellers on 24 July 2007. In confirming Buyers nominated vessel, Sellers stated as follows:

*"We draw your attention that the vessel to be ready in all respects to load her cargo at nominated window 10-11 August 2007 without extension. In case if you will delay that window will be missed."* (page 29).

17.   Buyers responded on 26 July 2007 rejecting Sellers' comments in relation to the purported narrowed window nomination (page 31).

18.   On 1 August 2007, the MV SOUTHGATE arrived at the port of Novorossiysk and the vessel's master tendered notice of readiness on 2 August 2007 (page 32).   On 3 August 2007, the vessel passed its hold inspection performed by SGS (pages 58-64).

19.   Following tender of NOR, Buyers had the vessel waiting ready for loading to commence. It initially appeared that no berth was available. However, on 9 August 2007, Buyers received a message from their agents stating as follows: *"ETB: not earlier than on 10-11/08 - due to unavailability of cargo"* (page 33-34).

20.   On 10 August 2007, Buyers sent a message to Sellers stating:

*"As you well know, the vessel has tendered NOR at the port and is ready to load the wheat since beginning of August.*

*We are very concerned, however, that we are yet to see any berthing instructions from sellers nor any confirmation that sellers have the cargo ready to commence loading.*

*We want to hear from sellers urgently on this.*

*In the meantime, Buyers have no option but to reserve all of their rights and hold sellers fully responsible for all losses, expenses and costs arising out of the delay in commencement of loading."*(page 35).

21.   Later that day, Buyers received a message from Sellers attaching a translation of a letter received from Sellers' forwarder at Novorossiysk stating that the vessel was not ready for handling due to a technical reason (pages 36 -38).

22.   Buyers immediately investigated the position and learned that the Ministry of Transport of the Russian Federation Federal Agency of Sea and River Transport Federal State Institution ("Novorossiysk Maritime Port Administration"), had ordered a Port State Control inspection of the MV Southgate on 8 August 2007. Buyers only learnt of the inspection on 10 August 2007.

23.   The Report of the Novorossiysk Maritime Port Administration was issued the same day and noted a number of deficiencies. A copy of the Report is attached at pages 39-41. This did not, however, affect the vessel's readiness to load the cargo. As set out above, the vessel had passed its hold inspection on 3 August.

LONDON-4507721.1-LMASON

24. Immediately, work was undertaken to remedy the deficiencies and on 11 August 2007, the Russian Maritime Register of Shipping undertook a survey of the vessel and concluded as follows: *"The all deficiencies (with the exception of item 0915 - IMO symbols) have been rectified. Deficiency concerning IMO symbols (item 0915) should be rectified at next port (code of action - 15/40)."* (page 44).

25. On 11 August 2007, Buyers reiterated to Sellers that vessel was ready to load, having arrived and tendered NOR a number of days previously. Buyers said that they expected Sellers to stand-by for loading (page 45).

26. Buyers sent a further message to Sellers on 12 August 2007 raising concerns that despite the Vessel being ready to berth it appeared that Sellers had failed to include it in the berthing plan. Buyers requested immediate confirmation from Sellers that they were urgently taking steps to allow the vessel to berth (page 46).

27. On 12 August 2007 Silverstone SA (Sellers' guarantor) confirmed to Sellers' forwarder (page 47 and 48) that the loading of the MV Southgate was being cancelled.

28. The information was confirmed the next day when Buyers were informed by their agents at Novorossysk port that Sellers had cancelled the MV SOUTHGATE for loading of the cargo (page 49).

29. On 14 August 2007, Buyers sent a message to Sellers mentioning that they had still not received a response from Sellers. Buyers referred to the Port State Control report which showed that the vessel was ready in all respects for loading. Buyers requested that Sellers declare their intentions in respect of the cargo urgently and requested a response by 4 pm that day (page 50).

30. Sellers responded on 14 August 2007 alleging that the Contract had been "frustrated" allegedly by reason of Buyers' vessel having missed the "window" (page 51).

31. On 15 August 2007, Buyers wrote again to Sellers reiterating that vessel had been at the port since the beginning of August and asking for clarification whether Sellers intended to load the M.V. SOUTHGATE (page 52).

