UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
NOBLE RESOURCES S.A.,                              :

                   Plaintiff,

                              :          08 CV 3876 (LAP)
   - against -                                          ECF CASE

                              :

YUGTRANZITSERVIS LTD. AND
SILVERSTONE S.A.,                                  :

                 Defendants.          :
-----------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION
FOR RECONSIDERATION OF THIS COURT'S DENIAL OF DEFENDANTS'
MOTION TO VACATE AND REQUEST TO CERTIFY THE MATTER
FOR SECOND CIRCUIT REVIEW**

       Plaintiff, Noble Resources S.A. ("Noble" or "Plaintiff"), by and through its undersigned

counsel, Tisdale Law Offices, LLC, respectfully submits this Memorandum of Law in

Opposition to Yugtranzitservis Ltd a.k.a. Yugtranzit Servis Limited ("YTS"), and Silverstone

S.A. ("Silverstone") (collectively "Defendants'") Motion to Reconsider the denial of their

Motion to Vacate the Maritime Attachment Order issued and/or their Request to Certify Matter

for Second Circuit Review.  Because there is no "intervening change of controlling law" in this

case, Defendants' Motion should be denied.

### RECENT PROCEDURAL HISTORY

       By Order to Show Cause dated July 21, 2008 Defendants' filed their Motion to Vacate

the Maritime Attachment.  Plaintiff filed its Opposition to Defendants' Motion on July 22, 2008

and the parties were heard before this Court on Wednesday, July 23, 2008, at 9:00 a.m.  After

hearing argument from both sides, Your Honor issued a ruling properly denying Defendants'

motion to vacate the attachment, as well as Defendants' request to certify the matter for Second

Circuit review pursuant to 28 U.S.C. § 1292(b). *See Transcript of Oral Argument, attached*

*hereto as Exhibit A.*  For all of the reasons below, Defendant's Motion for Reconsideration

should be denied.

## ARGUMENT

## I.    DEFENDANTS' MOTION FOR RECONSIDERATION SHOULD BE DENIED

In order for the court to grant a motion for reconsideration, the burden is on the moving

party to show that there is "an intervening change of controlling law, the availability of new

evidence, or the need to correct a clear error or prevent manifest injustice" in order for the

motion to succeed. *Catskill Dev., L.L.C. v. Park Place Entm't Corp.,* 154 F. Supp. 2d 696, 701

(S.D.N.Y. 2001) (quoting *Doe v. N.Y. City Dep't Soc. Servs.,* 709 F.2d 782, 789 (2d Cir. 1983)).

The standard for a motion for reconsideration is strict and will be denied unless the moving party

can point to controlling decisions or data that the court overlooked.  *Novoship (UK) Ltd. v.*

*Wilmer Ruperti,* No. 07 Civ. 9876 (DLC), 2008 U.S. Dist. LEXIS 47721 at * 3 (S.D.N.Y. 2008).

Matters that would reasonably be expected to alter the court's conclusion would be specific

examples of decisions that would warrant reconsideration because they show a change in the

law, new evidence, or a clear error made by the court. *Id.* This is not such a case.

Furthermore, reconsideration should not be granted when the moving party seeks to re-

litigate an issue already decided by the court. *Shamis v. Ambassador Factors Corp.,* 187 F.R.D.

148, 151 (S.D.N.Y. 1999).  The moving party may not introduce new facts, issues or arguments

not previously presented before the court. *Id. See also Allied Maritime, Inc. v. The Rice Corp.,*

361 F. Supp. 2d 148, 149 (S.D.N.Y. 2004) ("Courts have repeatedly been forced to warn counsel

that such motions should not be made reflexively, 'to reargue those issues already considered

when a party does not like the way the original motion was resolved.'") *quoting Houbigant, Inc. v. ACB Mercantile*, 914 F. Supp. 997, 1001 (S.D.N.Y. 1996). Here, the Defendants are making the same exact arguments that were included in their original motion and outlined during the oral argument on July 23, 2008. The Defendants are simply complaining that the Court got it wrong the first time. This is insufficient to justify reconsideration. *See id.*

In addition, at least one recent decision from this District indicates that Your Honor properly decided this case. In the case of *Noble Resources S.A. v. Sarl Ouest Import*, 08 CV 3587 (GEL), the plaintiff filed an application for a Rule B attachment to seek security for an arbitration award issued in its favor against the defendant, Sarl Ouest. The arbitration was commenced because of Sarl Ouest's breach of six sugar contracts it entered into with the plaintiff. The breaches were the result of Sarl Ouest's failure to pay demurrage due and owing to the plaintiff, as per the terms of the several contracts. The arbitration award in favor of the plaintiff calculated the demurrage due as per the terms of the sugar contracts.

Sarl Ouest filed a motion to vacate, challenging the Rule B application alleging that the contracts and arbitration award were not maritime and did not fall within the court's maritime jurisdiction under any circumstance. Judge Lynch denied the defendant's motion for very similar reasons as Your Honor in this case. In addition, the defendant Sarl Ouest relied on the same line of cases that the Defendants cite here in support of their position. Judge Lynch found all of those cases distinguishable and held that the contracts in questions were subject to the maritime jurisdiction of this court. *A copy of the Order and Decision issued by Judge Lynch, dated August 12, 2008, is attached hereto as Exhibit B.*

Case law that has dealt with this very issue of when maritime jurisdiction exists holds that the nature of the dispute under each particular contract must be reviewed in order to

3

determine whether maritime jurisdiction will stand. The Supreme Court has declined to apply a rule that would automatically exclude all contracts of a certain type from admiralty jurisdiction. *Exxon Corp. v. Central Gulf Lines*, 500 U.S. 603, 612 (1991). Instead, courts "focus the jurisdictional inquiry upon whether the nature of the transaction was maritime." *Id.* at 611. Lower courts are to make a case-by-case assessment of such a contract based on "the subject matter of the... contract" and "the services performed under the contract." *Id.* at 612. That is exactly what Your Honor did in this case, and the result is proper under the applicable case law.

Defendants' focus on one case, which stated that "it has long been held that a non-maritime sale and purchase contract does not become maritime merely because the purchaser entered into a third-party maritime contract..." ignores the relevant language in *Exxon* which directs the court to engage in a fact-intensive inquiry on a case by case basis. *See Defendants' Brief at p. 7.* It further ignores the Second Circuit's opinion in *Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.*, 413 F.3d 307 (2d Cir. 2005) where the court specifically directs the inquiry of whether maritime jurisdiction exists by focusing on the nature of the dispute under the particular contract. Plaintiff's did not argue that the contract here was maritime merely because the purchaser entered into a third-party maritime contract. The Contract between the parties in this case falls within the Court's admiralty jurisdiction because the nature of the dispute thereunder affects maritime commerce and maritime activity.

Furthermore, Defendant's contention that *Aston Agro* is "directly on point and should be followed" is misplaced and merely asks this court to reconsider the same issue it already resolved. In *Aston Agro*, Judge Daniels found that the contract between Agro and Star Grain was not maritime because Star Grain's liability to Aston in that case had nothing to do with any maritime obligations of the wheat contract. *Agro-Industrial AG v. Star Grain Ltd.*, 2006 U.S.

4

Dist. LEXIS 91636 (S.D.N.Y. 2006). The court in *Aston Agro* itself limits the scope of that holding to the fact pattern in that case. *See eg., Opinion and Order in Noble Resources v. Sarl Ouest Import, attached as Exhibit 2, at pp. 9-11 (transcript pp. 17-18; 22-23).*

Defendant further argues that this Court "missed the point" when it considered whether maritime transportation was "integral" to the contract. Instead, Defendant contends that the Court should have applied the "principle objective" standard. But this is merely a matter of semantics, which fall far short of the "intervening change of controlling law" requirement which a moving party must meet for a motion for reconsideration. For all of these reasons, Defendants' motion for reconsideration should be denied.