32. Buyers then sent a further message to Sellers on 16 August 2007 stating: *"We have already told you many times that we are ready and waiting to load the wheat but you are refusing to respond at all. Please urgently confirm that the cargo is ready to be loaded and that you will indeed be loading our cargo."* (pages 53-54).

33. No response was received from Sellers. Buyers gave Sellers a further opportunity to respond and on 17 August 2007, Buyers wrote to Sellers referring to its previous messages of 15 and 16 August 2007 (pages 55-56).

34. By this time, the price of Russian Milling Wheat had increased significantly to approximately US$300 per metric ton.

35. Buyers requested that Sellers immediately confirm their intentions as regards loading of the vessel. Buyers gave Sellers until 11 am local time on 21 August 2007 to confirm (a) that Sellers intend to load the vessel and provide a reasonable quick and short loading

4

date; or (b) to commence loading. Buyers indicated that if Sellers failed to give the requisite confirmation then Buyers would hold Sellers in default (page 55).

36. Sellers failed to respond within the requested deadline and no steps whatsoever were taken by Sellers to berth or load the vessel. Accordingly, by their message dated 21 August 2007, Buyers declared Sellers in default (page 57).

## BUYERS' NOTICE OF ARBITRATION

37. On 20 September 2007, Buyers wrote to Sellers claiming arbitration in respect of the substantial damages, additional expenses and costs incurred by reason of Sellers failure to berth and load the M.V. SOUTHGATE in accordance with the Contract.

38. Buyers appointed Mr Martin Sage as arbitrator in respect of its claims. On 28 September 2007, Sellers appointed Mr Peter Brown as arbitrator in response to Buyers' claims.

## SUBMISSIONS

39. Buyers' case is that Sellers - in breach of their obligations as FOB seller under the Contract - failed to make arrangements to berth the vessel at the port of Novorossiysk and failed to load the cargo on board the M.V. SOUTHGATE. Buyers have suffered losses as a result of that breach.

40. Buyers' vessel arrived at Novorossiysk port on 1 August 2008. The M.V. SOUTHGATE was fit and ready for loading as from 3 August 2008 as evidenced by the Holds Inspection by SGS dated 3 August 2007 (pages 58-64).

41. Buyers repeatedly asked Sellers to confirm their intentions in respect of loading of the vessel, as detailed at paragraphs 8 to 36 above. However, Sellers failed to make arrangements to berth and load the vessel or to co-operate with Buyers within the delivery period. This was against the background of the confirmation from Sellers' forwarder and Buyers' agents that Sellers had "cancelled" the vessel for loading within the contractual delivery period.

42. Buyers waited for an additional 6 days after the end of the delivery period before declaring Sellers in default. This was more than reasonable in the circumstances. Faced with Sellers' intransigence, and with no prospect of the M.V. SOUTHGATE being allowed to berth at Novorossiysk, Buyers had no option but to declare Sellers in default and re-fix the vessel.

43. The "window" given by Sellers on 20 July 2007 of 10-11 August was of no contractual effect since it was given too late under the Contract and, in any event, a window of 1-15 August had already been declared. Any further narrowing was not in accordance with the Contract, nor Buyers' message of 13 July 2007 (page 14).

44. Even if (which is denied), the window of 10-11 August was contractual:

   • The vessel arrived and was ready to load within the delivery period.

LONDON-4507721.1-LMASON

- The Port State Control inspection of the vessel did not affect its readiness to receive the cargo and in any event, the inspection was completed on 11 August and the vessel passed.

- The consequences of not meeting the window are set out in the Contract and Sellers were still obliged to load as the Delivery Period was still open until 15 August 2007

45.  In short, Buyers gave effective shipping instructions, Sellers accepted the vessel and the vessel was ready to load within the delivery period.  Buyers fulfilled all of their obligations under the Contract.  Sellers failed to ship the cargo and were in default.

## DAMAGES

46.  As a result of Sellers' breach of contract, Buyers' have incurred considerable losses. We set out below details of the sums Buyers now claim from Sellers.

### Default Damages

47.  The damages recoverable for default are set out in the GAFTA default clause (clause 20 of GAFTA 49). Clause 20 provides:

"(a) The party other than the defaulter shall, at their discretion have the right, after serving notice on the defaulter, to sell or purchase, as the case may be, against the defaulter, and such sale or purchase shall establish the default price.