## II.    THIS CASE IS NOT APPROPRIATE FOR CERTIFICATION FOR INTERLOCUTORY APPEAL

Certification of the matter for interlocutory appeal requires that the challenged order involve a controlling question of law as to which there is substantial ground for difference of opinion and that such immediate appeal may advance the ultimate termination of the case. *See* 28 U.S.C. § 1292(b). In this case, however, there are not substantial grounds for difference of opinion and an immediate appeal will not likely advance the termination of this case. This is clear from the Defendants' own brief wherein they fail to cite any authorities in support of their request for certification of the matter for appeal to the Second Circuit. *See Defendants' Brief at pp 9-10.*

The standard for certification requires that there be a significant question of controlling law. Your Honor correctly noted that, "The controlling law is not at all at issue in this case." *Transcript, Exhibit 1, p. 9. See also Exhibit 2.* Defendants merely disagree with Your Honor's application of the relevant precedent to the facts of this case. Furthermore, it has been held that

certification for interlocutory review "should be strictly limited because 'only 'exceptional circumstances' [will] justify a departure from the basic policy of postponing appellate review until after the entry of fial judgment.'" *Flor v. BOT Fin. Corp.*, 79 F.3d 281, 284 *quoting Klinghoffer v. S.N.C. Achille Lauro,* 921 F.2d 21, 25 (2d Cir. 1990). No such circumstances have been alleged by the Defendants and thus this case is not appropriate for interlocutory appeal.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, it is respectfully requested that this Court deny Defendants' motion for reconsideration and for certification for interlocutory appeal.

Dated: New York, NY  
      August 20, 2008

The Plaintiff,  
NOBLE RESOURCES S.A.,

By:    _____  
Claurisse Campanale Orozco (CC3581)  
Lauren C. Davies (LD 1980)  
TISDALE LAW OFFICES, LLC  
11 West 42nd Street, Suite 900  
New York, NY 10036  
(212) 354-0025 – phone  
(212) 869-0067 – fax  
corozco@tisdale-law.com  
ldavies@tisdale-law.com

6

# EXHIBIT 1

87N6NOBC

1

87N6NOBL
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  NOBLE RESOURCES,
3
4              Plaintiff,
4
5         v.                              08 CV 3876(LAP)
5
6  YUGTRANZITSERVIS and
6  SILVERSTONE,
7
7              Defendants.
8
8  ------------------------------x
9                                   New York, N.Y.
9                                   July 23, 2008
10                                  9:45 a.m.
10
11 Before:
11
12              HON. LORETTA A. PRESKA,
12
13                                       District Judge
13
14                   APPEARANCES
14
15 TISDALE LAW OFFICES, LLC
15      Attorneys for Plaintiff
16 BY:  CLAURISSE OROZCO
16
17 CHALOS & CO.
17      Attorneys for Defendants
18 BY:  GEORGE M. CHALOS
18
19
20
21
22
23
24
25
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

2

87N6NOBL
1          (Case called; in open court)
2
3          THE COURT:  Counsel have very graciously agreed to
4  prepare their papers quickly so that the hearing required to be
5  conducted quickly on a motion to vacate a maritime attachment
6  could take place promptly.  I am grateful to counsel for doing
7  that.
8          Defendant argues first that the contract at issue is
9  not subject to maritime jurisdiction.  We all agree to the law
10 which is that the threshold inquiry examines the subject matter
11 of dispute as opposed to the underlying contract.  To determine
12 if an issue related to maritime interests has been raised, an
13 issue will not give rise to maritime jurisdiction if the
14 subject matter of the dispute is so attenuated from the
                         Page 1

87N6NOBC

15  business of maritime commerce that it does not implicate the
16  concerns underlying admiralty and maritime jurisdiction.
17              As the Court of Appeals acknowledged in FolksAmerica,
18  Reinsurance Co. v. Cleanwater New York, Inc., 413 F.3d 307 (2d
19  Cir. 2005) the court directed that the jurisdictional inquiry
20  be focused upon whether the nature of the transaction was
21  maritime and observed that the fundamental interest giving rise
22  to maritime jurisdiction is the protection of maritime
23  commerce.
24              Here, the contract itself makes clear that maritime
25  transportation was integral to the agreement. For example, the

87N6NOBL

1   contract provided that Plaintiff Noble would purchase a cargo
2   from YTS and the contract set out in great detail the
3   conditions for transportation and delivery.
4               The contract set out in the portion under delivery the
5   window of dates open for loading in the specified port, that
6   portion of the contract also required that the vessel nominated
7   by buyers was required to tender her notice of readiness at the
8   designated port. It set out how the loading of the vessel was
9   to be effected. It set out in great detail the type of vessel
10  that would be acceptable, that is, "A self-trimming bulk
11  carrier, single-decker vessel suitable for direct loading
12  (wagon-board of the vessel)."
13              The Contract also provided that the vessel could be --
14  should be confirmed or rejected by sellers in writing and, in
15  fact, here the sellers rejected the first three vessels that
16  were nominated eventually accepting the Southgate.
17              The contract further set out the preadvise that buyers
18  were to give the sellers of the vessel's ETA, name, flag,
19  dimensions, hatches and hold dimensions and alike. It set out
20  in detail the loading instructions, the loading rate, detailed
21  the notice of readiness and the laytime and the demurrage,
22  among other provisions. So the underlying contract certainly
23  touched upon the business of maritime commerce.
24              In addition, the dispute between the parties also
25  touches upon the maritime commerce. As set out in plaintiff's

87N6NOBL

1   claim submissions in the arbitration, and perhaps more
2   importantly as reflected in the award, the dispute centered on
3   two issues. First, the default by YTS in failing to provide a
4   berth for the vessel after she had tendered her notice of
5   readiness and refusal to load the vessel constituting a default
6   under the contract. And, secondly, a request for wasted vessel
7   costs, that is, the costs incurred by the vessel following
8   tendering of her notice of readiness.
9               As set out in the award damages were awarded for both
10  these items and indeed there was a lengthy discussion in
11  Section 6 of the award about the wasted costs incurred on
12  account of the vessel's lack of use because of defendant YTS's
13  default. The wasted vessel expenses included bunkering costs,
14  port and survey costs, and hire payments, all clearly within
15  the maritime jurisdiction.
16              For all those reasons, I find that the contract and
17  dispute at issue fall within the Court's maritime jurisdiction.
18              The question has also been presented as to whether or
19  not the guarantee by Silverstone falls within the Court's

87N6NOBC

20  maritime jurisdiction.  As the Court has set out recently in C
21  Transport Panamax, Ltd. v. Kremikovtzi Trade, et al., 07 CR 893
22  (June 19, 2008 S.D.N.Y.) courts in this circuit and elsewhere
23  have long held that an agreement to act as a surety on a
24  maritime contract is not maritime in nature.  They have
25  recognized that the same is not true of an agreement to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                  5