(b)  If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be mutually agreed, then the assessment of damages shall be settled by arbitration.

(c )  The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price established under (a) above or upon the actual or estimated value of the goods on the date of default established under (b) above."

48.  Buyers claim damages under GAFTA 24(c). Buyers declared Sellers in default on 21 August 2007. Accordingly, the date of default for the purpose of establishing the default price is 21 August 2007.

49.  Buyers refer the Tribunal to the market price evidence summarised in the attached table (page 65).  The statements of independent brokers, Allgrain Brokers (page 66) and Vicorus Commodity Brokers (page 67) are the best evidence of the market price for Russian Milling Wheat on the date of default. Taking an average of the two statements, the market price at the time of default was US$297.00 per metric tonne.  Accordingly, Buyers claim damages of US$3,125,000 being the difference between the contract price of US$172.00 and the market price of US$297.00 in respect of the mean contractual quantity of 25,000 mts.

6

Wasted Vessel Costs

50.   GAFTA 20 (d) provides as follows:

> "In all cases the damages shall, in addition, include any proven additional expenses which would directly and naturally result in the ordinary course of events from the defaulter's breach of contract..."

51.   Buyers paid hire on the vessel chartered to perform the Contract in the total sum of US$1,364,515.59.   They also paid bunker costs of US$131,520 and port costs of US$26,000. The vessel was delivered and gave NOR on 2 August 2007, within the delivery period and original "window". Accordingly, pursuant to GAFTA 20(d) Buyers are entitled to those wasted vessel costs incurred as a result of Sellers' default less any sums obtained from Buyers re-letting the vessel. Buyers were able to re-let the vessel as from the date of default (21 August 2007) for the amount of US$733,411.72. Buyers therefore claim total wasted vessel costs in the sum of US$788,623.87.

## CONCLUSION

52.   Sellers were plainly in default of the Contract. Accordingly, Buyers are entitled to default damages in the sum of US$3,125,000.00 based on the difference between Contract and market price.

53.   Buyers are also entitled to wasted costs of US$788,623.87.

54.   Buyers ask the Tribunal for an Award in the following terms:

    (a)   Sellers were in default of Contract by virtue of their failure to load the cargo.

    (b)   Sellers pay Buyers' damages (including proven additional expenses) in the sum of US$3,913,623.87 (paragraphs 49 to 51 above).

    (c)   Sellers to pay the costs of the arbitration.

    (d)   Sellers to pay compounded interest on all principal sums awarded from the date of default to the date of payment and Sellers to pay interest on arbitration costs from the date of the Award until payment.

26 November 2007

7

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/19/08

- - - - - - - - - - - - - - - - - -X
              :
C. TRANSPORT PANAMAX, LTD.,     :   07 Civ. 893 (LAP)
              :
         Plaintiff,   :   <u>MEMORANDUM AND ORDER</u>
              :
     v.           :
              :
KREMIKOVTZI TRADE E.O.O.D. a.k.a. :
KREMIKOVTZI TRADE LTD. a.k.a.   :
KREMIKOVTZI TRADE TREYD,      :
KREMITOVTZI CORP. a.k.a.      :
KREMITOVTZI A.D. a.k.a.       :
KREMITOVTZI FINMETALS HOLDING EAD :
a.k.a. FINMETALS HOLD.EAD a.k.a. :
FINMETALS HOLDING A.D. a.k.a.   :
DARU METALS LTD.,          :
UNICORN STELL F.Z.E.,       :
MADGE INVESTMENTS,         :
GHSL BULGARIA S.A.,         :
GLOBAL STEEL HOLDINGS LTD., a.k.a. :
GLOBAL STEEL a.k.a. GSHL,     :
STEEL SHIPPING & FORWARDING PLC  :
a.k.a. SSF,            :
              :
         Defendants.  :
              :
- - - - - - - - - - - - - - - - - -X

LORETTA A. PRESKA, U.S.D.J.