87N6NOBL
1   guarantee the performance of a maritime contract.
2            See e.g. Compagnie Francaise, DE Navigational Avapeur
3   v. Bonnase, 19 F.2d 777, 779 (2d Cir. 1927) (L. Hand, J.).
4            Here the guarantee by Silverstone specifically states
5   "The guarantor (Silverstone) irrevocably and unconditionally,
6   A, as principal obligor guarantees to the Buyers the prompt
7   performance by (YTS) of all its obligations under the
8   Contract...."  Accordingly, the guarantee at issue here based
9   on longstanding Second Circuit law falls within the meaning of
10  maritime contracts.
11           Finally, with respect to defendant's argument that the
12  matter is not ripe, the arbitral award has ordered that the
13  payment be made and it has not yet been paid.  Accordingly, the
14  matter is ripe with respect to the guarantor.  In addition, it
15  is most frequently the case that Rule B attachments are used to
16  provide security for arbitral awards and that has been the use
17  here.  Accordingly, defendants' motion to vacate the attachment
18  is denied.
19           THE COURT:  Is there anything else today?
20           MR. CHALOS:  Yes, your Honor, two points if I may.
21           THE COURT:  Sir.
22           MR. CHALOS:  We thank the Court for hearing us on an
23  expedited basis.  We would first off like to make an
24  application to the Court to reduce the amount of security.  On
25  page 14 of the award, the panel clearly sets forth that the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                  6

87N6NOBL
1   plaintiff was awarded $3,362,400 and no more as the words of
2   the panel.  Here the amount of the order attachment is almost
3   double that.  It is significantly more.
4            THE COURT:  What is the story with the interest,
5   Mr. Chalos?
6            MR. CHALOS:  According to the panel, it is 7.5 percent
7   beginning August 16, 2007.  That is only one year's worth of
8   interest.  Surely this can be resolved in the next, I would
9   assume, six months or so with the upcoming appellate deadlines.
10           THE COURT:  Has anyone done the calculation of the
11  interest?
12           MS. OROZCO:  I have, your Honor.  But I would just
13  like to speak on that point.  The panel awards the amount less
14  than we had sought in our application, but it also awards
15  interest 7.5 percent from the date of the default until it is
16  paid and it also awards costs of arbitrator, not legal costs.
17           We have attached to date as outlined in my declaration
18  $4 million.  It is paragraph 34 of my declaration at page 6.
19  We have not calculated the interest out for a year.  What we
20  have done is calculated it out for three years, which is
21  normally what we undertake in anticipating appeals and that
22  sort of thing.  If we allow for three years of interest,
23  security for three years of interest, plus the costs of the
24  Gafta arbitration, the security that we would be entitled to
                            Page 3

87N6NOBC
25    would be $4,225,000.

87N6NOBL
1    So we are at this time undersecured by 200,000.
2    However, if the Court wants us to reevaluate the interest, we
3    would be willing to do so and then release the funds
4    accordingly if that was a proper analysis.
5        THE COURT:  Counsel.
6        MR. CHALOS:  Those calculations are flawed.  Those
7    calculations are based on the principal claim of 3.9 million.
8    That is not what the panel awarded.  7.5 percent on the $3.3
9    million award is about, 21 to $210,000.
10       MS. OROZCO:  I actually calculated the three-year
11   interest on the amount awarded by the arbitrators, which was
12   $3,362,400.  And the interest from August 15th, 2007 through
13   August 15th, 2010 is $840,000.
14       MR. CHALOS:  I submit through 2010 is a bit long.  I
15   can certainly understand maybe two years, but not three.
16       Also, seeing as they are already secured from the
17   guarantor's EFTs, I renew my application and dismiss the matter
18   against YTS.  They are secured or they are not secured.  They
19   have it already attached.  There is no in rem quasi
20   jurisdiction over the party whose funds who haven't been
21   attached.
22       THE COURT:  I don't hear counsel going out and seeking
23   further attachments here.
24       MR. CHALOS:  But they would, though.  That is the
25   point if they sought to move money.  In fact, in the papers

87N6NOBL
1    that counsel submitted last night, they said exactly that they
2    would do that.  If they wound up -- U.S. dollar transfers on
3    behalf of Yugtranszitservis came through New York, they would
4    catch that and release monies belonging to the guarantor.
5        THE COURT:  What do you say to that, counsel?
6        MS. OROZCO:  Was that was a statement that we made.
7    That statement as made with respect to the application of the
8    New York CPLR in that case, which we didn't address and we say
9    we are not applied.  We actually have stopped serving the writ
10   of attachment in this case and we are no longing serving on any
11   of the defendants.
12       THE COURT:  First, I decline to reduce the amount.
13       Second, obviously counsel knows that plaintiff may not
14   be oversecured.  If, Mr. Chalos, you find that plaintiff is
15   attaching more than the four million two number -- is that the
16   total number?  Please remind me.
17       MS. OROZCO:  Yes.  The total number is comprised of
18   $3,362,400 of principal pursuant to the arbitration award
19   issued on July 4th, 2008, with the rate of interest calculated
20   at 7.5 percent which is also the rate awarded for three years
21   from August 15th, 2007 through August 15th, 2010.  The interest
22   on that amount is $840,501.
23       In addition, the arbitration award also allowed costs,
24   Gafta costs, to the plaintiff and the Gafta costs incurred were
25   23,000 U.S. dollars.  So the total security we would be

87N6NOBL

87N6NOBC
1    entitled to or we would be seeking is $4,225,901.
2        THE COURT:  To the extent, Mr. Chalos, counsel
3    attaches more than that, you let me know.
4        MR. CHALOS:  Thank you, your Honor.
5        Finally, your Honor, we would like to ask the Court to
6    certify this for immediate appeal to the Second Circuit.
7        THE COURT:  I will take a letter on that.
8        How is this a complex or novel issue?
9        MR. CHALOS:  Well, it is a novel issue in the sense
10   that the Court has for the first time found a Gafta contract to
11   be within the meaning of a maritime contract and a maritime
12   claim under Rule B.  It stands starkly in contrast to Judge
13   Daniels' decision as to Aston Agro as well as Judge Sullivan, I
14   am not sure about that, in the Tan Shan case.  These exact
15   arguments were presented there with a 180-degree different
16   result and I do believe that if we can bring this to a head
17   Second Circuit level promptly that would help provide some
18   clarity on these types of issues.
19       THE COURT:  The law is not in doubt.  It is the
20   application, right?
21       MR. CHALOS:  Well, I think the law is in doubt in a
22   sense that our position is that the Court needs to look to the
23   primarily objective of the contract.  Our argument has been
24   that the primary objective of the contract is one of sale and
25   purchase.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

10

87N6NOBL
1        THE COURT:  I didn't see any of the Second Circuit
2    cases talking about the primary objective of the contract.
3        MR. CHALOS:  Well, I think we set out the argument
4    based on the precedent of Judge Daniels' decision, which can be
5    found for the Court's reference on page 3 of the Aston Agro
6    decision where he writes, In this case the contracts are not
7    maritime contracts because they are primary objective was not
8    the transportation of goods by sea.  Instead, their primary
9    objective was undoubtedly the sale of wheat.  That the wheat
10   was transported on a ship does not make the contracts maritime
11   contracts anymore than it would make them aviation contracts
12   had the wheat been shipped via airplane.  Nor would the
13   contracts between a seller and shipper -- that is true here.
14   the judge in that matter goes on to write, Nor can maritime
15   jurisdiction be exercised under an exception to the general
16   rule that maritime jurisdiction "Arises only when the subject
17   matter of the contract is purely or wholly maritime in nature.
18   Under the first exception, federal court can exercise --
19       THE COURT:  Counsel, do you want this taken down?  If
20   you do, you better read so the court reporter can take it down.
21       MR. CHALOS:  The Court has it before it.
22       THE COURT:  So you don't need to read it.
23       MS. OROZCO:  May I respond?
24       THE COURT:  Yes, ma'am.
25       MS. OROZCO:  The key to the quotes by defendant from
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