Plaintiff C. Transport Panamax, Ltd., agreed to charter several vessels to Defendants Unicorn Shell F.Z.E. ("Unicorn") and Madge Investments ("Madge") (collectively, "charter Defendants"). (See Fourth Amended Complaint ¶ 16, C. Transport Panamax v. Kremikovtzi Trade E.O.O.D. et al., 07 Civ. 893 (filed Dec. 6, 2007) (hereinafter "FAC").) Under the terms of those agreements, Defendant Kremikovtzi Trade, Ltd. ("KT"), agreed to

guarantee fully the charter Defendants' performance. (See FAC ¶ 17; see also Duffy Decl. ¶ 12; Zilioli Decl. Ex. 1 (M/V Alpha Effort Charter Agreement).)[1] After the voyages were complete, a dispute arose between Plaintiff and the charter Defendants as to certain demurrage charges. (See FAC ¶ 18; see also Def's Reply 3 n.1 ("[D]emurrage is an ancillary cost that represents liquidated damages for delays, and occurs when the vessel is prevented from the loading or discharging of cargo within the stipulated laytime.").) That dispute was submitted to arbitration in London, which resulted in a settlement agreement between Plaintiff and Defendants KT and Kremikovtzi Corp. ("KC") that contemplated certain payments from Defendants KT and KC and included certain other terms. (See FAC ¶ 21; see also Zilioli Decl. Ex. 2 (Settlement Agreement).) After those payments were not forthcoming,[2] Plaintiff filed lawsuits in London to enforce the settlement agreement and, on May 4, 2007, obtained default

---

[1] Reference is to the Attorney's Affidavit in Support of Motion to Vacate Process of Maritime Attachment ("Duffy Aff."), sworn to by Owen F. Duffy on May 14, 2008, and the Declaration of Claude Zilioli in Opposition to Defendant's Motion to Vacate Maritime Attachment ("Zilioli Decl."), sworn to on May 28, 2008.

[2] Plaintiff received $249,161.00 in payment under the settlement agreement, which payment was made under the name KT but which funds originated from accounts of Defendant Finmetals. (See Declaration of Lauren C. Davies in Support of Plaintiff's Opposition to Motion to Vacate Maritime Attachment ("Davies Decl.") (sworn to May 28, 2007) ¶¶ 10-11.)

judgments against both Defendants KT and KC. (See FAC ¶ 25; see also id. Exs. 1, 2 (Default Judgments).)

Plaintiff originally filed this action in February 2007 and has since amended the complaint several times: currently pending is the Fourth Amended Complaint ("FAC"). The FAC names as defendant, inter alia, Global Steel Holdings, Ltd. ("GSHL"), which it alleges is an alter ego of Defendant KC. (See FAC ¶¶ 35-41.) The FAC reflects entry of the British default judgments against Defendants KT and KC (see Duffy Aff. ¶ 29), and, simultaneous with filing that amendment, Plaintiffs obtained an ex parte order of attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims ("Supplemental Rules") to secure payment of the British default judgments (see TAC ¶ B). Pursuant to that attachment, $799,806.00 in funds belonging to Defendant GSHL were and remain restrained. (See Duffy Aff. ¶ 35.)

Defendant GSHL now moves by order to show cause to vacate the attachment against it. For the reasons set forth below, that motion is DENIED.

DISCUSSION

On a motion to vacate, plaintiff bears the burden of showing that the attachment should not be vacated. See, e.g., Proshipline Inc. v. Aspen Infrastructures Ltd., 533 F. Supp. 2d

3

422, 426 (S.D.N.Y. 2008). To show a valid maritime attachment,

plaintiff must show, among other things, that it has a valid

prima facie admiralty claim against the defendant. See Aqua

Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445

(2d Cir. 2006). Failure to do so undermines the Court's

maritime jurisdiction and renders the attachment void. See,

e.g., Sea Transp. Contractors, Ltd. v. Industries Chemiques du

Senegal, 411 F. Supp. 2d 386, 392 (S.D.N.Y. 2006).