11

87N6NOBL
1    the Ashon Agro case is the first line where it says, "In this
2    case." and further or in the quote Judge Daniels says that
3    based on the facts of that particular case they are not within
4    the maritime jurisdiction.
5        I would just like to point out that the Exxon case,
                        Page 5

87N6NOBC

6  500 U.S. 603, 612 reminds us -- this is the U.S. Supreme
7  Court -- reminds us that courts are required to look to the
8  subject matter of the relevant contract. And in this case the
9  relevant contract, the Noble YTS contract, provides maritime
10  jurisdiction.
11          MR. CHALOS: Your Honor, this is the shifting sands
12  that I have been arguing again. The Court is required to look
13  to the nature of the contract, not the dispute. Twenty minutes
14  ago counsel was arguing the Court needs to look to the dispute
15  and I rejected that. The contract is a sale and purchase
16  contract, not a maritime contract. It is not maritime contract
17  with third parties. We had nothing do with it. My clients had
18  nothing to do with it. That is the dispute here. If you look
19  to the nature and substance of the contract, we are selling and
20  they are buying. Full stop. It is the sale and purchase
21  contract.
22          In fact, your Honor, that was precisely what was
23  addressed by Judge Daniels. He writes here invoking the first
24  exception, Aston contends that maritime jurisdiction exists
25  because the particular claims at issue involve only the
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

12

87N6NOBL

1  maritime portions of the contracts, and it was rejected, which
2  is precisely the argument presented by plaintiff. Our
3  opposition is precisely the argument adopted by Judge Daniels.
4          THE COURT: The Court denies the request for
5  certification under 28, U.S.C., Section 1292(b). The
6  controlling law is not at all at issue in this case. Everyone
7  agrees on the cases that should be looked to for guidance. The
8  only dispute is the application of those cases to the facts of
9  this case as opposed to the facts of other cases. Accordingly
10  certification for immediate appeal is denied.
11          Anything else, counsel?
12          MR. CHALOS: Nothing further, your Honor.
13          THE COURT: Thank you, ladies and gentlemen. Thank
14  you for your excellent arguments.
15                        oOo
16
17
18
19
20
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

# EXHIBIT 2

88C9NOBA

1

88C9NOBA
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  NOBLE RESOURCES SA,
3
4              Plaintiff,
4
5       v.                              08 CV 3587 (GEL)
5
6  SARL OUEST IMPORT,
6
7              Defendant.
7
8  ------------------------------x
8                                  New York, N.Y.
9                                  August 12, 2008
9                                  10:15 a.m.
10
10  Before:
11
11              HON. GERARD E. LYNCH,
12
12                                      District Judge
13
13              APPEARANCES
14
14  TISDALE LAW OFFICES, LLC
15       Attorney for Plaintiff
15  BY:  CLAURISSE OROZCO
16
16  CICHANOWICZ, CALLAN, KEANE, VENGROW & TEXTOR, LLP
17       Attorney for Defendant
17  BY:  JOSEPH F. DeMAY, JR.
18
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

88C9NOBA
1              (Case called)
2              MS. OROZCO:  Good morning, your Honor.  Claurisse
3  Orozco from Tisdale Law Offices for the plaintiff, Noble
4  Resources.
5              THE COURT:  Good morning.
6              MR. DeMAY:  Good morning.  Joseph DeMay, Jr. from
7  Cichanowicz, Callan, Keane, Vengrow & Textor for the defendant.
8              THE COURT:  Mr. DeMay, good morning.
9              Well, I think that what is technically before me is a
10  request for a hearing on a potential motion to vacate an order
11  for marine attachment.  The parties have written a number of
12  letters to the court regarding that.  It's my impression -- and
13  I think it's been confirmed by my law clerk -- that the parties
14  have fully briefed the merits of the issue and that what we're
Page 1

88C9NOBA
```
15    really here to do today is to have oral argument towards
16    deciding the motion to vacate the attachment.
17              Is that everybody's understanding, or does anybody
18    think we need more of anything?
19         MS. OROZCO:  No.  That's my understanding, your Honor.
20         MR. DeMAY:  Oral argument, your Honor.
21         THE COURT:  Very good.
22              So, I think what I'd really like to hear -- I suppose
23    starting with the defendant as the movant -- is an account from
24    each side of what they think is at issue in the arbitration in
25    this case; that is, what are the factual issues and legal
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

88C9NOBA
```
1    issues that the arbitrators had to decide.
2         Mr. DeMay.
3         MR. DeMAY:  Your Honor, I'll confess that I was not
4    fully briefed on the arbitral aspect of it.  Our application
5    and our retention as attorneys was directed solely toward the
6    propriety of the maritime attachment.  For that purpose, we
7    have assumed, for argument's sake only, the validity of the
8    arbitration award, and the accurate and true condition of the
9    contracts of sale that the plaintiff has already provided.
10        THE COURT:  Yes.  I'm not so much concerned with the
11   merits of the arbitration.  But, as I understood it, your
12   argument is that this is really not a maritime case.
13        MR. DeMAY:  Yes, your Honor.
14        THE COURT:  And on reading the arbitration award, it
15   seemed to me that what the arbitrators were concerned with was
16   what, as a nonadmiralty lawyer you'll forgive me for calling,
17   boaty things; assumed to be about what happened to the ship and
18   why it was late and things of that sort.
19             And I wanted to give everyone a chance to address that
20   in case I misperceived what was the -- what is the real dispute
21   between the parties because it sounded to me, in my landlubber
22   way, to be a maritime kind of dispute.
23        MR. DeMAY:  Your Honor, my understanding is that what
24   we're talking about here are essentially pricing terms.  The
25   sales contract were just that.  They were contracts for the
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

88C9NOBA
```
1    sale of sugar.
2              Under like the contracts in Judge Preska's case, which
3    has already been provided to you, these particular contracts
4    made reference to the ship.
5              They made reference to the fact that the buyer, our
6    client, would be responsible for certain discharging costs, and
7    they provided references to the charter party by which those
8    costs would be calculated.
9              My understanding, however, is that unlike the typical
10   maritime case, our client did not assume any direct obligation
11   toward the operation or navigation of the ship.  In other
12   words, the contract for the sale of the sugar made reference to
13   the operation of the ship, made reference to things like
14   demurrage.  But I think the case law is fairly clear that
15   simply making reference to those things do not give rise to a
16   maritime obligation.  The maritime obligation arises when you
17   assume an obligation that directly relates to the operation and
18   navigation of a ship in commerce on the high seas.
19        THE COURT:  Well, I mean it seems to me that there
```
Page 2

88C9NOBA

20  are, as I've understood the case law, two different kinds of
21  ways in which a contract can give rise to admiralty
22  jurisdiction.  The one is, as you say, where the contract
23  itself is predominantly about maritime issues.  And I'd have to
24  agree with you, this looks more like, for example, the case
25  that I have that the parties cited in that it's really a
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

88C9NOBA

1  contract for the sale of goods that says:  Well, but by the
2  way, it's going to be going by ship.
3        But then there is a separate issue where the claim at
4  issue arises from a breach of the maritime obligations that are
5  part of the contract.  And it seemed to me that what the
6  parties were actually fighting about here was the maritime part
7  of the contract.  In other words, they were concerned about
8  what the demurrage costs were going to be based on what
9  happened at sea.
10       Am I wrong about that?
11       MR. DeMAY:  No, your Honor.  To the extent that this
12  is a demurrage claim, that's absolutely correct.  And the
13  contract does make provision for our client to reimburse the
14  seller for all demurrage costs that they incur.
15       But demurrage is primarily an obligation that's
16  incurred by the charterer, in this case the seller, to the
17  vessel owner.  Our client, the buyer, is neither the charterer
18  nor the vessel owner.
19       What they did, in effect, was to say that:  We, the
20  buyer, will indemnify or compensate you, the seller, for
21  whatever demurrage costs that you incur during the performance
22  of the charter party.
23       And think the case law is clear that unlike a
24  situation where somebody, say a guarantor, assumes the direct
25  performance and obligation to the vessel owner, where you
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