1.   FAC's Claims are Maritime in Nature

Defendant DSHL argues that the claims at issue in this

action are not maritime in nature. (See Def.'s Mem. 4.) First,

it argues that the underlying claim against KT is for breach of

a guarantee and that, while the guaranteed contract may be

maritime in nature, the guarantee itself is not. (See id. at 5-6

(citing Pac. Sur. Co. v. Leatham & Smith Towing & Wrecking Co.,

151 F. 440 (7th Cir. 1907) and Fednav, Ltd. v. Isoramar, S.A.,

925 F.2d 599 (2d Cir. 1991)).) Second, even if the underlying

claim does sound in maritime, Defendant GSHL argues that the FAC

seeks only to enforce the terms of the settlement agreement

resolving that underlying claim and that, regardless the nature

of the underlying claim, a settlement agreement is not maritime

in nature. (See id. at 7 (citing Westvaco Worldwide Corp. v. M/V

4

Niger Basin, 88 Civ. 621, 1989 WL 51714 (E.D.Pa. May 11, 1989).)
Neither is persuasive.

To determine whether a claim sounds in maritime, "courts should look to the subject matter of the [relevant] contract and determine whether the services performed under the contract are maritime in nature." Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 612 (1991). This inquiry "depends upon . . . the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions." Norfolk Southern Railway Co. v. Kirby, 543 U.S. 14, 24 (2004) (quotation marks omitted).

While courts in this Circuit and elsewhere have long held that an agreement to act as a surety on a maritime contract is not maritime in nature, see Interocean Shipping Co. v. Nat'l Shipping & Trading Corp., 462 F.2d 673, 678 (2d Cir. 1972) (citing Pac. Sur., 151 F. at 443-44); see also Japan Line, Ltd. v. Willco Oil Ltd., 424 F. Supp. 1092, 1094 (D.C.Conn. 1976), they have recognized that the same is not true of an agreement to guarantee the performance of a maritime contract, see, e.g., Compagnie Francaise de Navigation a Vapeur v. Bonnasse, 19 F.2d 777, 779 (2d Cir. 1927) (L. Hand, J.). The rationale for the distinction between the two is as sound now as it was in 1927: whereas a guarantor promises to become the principal obligor and do the very act promised, see id., "a surety on a bond does not

5

promise to perform . . . , but to pay damages in the event of nonperformance . . . ." Mercator Line, Inc. v. Witte Chase Corp., 88 Civ. 8060, 1990 WL 52254, at *3 (S.D.N.Y. Apr. 18, 1990).

The contract provided by Plaintiff clearly states that it was entered into by Defendant Madge, "whose performances are fully guaranteed by [KT]." (Zilioli Decl. Ex. 1.)  Nevertheless, Defendant GSHL now urges the Court to look beyond that clear language, arguing that a guarantee of payment of demurrage is, in effect, a guarantee of liquidated damages and, as such, is tantamount to a surety on a bond. (See Def.'s Reply 2.) Compagnie Francaise and its progeny do not permit the Court to disregard the contract's plain terms.  The fact that KT's guarantee required it to pay money only is irrelevant. See Compagnie Francaise, 19 F.2d at 779.  Because the payment of demurrage was an obligation of the chaterer under the charter party, there is no question that the obligation relates to maritime service and transactions. See Kirby, 543 U.S. at 24. Accordingly, KT's guarantee sounds in maritime.

Courts have also recognized that a settlement agreement "does not relate to any maritime activity or services [and, therefore,] is not a maritime contract." Westvaco, 88 Civ. 621, 1989 WL 51714 at *4; see also Mulvaney v. Dalzell Towing Co., 90 F. Supp. 259, 260 (S.D.N.Y. 1950) ("[A]n action for breach of

6

contract to compromise and settle . . . is not within the admiralty jurisdiction."). While such a rule might well encourage the breach of settlement agreements in an effort to divest admiralty courts of their jurisdiction over maritime claims, there is no need to address that concern further here because that rule has no present application. As Plaintiff points out, "the settlement agreement itself in the instant case relates to maritime activity and services." (Pl.'s Opp'n 10.) The Settlement Agreement not only creates obligations intended to resolve a legal dispute (see Zilioli Decl Ex. 2 at ¶ 1) but also creates obligations concerning the payment of demurrage on a theretofore uncompleted charter (see id. ¶ 3). Thus, this settlement agreement is more than the typical settlement agreement at issue in Westvaco or the promise to settle at issue in Mulvaney -- both of which involved promises to pay a sum certain in settlement of claims for cargo losses and personal injuries, respectively -- it is a settlement that includes maritime contract provisions. As such, it "has reference to maritime service or maritime transactions," Kirby, 543 U.S. at 24, and thus is maritime in nature.[3]

---

[3] This conclusion is not disturbed by Defendant GSHL's argument, advanced at oral argument, that the maritime provision of the settlement agreement does not sound in maritime because it is not supported by consideration itself sounding in maritime. The Court perceives no basis for making such a distinction and declines to do so here.