88C9NOBA

1  merely take or undertake to indemnify or compensate somebody
2  for a maritime obligation that they have incurred, that
3  obligation to pay, to indemnify, is not itself a maritime
4  obligation.
5       It is inevitable if you've undertaken to compensate or
6  indemnify somebody for a maritime obligation that the dispute
7  will necessarily center on the details of that maritime
8  obligation.  But, here the maritime obligation was not our
9  client's maritime obligation.  It was first and foremost the
10  seller/charterer's obligation, and our client was merely called
11  upon to indemnify, which meant that inevitably that the details
12  of the charter party of the performance would have to be
13  raised.  But that's not the same thing as saying that our
14  client undertook a maritime obligation, undertook to compensate
15  the charterer for its maritime obligations.
16       THE COURT:  I see.  So you're saying even if the
17  dispute was in substance about the facts of what occurred at
18  sea, that your obligation here was purely to pay whatever the
19  chartering party had to pay in demurrage costs?
20       MR. DeMAY:  Exactly.  The contract for sale set out
21  the way in which that compensation would be calculated.  But
22  that is essentially the case.
23       THE COURT:  Again, when you say the contract for sale
24  set out the way in which it would be calculated, what did the
Page 3

88C9NOBA
25    contract of sale say?
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

88C9NOBA
1        Again, it seems to me that your argument works best if
2    the contract simply says whatever the -- am I using the right
3    terminology -- the chartering party has to pay in demurrage
4    costs, you will reimburse, not us. And we don't care
5    whether -- what the rights and wrongs are of that charge.
6    Whatever he gets charged, you will pay.
7        And in that event, you would not have a dispute about
8    whether the charges were correct or about anything maritime at
9    all. It would simply be: Here's the bill that we were
10   presented and you better pay it.
11       MR. DeMAY: That would be the cleanest way of doing
12   it. But in commerce, it is not unusual that the parties
13   bargained for whatever advantage they can get. And it was
14   certainly open to the parties in this case, in our case the
15   buyer, to negotiate with the seller that, yes, it would be
16   responsible for demurrage but only within certain parameters
17   and on certain conditions.
18       So that the mere fact that they tried to cut
19   themselves a better deal than the seller/charterer might have
20   had with the vessel owner, I don't think changes the essential
21   fact that they're not assuming a maritime obligation. They are
22   assuming a payment obligation.
23       THE COURT: But the obligation then is very similar to
24   the payment obligation that would occur if the contract simply
25   said we're responsible for getting the ship to port and if you
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

88C9NOBA
1    don't get there you pay demurrage, right?
2        I mean it winds up being the same thing. Once you
3    incorporate the maritime issues into what has to be paid,
4    you're essentially talking about a very maritime kind of set of
5    issues, aren't you?
6        MR. DeMAY: Yes. The issues can be maritime. I don't
7    think that's determinative.
8        THE COURT: I see.
9        MR. DeMAY: The question is: Are the obligations
10   maritime? And, of course, if, as I said before, you're talking
11   about having the buyer, having to compensate the seller, for
12   money incurred in the performance of maritime obligations,
13   unless the seller has somehow undertaken to directly assume an
14   obligation to the shipowner, I don't see that it's a maritime
15   obligation; it's simply a payment obligation that has reference
16   to maritime issues.
17       THE COURT: I see. And that further explains why you
18   would take the position that I really shouldn't worry very much
19   about what the arbitrators had to do? I should just look at
20   the contract itself to decide what the nature of the obligation
21   is that the parties are disputing?
22       MR. DeMAY: Yes, your Honor.
23       THE COURT: Okay. That's very helpful. Thank you.
24       Ms. Orozco, what's your view?
25       MS. OROZCO: Well, clearly, I disagree with Mr. DeMay.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

88C9NOBA
Page 4

88C9NOBA

1   I think that the dispute here is clearly a maritime dispute.
2   And I think that the case law requires us and directs us to
3   look at the nature of the dispute of this particular contract.
4   That's what the Second Circuit has directed in Folksamerica.
5          And I believe that the very dispute in this case,
6   which is admitted by both parties, is identified in the
7   arbitration award.  And I think that the arbitration award is
8   important because it outlines and indicates what the parties'
9   understandings were and what their rights and obligations were
10  under the contract.  So, I think that the arbitration is
11  important.
12         But before getting to the arbitration award, the
13  contract itself has very specific maritime provisions.  Each of
14  the six contracts are generally the same.  The only differences
15  being the date, the quantity of goods to be shipped, and the
16  vessels.
17         THE COURT:  Can you point me to where in the
18  voluminous materials I will most easily find the contracts so I
19  can follow?
20         MS. OROZCO:  They are -- to my letter dated July 8,
21  they are Exhibits 1 through 6.  They are all generally the
22  same.
23         THE COURT:  Okay.  Got it.
24         MS. OROZCO:  If you go to the fourth page of the
25  contract under discharging conditions --
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

10

88C9NOBA

1          THE COURT:  Okay.
2          MS. OROZCO:  -- it specifically identifies and
3   specifically states that all of the discharging costs are for
4   the buyer's account, in this case the defendant.
5          So, there is no secret or no hidden agenda.  It's
6   basically any discharging costs, discharging, port expenses,
7   demurrage incurred, any other vessel-related costs that would
8   be incurred are for the buyer's account.
9          More importantly, in this particular contract -- each
10  contract identifies the vessel, as well.  So, the buyer's
11  already aware of the discharging terms, the conditions, the
12  payments they are going to incur, the vessel that is going to
13  be nominated, And I think what's very important is the very
14  last sentence says, "All of the other conditions to be in
15  accordance with the amended version of the Sugar Charter Party
16  Form 1999."
17         The arbitrators, when they were reviewing their award,
18  made a note at page 4 of the arbitration award, which is your
19  Exhibit 7, in paragraph 6.  They stated and they recognized
20  that at the oral argument hearing during the arbitration both
21  parties agreed in accordance with clause 22 of the standard
22  sugar charter party 1999, which was incorporated into each of
23  the six contracts, gross weight, rather than net weight, was
24  relevant.
25         This statement was made for the purposes of
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

11

88C9NOBA

1   calculating the demurrage rate.  But what's, I find -- I think
2   is very important in this particular case is that the charter
3   parties were incorporated.  And to the extent that the
4   discharging conditions in the standard form were different than
5   this particular contract, this particular contract would
                        Page 5

88C9NOBA

6   govern.  But otherwise, all of the standard terms of the sugar
7   charter party were incorporated.
8           In addition --
9           THE COURT:  So, looking back at the contract for a
10  moment, the contract doesn't, in your view, simply say that
11  there's going to be reimbursement of costs; instead, you're
12  saying that the contract provides specifically for terms about,
13  for example, how the vessel is going to be discharged?
14          MS. OROZCO:  Yes.
15          THE COURT:  And those are provisions between these
16  parties, not involving the shipowner.  They are between these
17  parties.  And they are agreeing as to how the vessel is going
18  to be discharged and what -- when lay time is going to count
19  and when it's not going to count; and how the demurrage is
20  going to be settled; and what the water draft is at the port of
21  discharge.  These are all obligations that the buyer is
22  guaranteeing, not something that the buyer is just going to pay
23  costs that somebody else incurs?
24          MS. OROZCO:  Yes.  I believe -- my position would be,
25  your Honor, that this is not at all an indemnity provision.  If