7

2.   FAC Adequately Pleads Alter Ego Liability

Defendant GSHL argues that, even if the claims sound in maritime, the FAC fails adequately to plead a prima facie case of alter ego liability. (See Def.'s Mem. 12.)  As this Court recently summarized the state of the law governing plaintiffs' burden to show a prima facie maritime case:  "maritime plaintiffs are not required to prove their cases at this stage of a Rule E(4) hearing." Transportes Navieros y Terrestes, S.A. de D.V. v. Fairmount Heavy Transport N.V., 07 Civ. 3076, 2007 WL 1989309, at *4 (S.D.N.Y. July 6, 2007).  In that case, this Court followed Chief Judge Wood's decision, in accord with a majority of our colleagues in this District, that "a plaintiff seeking a maritime attachment need not provide any supporting evidence; its complaint should suffice." See id. at *3-4 (rejecting "probable cause" or "reasonable grounds" standards); see also SPL Shipping Ltd. v. Gujarat Cheminex Ltd., 06 Civ. 15375, 2007 WL 831810, at *4 (S.D.N.Y. Mar. 15, 2007) (holding prima facie standard met where plaintiff plead alter ego liability).

Defendant GSHL now asks the Court to revisit its prior conclusion, at least as it applies to cases that involve claims predicated on alter ego liability. (See Def.'s Mem. 14.)  It argues that applying the prima facie standard in alter ego cases

8

"scrape[s] up against the grain of the well-settled American

presumption of separateness normally afforded corporations

. . . ." (Id.)  Instead, Defendant GSHL urges this Court to

follow the "better reasoned opinions [that] require a Plaintiff

to allege sufficient facts that would actually support an

inference the alter ego defendant [sic] has so dominated and

disregarded the subsidiary's form before allowing the attachment

to stand." (See id. at 16.)

One might raise a concern that the prima facie pleading

standard in Rule B actions may result in the use of boilerplate,

conclusory pleadings that recite, on information and belief,

each and every ground for alter ego liability. See MAG Portfolio

Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 63 (2d

Cir. 2001) (suggesting ten factors relevant to the alter ego

inquiry); see also, e.g., FAC ¶ 35 ("Upon information and

belief, GSHL is the alter ego of K.C. because it dominates and

disregards K.C.'s corporate form to the extent that GSHL is

actually carrying on K.C.'s business and operations as if the

same were its own.").  I need not address that concern here,

however, because the FAC includes "enough factual matter (taken

as true) to suggest" the plausibility of Plaintiff's alter ego

theory. See Bell Atlantic v. Twombly, 127 S.Ct. 1955, 1965

(2007).  For instance, the FAC alleges that KC is completely

owned by GSHL and that the two share eight common directors and

9

certain officers, including KC's CEO. (See FAC ¶¶ 37, 38(a)-(c).)  Further, it alleges that the seemingly parallel internet presences of KC and GSHL also substantiates its theory of alter ego liability. (See id. ¶¶ 38(e)-(f) (noting that KC's website lists GSHL as the "copyright name on the bottom of each page of [KC's] website.").)  Finally, it notes that the one payment that was made under the settlement agreement was made on KC's behalf by entities owned or controlled by GSHL. (See id. ¶¶ 23-24.) Such factual allegations dispel any concerns about conclusory alter ego pleadings and are sufficient to discharge Plaintiff's pleading obligations at this stage of the proceedings.

CONCLUSION

For the reasons stated above, Defendant GSHL's motion [dkt. no. 36] to vacate the Supplemental Rule B attachment is DENIED.

DATED:    New York, New York
          June _19_, 2008

*Loretta A Preska*
LORETTA A. PRESKA, U.S.D.J.

10