12

88C9NOBA

1   it was an indemnity provision, I think it would say it was an
2   indemnity provision.
3           In the case of Aston Agro v. Star Grain, which the
4   defendant had cited in one of their letters, which is a case of
5   Judge Daniels, it was a sales contract, and I believe it was
6   for the sale of wheat, I don't recall off the top of my head.
7           But, in that particular case, the issue before the
8   court and what the court stated was with respect to the
9   demurrage obligations in that case, it was not clear under the
10  contract which party would pay for or incur demurrage.
11          In that case, Judge Daniels found that it may very
12  well just have been an indemnity provision.  But the demurrage
13  clause in that contract just said demurrage to be calculated in
14  accordance with the charter party.  So at the time of entering
15  into the contracts in this case, the defendant was very much
16  aware that it was obligating itself to pay demurrage.
17          In addition, the arbitration decision --
18          THE COURT:  Now, again, just to go back to this.
19          MS. OROZCO:  Yes.
20          THE COURT:  I cited a moment ago various provisions in
21  the contract that seemed to be of a maritime nature, but it's
22  not clear to me -- I suspect it's the other way -- it's not
23  clear to me that those were -- the ones I cited are the -- what
24  the dispute was about.  No one was fighting about whether there
25  was lay time on a Thursday afternoon, I take it.

13

88C9NOBA

1           So, what exactly -- well maybe they were.  There's a
2   lay time allowance being calculated.  There is an effective
3   demurrage -- on demurrage of rain periods during the discharge.
4           What contract provisions do those disputes fall under?
5           MS. OROZCO:  Those disputes fall under the discharge
6   conditions.  And to the extent that they are not outlined
7   within the discharging conditions of the particular contracts,
8   then the sugar charter party form would come into play.
9           And at page 2 of the arbitration award in the overview
10  paragraph, it's clearly stated that Noble, the plaintiff in

Page 6

88C9NOBA

11    this case, their claims are for demurrage which were incurred.
12    And Ouest Import, the defendant, admitted that the demurrage
13    costs were incurred.  But, the dispute was the defendant had
14    counterclaims for dead freight and for dispatch -- I'm sorry,
15    not dead freight -- dispatch and discharge port fines.
16        So, it wasn't a question of:  Do we owe demurrage or
17    not?  It was a question of how demurrage is calculated, and how
18    do we treat lay time periods, how do we treat rain delays, how
19    do we treat lack of bills of lading at the discharge port.
20    Those were the disputes.
21        Just two more important points.  If it was an
22    indemnity contract, perhaps the issue would be:  You paid the
23    charterer -- Noble, you paid the owner too much money and we
24    don't think we should indemnify you.  But, it's not.  It's a
25    dispute of how to calculate, when does lay time run.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    14

88C9NOBA

 1        More importantly, on page 9 at paragraph 25 and page
 2    10 at paragraph 27 in the arbitration award, the defendant in
 3    this case relied on charter party case law in London to support
 4    its positions.  So I don't think that it's -- I think that the
 5    parties were very much aware of the maritime nature of the
 6    obligations with this particular dispute.
 7        And I think that this case is very similar to the
 8    Noble v. YTS case that I submitted to your Honor, recently
 9    decided by Judge Preska.  I think that these are clearly
10    maritime obligations.
11        THE COURT:  Okay.
12        Mr. DeMay, any last words?
13        MR. DeMAY:  Yes, your Honor.
14        Number one, I disagree that this case is on all fours
15    with Judge Preska's decision.  If you look at Judge Preska's
16    decision, I think on the second page she outlines a number of
17    details that were present in those contracts that are not
18    present in these contracts.
19        Number two, I believe only four of the six contracts
20    actually named the vessel.  Two of them do not.
21        Number three, I take issue with the notion that the
22    charter party was incorporated.  What it says is that, "All of
23    the other conditions to be in accordance with the amended
24    version of the sugar charter party."  And "conditions" in that
25    sense has to refer to the caption, which is discharge
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    15

88C9NOBA

 1    conditions.
 2        So, once again, all the parties have done is to refer
 3    to another document as a standard by which they determine their
 4    own obligations.
 5        The notion that the buyer guarantees the minimum water
 6    draft, again, that's fine if the guarantee is being made
 7    directly to the vessel owner, where it certainly then would be
 8    a maritime obligation.  But as between two businessmen, a buyer
 9    and seller of sugar, that means something else.  It simply
10    means that the buyer says:  If the water draft is not 99 feet,
11    we'll compensate you for damages suffered as a result of that.
12    And the notion that if this were intended to be an indemnity
13    provision, they would have said so.
14        This is a businessman's contract.  And I think it's
15    unreasonable to assume that businessmen would necessarily
                              Page 7

88C9NOBA
```
16   phrase their obligations as would an attorney.
17           THE COURT:  I understand.  I think I'm prepared to
18   rule.
19           As I said, what's before the court is effectively a
20   motion by the defendant to vacate an order for the process of
21   maritime attachment.  The underlying dispute concerns a series
22   of agreements between the plaintiff and defendant for the sale
23   of sugar.  A dispute arose between the parties regarding the
24   performance of those contracts, and following arbitration a
25   panel awarded the plaintiff $674,558 in outstanding demurrage
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

88C9NOBA
```
1    charges owed by the defendant.
2            The plaintiff then sought this order of maritime
3    attachment in an attempt to satisfy that judgment which remains
4    unsatisfied.
5            The defendant contests the existence of federal
6    admiralty jurisdiction, which is of course a prerequisite to
7    the applicability of the rules governing maritime attachments.
8            After hearing argument and reviewing the papers
9    submitted by the parties, for the following reasons the court
10   denies the defendant's motion to vacate the order for maritime
11   attachment.
12           Traditionally, the rule was that a federal court could
13   exercise admiralty jurisdiction only over "contracts, claims,
14   and services, purely maritime," in nature.  That's Rea v. The
15   Eclipse, 135 U.S. 599, 608 (1890).  However, that rule has
16   loosened considerably and today mixed contracts, those
17   containing both maritime and nonmaritime provisions, can be
18   subject to admiralty jurisdiction in two situations.  As set
19   forth by the Second Circuit in Folksamerica Reinsurance Company
20   v. Clean Water of New York, Incorporated, 413 F.3d 307, (Second
21   Circuit 2005), those situations are, first, where "the
22   principal objective of a contract is maritime commerce," and
23   second, where the claim at issue in the dispute, "arises from a
24   breach of maritime obligations that are severable from the
25   nonmaritime obligations of the contract."  And that quotation
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

88C9NOBA
```
1    is from page 315 of the opinion.
2            It's clear that the first situation does not apply
3    here.  The contracts in this case deal primarily with the sale
4    of goods.  Each is styled as a "Confirmation of Sale."  See
5    Exhibits 1 to 6 of the plaintiff's letter of July 7, 2008.
6            Each of the contracts sets forth the standard terms
7    one expects to see in a contract for a sale of goods, including
8    a buyer, a seller, a price, quantity, and quality.
9            The contracts also set forth the terms of payment.
10           The contracts do, however, specify some details about
11   shipment.  Some indicate shipment dates and others the actual
12   ships to be used.  The contracts specify that "discharging
13   costs" are to be borne by the buyer.  See, for example, Exhibit
14   1 to the plaintiff's letter of July 7, 2008.
15           But, the contracts are not themselves contracts for
16   the carriage of goods and they clearly contemplate separate
17   bills of lading to be negotiated between the seller and a third
18   party carrier.
19           Materially similar contracts were found not to have
20   maritime commerce as their principal objective in Aston
```
Page 8

88C9NOBA

21   Agro-Industrial AG v. Star Grain Limited, 2006 U.S. District
22   Court, LEXIS 91636, (Southern District of New York,
23   December 20, 2006).  Star Grain considered contracts for the
24   sale of wheat that contained some details about the shipment of
25   the wheat such as, "the conditions under which the shipment and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

88C9NOBA

1    unloading of the wheat should occur," and how demurrage costs
2    were to be calculated.  See pages 1 to 2 of this opinion.  The
3    court held that despite these details, the contracts' "primary
4    objective was undoubtedly the sale of wheat," not "the
5    transportation of goods at sea," at page 9."
6            Similarly, in Shanghai Sinom Import and Export v.
7    Exfin (India) Mineral Ore Company, 2006 A.M.C. 2950, (Southern
8    District of New York 2006), an oral opinion, this court, that
9    is I, considered a contract for the sale of iron ore that also
10   included maritime provisions "requiring the ore to be shipped
11   by sea and specifying certain requirements regarding the
12   conditions for such shipment." 2006 A.M.C. at 2950.  Noting the
13   dangers of interpreting federal maritime jurisdiction too
14   broadly, this court decided it did not have jurisdiction
15   because the contract was "essentially a land-based contract for
16   the sale of goods," at page 2954.
17           Although the contracts here clearly contemplate
18   shipping, the bulk of the contracts are devoted to defining
19   terms of sale rather than terms of transport.  The fact that
20   the movement of the goods over sea is essential to the
21   performance of the contract does not by itself make a contract
22   maritime.  If that were so, then any contract for the sale of
23   goods between countries on different continents would become
24   maritime law.  The court does not find support for so broad an
25   interpretation of its maritime jurisdiction.  For similar

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

88C9NOBA

1    reasons, that the contracts for sale of goods incidentally
2    specify some terms of transport does not make their principal
3    objective a maritime one.
4            The second basis for admiralty jurisdiction, however,
5    is where the dispute "arises from a breach of maritime
6    obligations that are severable from the nonmaritime obligations
7    of the contract."  That is to say, to the extent that the
8    contracts here are mixed contracts, if the dispute concerns
9    those parts of the contracts that are maritime in nature, then
10   this court has jurisdiction.  Because the dispute does concern
11   those parts of the contract that are maritime in nature, this
12   provides a basis for the court's jurisdiction.
13           The dispute here centers on the payment of demurrage
14   that resulted from delays in the discharge of ships' cargoes at
15   their destination ports.  Resolution of the competing claims
16   required the arbitration panel to analyze a number of
17   obligations under the contracts.  These included provisions
18   relating to the assignment of discharging costs, conditions for
19   the commencement of discharge, the calculation of demurrage
20   rates, and the parties' obligations under related bills of
21   lading, letters of credit, and a charter party.  See, for
22   example, the interim final arbitration award, Exhibit 7 to the
23   plaintiff's letter of July 7, 2008 at pages 7, 17, 19, 24, 33,
24   and many other places.
25           Such obligations fall squarely within the court's

Page 9

88C9NOBA
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

88C9NOBA
1  admiralty jurisdiction.  In deciding whether obligations are
2  maritime in nature, the test is, "whether the subject matter of
3  the dispute is so attenuated from the business of maritime
4  commerce that it does not implicate the concerns underlying
5  admiralty and maritime jurisdiction."  That is from Atlantic
6  Mutual Insurance Company v. Balfour Maclaine International
7  Limited, 968 F.2d 196, page 200, (Second Circuit 1992).
8          Far from being attenuated from the business of
9  maritime commerce, discharge of cargo, calculation of
10 demurrage, bills of lading, and letters of credit are subjects
11 intimately connected to the business of maritime commerce.
12 Federal adjudication of disputes over such matters serves the
13 goals of admiralty jurisdiction in providing "a neutral federal
14 forum and a uniform body of law to adjudicate rights and
15 liabilities as they relate to the trafficking of sea-faring
16 vessels," from the same place in the Atlantic Mutual case.
17 Consequently, admiralty jurisdiction is warranted over disputes
18 between the parties arising out of these obligations.
19         Reference to the contract at Exhibit 1 clearly
20 provides for a variety of obligations that the buyer in this
21 case undertook, which are not simply obligations to pay but are
22 obligations to see to certain performance, and that performance
23 relates to things like how the vessel should discharge, how lay
24 time should be treated, even what the water draft should be at
25 the port of discharge, and furthermore, the parties then
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

88C9NOBA
1  incorporate additional provisions from an underlying charter
2  party.
3          Mr. DeMay argues, as a very well made argument,
4  indeed, that these are simply conditions of payment.  But, of
5  course, all conditions between commercial parties, maritime and
6  otherwise, boil down to agreements to pay if the conditions
7  that are established are not satisfied.  And these are no
8  different in that regard from any other provision that
9  specifically requires that vessels be discharged in particular
10 ways.  All such provisions boil down to an agreement to pay
11 damages or pay costs in some way if those conditions are not
12 met.
13         The question is:  What are you paying for?  And here,
14 it seems clear, that what the buyer is agreeing to do is to pay
15 certain specifically maritime obligations are not met, or to
16 pay for particular shipping costs, to be calculated in ways
17 that, quite understandably, are referred to arbitrators with
18 expertise in admiralty matters, who then proceed to decide the
19 case by reference to various maritime commercial concepts.
20         Anyone who reads the arbitration agreement, it seems
21 to me, is forced to the conclusion that what these parties are
22 disputing in this case is nothing related to the sale of sugar
23 but is everything related to the proper conduct of the vessel
24 with respect to discharging the conduct.
25         Now, the parties have cited a number of district court
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

88C9NOBA
1  cases.  And, of course, it's worth remembering that none of
Page 10

88C9NOBA

2  these cases, whoever cites them and whichever side they seem to
3  fall on, are binding authority in this court. Nevertheless,
4  the court respects the value of consistency and the importance
5  of considering those cases and specifically respects the
6  expertise of the judges who decided them.
7        So, I have considered those cases. And it seems to me
8  that the holding in Star Grain, the principal case on which the
9  defendant relies, is not really to the contrary. That case was
10 similar to this one insofar as the claim there was also for the
11 payment of demurrage. However, as I read the case, the claim
12 in Star Grain arose not out of a specific obligation in the
13 contract with regard to demurrage but ultimately from a
14 standard contract term that assigned the risk of loss of goods
15 during transit to the buyer. See page 14 of 2006 U.S. District
16 Court LEXIS 91636.
17        Because the demurrage was the result of damage to the
18 goods during transit, the dispute centered on this standard
19 nonmaritime contract term and not on parts of the contract that
20 were, "uniquely maritime," quoting from page 12 of the opinion.
21        Now, it's not entirely clear to me that the uniquely
22 maritime standard applied in Star Grain is exactly consistent
23 with the standard laid down by the Second Circuit in Atlantic
24 Mutual Insurance, which seems to me to put the burden to some
25 degree -- the presumption in the other direction saying that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

88C9NOBA

1  the provisions are not maritime if they are so attenuated from
2  maritime commerce as opposed to that they are only to be
3  considered maritime if they are uniquely maritime.
4        It may be that the court in Star Grain applied a
5  narrower rule of maritime jurisdiction than the Second Circuit
6  law justifies.
7        But this case is sufficiently different from Star
8  Grain that I don't have to decide in any way whether I would
9  decide Star Grain the same way as Judge Daniels did. This case
10 concerns obligations that are common and instrumental features
11 of maritime contracts and not terms that are typical features
12 of contracts for the sale of goods generally.
13        Accordingly, it's hereby ordered that the defendant's
14 motion to vacate this court's April 15, 2008 ex parte order for
15 process of maritime attachment is denied.
16        Now, Ms. Orozco, one of the things I always wonder
17 about with these maritime attachment cases is when do they end?
18 What typically happens, it seems to me -- and again, I'm hardly
19 an expert in this stuff -- is that a plaintiff brings an action
20 in this court and seeks maritime attachment by way of gaining
21 security, and then doesn't really have any intention of
22 following up the case. Here, the case is decided in some other
23 forum, usually an arbitral forum. And in this case if I have
24 the timing right, the arbitration actually happened in the
25 first place and then this was sought in aid of execution of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

88C9NOBA

1  judgment.
2        Is this a tempest in a teapot? Do you have money?
3  And if so, how much do you have? And what happens by way of --
4        MS. OROZCO: Procedurally, we actually have not
5  captured any funds yet. But what the intention would be, would
6  be that in the event we capture funds, we would move to confirm

Page 11

88C9NOBA

7    the award in this court.  And once the award is confirmed,
8    which we have no reason to believe it would not be confirmed,
9    it's a London arbitrating, then we would move to secure any
10   security to satisfy that New York judgment.
11        THE COURT:  But how long does this go on?  I don't
12   know -- I gather from the fact that Mr. DeMay is here, that the
13   defendant exists and has ongoing business and can afford to
14   retain a lawyer to engage in this dispute.  So maybe some day
15   some money will show up in this district.
16        But, one thing that has concerned me, both from a
17   very, perhaps, pedantic concern for the court's docket, to a
18   more substantive concern about the nature of these attachments,
19   is that it's one thing to attach property that's here, even if
20   that is intangible property.  It's another thing to have a sort
21   of open-ended order that will attach something someday if it
22   should appear when there is no particular reason, other than
23   the fact that a lot of money comes through New York, to assume
24   that it's ever going to.
25        Now, I've had to deal with this issue in other cases
             SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                              25

88C9NOBA

1    and it seems to me the Second Circuit law is clear that these
2    prospective attachments are valid.  It seems to me that the
3    underlying Second Circuit cases are ones precisely in which the
4    district court issued an order saying you could attach some
5    money transfer when nobody actually was aware of a particular
6    transfer being there.  So, the validity of this I take as
7    established by circuit case law, but I don't think, as far as I
8    know, that the circuit has addressed:  Is this open-ended
9    forever, or at what point is it perfect for a court to say:
10   But there ain't no property to attach, and there never has
11   been, and it's unclear when, if ever, there will be, and why
12   don't we just close this up.
13        Now, this one hasn't been pending for very long and I
14   don't know that we're close to any point of whatever it might
15   be of closing it down.  But, do you have any thought or
16   suggestion as to when this just becomes ridiculous?
17        MS. OROZCO:  I do, your Honor.  Actually it's an issue
18   that we deal with.  Our general rule of thumb, if we have not
19   caught any funds after about six to eight months -- depending
20   upon what type of information we can find that confirms that
21   the defendant is still in business or that they are not in
22   business or that there are eight other attachments -- if we
23   haven't caught funds after about the six-to-eight-month period,
24   we generally recommend to our client that we dismiss without
25   prejudice.  In the future if you have information; you discover
             SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                              26

88C9NOBA

1    they are trading, they are liquid, we can revisit, perhaps
2    reopening the file.  But that is our general recommendation for
3    the same reason of it's overwhelming the courts.  It's
4    overwhelming to us, and it's daily service -- it's throwing
5    money -- the client spends money for daily service and they are
6    getting nowhere.  And if the company is really not trading,
7    there's really no point.  The attachment is there.
8        It can be -- we've had cases where we've dismissed the
9    attachment and then we've gotten information and refiled and
10   we've caught money within 30 days, but it's generally -- we do
11   put an end to it.  We go back to our clients and say, look,
                        Page 12

88C9NOBA

12  this is -- you know.
13        THE COURT:  Well, of course, that's what you do and
14  you're free to do as you like.  The question is --
15        MS. OROZCO:  As are you?
16        THE COURT:  Well, that's the question.  Am I?  Is this
17  solely a matter for my discretion, or are there any rules that
18  ought to apply here?
19        Now, at this point -- I just said the date, now I'm
20  forgetting.  It was April --
21        MS. OROZCO:  April 12 it was issued.  I believe we
22  started serving April 15.
23        THE COURT:  So, it's been four months and nothing has
24  turned up yet.  Certainly six months sounds like to me
25  relatively an outside period unless there is some evidence that
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                              27

88C9NOBA
1   something is likely to happen now.
2         Again, I suppose it's possible that a party could try
3   to simply avoid New York for a period and then if something
4   gets vacated resume normal business practices.  I doubt that
5   would be easy to do, but maybe it's possible.
6         And I suppose, further, that absent the process of
7   daily service and having an open order, you would never really
8   have any way of knowing whether that's resumed.
9         At any rate, it seems to me that come October this is
10  going to be vacated anyway if there is not some success in
11  attaching something.  And I don't know any way of dealing with
12  this kind of problem other than by rule of thumb of that sort.
13        Mr. DeMay, do you have a thought or -- this is a
14  different issue than what you all came here to talk about,
15  but --
16        MR. DeMAY:  Your honor, I've been on both sides of the
17  transaction.  I take it as a given that no Rule B case would be
18  allowed to remain open-ended.
19        THE COURT:  I should think not.
20        MR. DeMAY:  My understanding is that under Rule 4,
21  there's a 120-day limit for service of process.  If the
22  defendant is one on whom service of process can be made in the
23  United States, I think that 120-day rule probably would apply
24  absent good cause.  If the defendant is located overseas, my
25  understanding is the 120-day rule does not strictly apply.
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                              28

88C9NOBA
1   It's up to the court's discretion; may be applicable in a case
2   where the defendant is located in a western nation where
3   service can easily be made.
4         But my understanding is that Rule B is essentially
5   equitable in nature.  It's subject to the court's discretion.
6   The court can limit the attachment; it can vacate an
7   attachment.  So I would read into that, that the court has
8   inherent power, after a passage of time that the court deems to
9   be reasonable, to decide that there is no point in continuing,
10  that the case would have to be dismissed without prejudice.
11        THE COURT:  Well, that sounds about right to me.  I
12  think what I've done in the past -- and I don't know whether
13  there's ever been a particular time -- but once I started
14  seeing these things piling up on the docket, I did a little
15  project of just issuing orders saying tell me what's going on.
16  And it turned out that most of the plaintiffs had attached
                          Page 13

88C9NOBA

17  something during that period and we just didn't know about it.
18  So, they weren't totally dormant.  But it seems to me that some
19  sort of time limit is appropriate.
20       And I guess it sounds as if the practice at the bar so
21  far has been not to include such a time period, an expiration
22  date in the order of attachment itself.  And that makes some
23  sense.  It may be that leaving this to case-by-case issues and
24  allowing the plaintiff an opportunity to explain why they
25  think, if they do, that the order should be extended after some

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

88C9NOBA

1   period of time, is the best way to go.
2        But at any rate, what I'm indicating is you can expect
3   that come October either this will be vacated outright or I'll
4   be at least asking the plaintiff for some account of is there
5   any reason they can think of why this should go on.  Of course,
6   it's my expectation that the defendant will say no, it
7   shouldn't.  And barring some new news, this dispute is resolved
8   now only for the next two months and it may well be that
9   today's order is largely academic.
10       All right.  Thank you very much.
11       MS. OROZCO:  Thank you, your Honor.
12       MR. DeMAY:  Thank you, your Honor.
13       (Adjourned)
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300